**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TETHYAN COPPER COMPANY PTY LIMITED,<br><br>            *Petitioner*,<br><br>      v.<br><br>ISLAMIC REPUBLIC OF PAKISTAN,<br><br>            *Respondent*. | Civil Action No. 1:19-cv-02424 (TNM) |

**MEMORANDUM OF LAW IN SUPPORT OF
RESPONDENT'S RENEWED MOTION TO STAY PROCEEDINGS,
OR IN THE ALTERNATIVE, TO DISMISS THE PETITION**

## <u>TABLE OF CONTENTS</u>

**Page**

BACKGROUND ................................................................................................................. 2

I.    The Dispute Between Petitioner and Pakistan ................................................. 2

II.   Arbitration Proceedings .................................................................................. 4

ARGUMENT ..................................................................................................................... 8

I.    This Action Should Be Stayed Pending the Completion of the ICSID Annulment
Proceedings ................................................................................................... 9

    A.    This Court Has the Inherent Power to Stay this Proceeding ................................ 9

    B.    The Benefits of a Stay Decisively Outweigh Any Harm .................................... 11

        (1)    Judicial Economy Is Served by a Stay .................................................... 11

            a.    No Security Is Required .......................................................... 13

        (2)    Hardship to Pakistan ........................................................................ 14

        (3)    No Harm to TCC .............................................................................. 16

        (4)    Public Policy Weighs In Favor Of A Stay ............................................. 17

II.   This Court Has No Jurisdiction Under the FSIA ......................................... 17

    A.    There Is No Personal Jurisdiction Because Pakistan Was Not Properly
Served .................................................................................................... 18

    B.    There Is No Subject Matter Jurisdiction Because None of the FSIA
Sovereign Immunity Exceptions Are Present Here ............................................ 21

III.   The Award Is Not Entitled to Full Faith and Credit ....................................... 28

    A.    The Tribunal Lacked Jurisdiction to Hear this Arbitration and Issue an
Award ..................................................................................................... 29

    B.    The Manifestly Excessive Damages Award Results in a Denial of Due
Process .................................................................................................... 31

CONCLUSION ................................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*9REN Holding S.A.R.L. v. Kingdom of Spain,*
2020 WL 5816012 (D.D.C. Sept. 30, 2020) .................................................................9, 14

*Abur v. Republic of Sudan,*
437 F. Supp. 2d 166 (D.D.C. 2006) ..................................................................17, 19

*Adetoro v. King Abdullah Academy,*
2019 WL 3457989 (D.D.C. July 30, 2019)...................................................19, 20

*Angellino v. Royal Family Al-Saud,*
688 F.3d 771 (D.C. Cir. 2012) ...........................................................................18

*Aquamar S.A. v. Del Monte Fresh Produce N.A.,*
179 F.3d 1279 (11th Cir. 1999) .........................................................................25

*Argentine Republic v. Amerada Hess Shipping Corp.,*
488 U.S. 428 (1989)............................................................................................17

*Ashraf-Hassan v. Embassy of France in the U.S.,*
40 F. Supp. 3d 94 (D.D.C. 2014) ................................................................25, 26

*Barot v. Embassy of the Republic of Zambia,*
785 F.3d 26 (D.C. Cir. 2015) .............................................................................19

*Belize Soc. Dev., Ltd. v. Gov't of Belize,*
668 F.3d 724 (D.C. Cir. 2012) ...........................................................................11

*Belize Soc. Dev. Ltd. v. Gov't of Belize,*
794 F.3d 99 (D.C. Cir. 2015) ......................................................................21, 27

*Blue Ridge Invs., L.L.C. v. Republic of Argentina,*
735 F.3d 72 (2d Cir. 2013)..................................................................................27

*Chevron Corp. v. Republic of Ecuador,*
795 F.3d 200 (D.C. Cir. 2015) ....................................................................21, 27

*Creighton Ltd. v. Gov't of the State of Qatar,*
181 F.3d 118 (D.C. Cir. 1999)................................................................25, 26, 27

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela,*
No. 1:17-cv-00151-VAC-SRF, Mem. Order, ECF No. 154 (D. Del. Dec. 12,
2019) ...............................................................................................................16, 17

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*de Sousa v. Embassy of Rep. of Angola*,
    229 F. Supp. 3d 23 (D.D.C. 2017) ................................................................19

*DRC, Inc. v. Republic of Honduras*,
    774 F. Supp. 2d 66 (D.D.C. 2011) ................................................................13

*Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*,
    156 F.3d 310 (2d Cir. 1998) .........................................................................16

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
    905 F.2d 438 (D.C. Cir. 1990) ...............................................................25, 26

*Getma Int'l v. Republic of Guinea*,
    142 F. Supp. 3d 110 (D.D.C. 2015) .......................................................13, 16

*Gutch v. Fed. Republic of Germany*,
    255 F. App'x 524 (D.C. Cir. 2007) ..............................................................25

*Hulley Enters. v. Russian Fed'n*,
    2020 WL 6822666 (D.D.C. Nov. 20, 2020) ...................................11, 13, 14, 16

*Hulley Enters. v. Russian Fed'n*,
    211 F. Supp. 3d 269 (D.D.C. 2016) ..............................................................11

*Infrastructure Servs. Luxembourg S.A.R.L. & Energia Termosolar B.V. v.*
    *Kingdom of Spain*,
    No. 1:18-cv-01753-EGS, Minute Order (D.D.C. July 15, 2020)...............10, 11, 12

*Johnson v. Hugo's Skateway*,
    974 F.2d 1408 (4th Cir. 1992) ......................................................................32

*Johnson v. Parrish*,
    827 F.2d 988 (4th Cir. 1987) ........................................................................32

*Karkey Karadeniz Elektrik Uretim A.S. v. Islamic Republic of Pakistan*,
    No. 1:18-cv-01461-RJL, Minute Order (D.D.C. July 24, 2019) ..........................10

*Landis v. N. Am. Co.*,
    299 U.S. 248 (1936).................................................................................9, 13

*Library of Cong. v. Shaw*,
    478 U.S. 310 (1986)......................................................................................24

*Luciano v. Olson Corp.*,
    110 F.3d 210 (2d Cir. 1997)..........................................................................32

## TABLE OF AUTHORITIES
(Continued)

**Page(s)**

*Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    703 F.2d 1152 (10th Cir. 1981) ............................................... 31

*Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*,
    397 F. Supp. 3d 34 (D.D.C. 2019) ..................................... 10, 11, 14, 15

*Mobil Cerro Negro Ltd. v. Bolivarian Republic of Venezuela*,
    863 F.3d 96 (2d Cir. 2017) ................................................. 28

*Nextera Energy Global Holdings B.V. v. Kingdom of Spain*,
    2020 WL 5816238 (D.D.C. Sept. 30, 2020) ............................... *passim*

*Novenergia II - Energy & Env't (SCA) v. Kingdom of Spain*,
    2020 WL 417794 (D.D.C. Jan. 27, 2020) ................................. 12, 13

*OI European Group B.V. v. Bolivarian Republic of Venezuela*,
    No. 1:16-cv-01533-ABJ, Min. Order (D.D.C. Dec. 21, 2017) ............... 10

*Samantar v. Yousuf*,
    560 U.S. 305 (2010) ....................................................... 17

*Sanjuan v. IBP, Inc.*,
    160 F.3d 1291 (10th Cir. 1998) ........................................... 31

*Saudi Arabia v. Nelson*,
    507 U.S. 349 (1993) ....................................................... 20

*Seetransport Wiking Trader v. Navimpex Centrala Navala*,
    989 F.2d 572 (2d Cir. 1993) ............................................... 26

*Stati v. Republic of Kazakhstan*,
    199 F. Supp. 3d 179 (D.D.C. 2016) ....................................... 27

*Tatneft v. Ukraine*,
    771 F. App'x 9 (D.C. Cir. 2019) .......................................... 27

*TECO Guatemala Holdings, LLC v. Rep. of Guatemala*,
    2019 WL 4860819 (D.D.C. Oct. 1, 2019) .................................. 28

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
    30 F.3d 148 (D.C. Cir. 1994) ............................................. 19

*Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar.*
*Ass'n*,
    455 U.S. 691 (1982) ....................................................... 29

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Unión Fenosa Gas, S.A. v. Republic of Egypt*,
    2020 WL 2996085 (D.D.C. June 4, 2020) ................................................................10, 12, 15

*United Int'l Holdings Inc. v. Wharf Holdings Ltd.*,
    210 F.3d 1207 (10th Cir. 2000) ........................................................................................31

*V.L. v. E.L.*,
    136 S. Ct. 1017 (2016) ................................................................................................29, 31

*Verlinden B.V. v. Cent. Bank of Nigeria*,
    461 U.S. 480 (1983) ..........................................................................................................21

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*,
    296 F.3d 1154 (D.C. Cir. 2002) ..............................................................................24, 25, 26

**Statutes**

22 U.S.C. § 1650 ........................................................................................................28, 29

28 U.S.C. § 1330 ..............................................................................................................18

28 U.S.C. § 1605 .......................................................................................................*passim*

28 U.S.C. § 1608 ..............................................................................................17, 18, 19, 20

Respondent Islamic Republic of Pakistan ("Pakistan") submits this memorandum in support of its renewed motion to stay these proceedings, or in the alternative, pursuant to Rules 12(b)(1), 12(b)(2), 12(b)(5) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Petition to Enforce the Arbitral Award (ECF No. 1, filed August 9, 2019) (the "Petition").[1]  This Court should, as has every court in this Circuit when presented with this issue, stay these proceedings.

By this action, Petitioner Tethyan Copper Company Pty Ltd. ("TCC"), an Australian company, seeks to enforce an award issued on July 12, 2019, by an arbitral tribunal constituted under the International Centre for Settlement of Investment Disputes ("ICSID") and the Agreement between Australia and the Islamic Republic of Pakistan on the Promotion and Protection of Investments, dated 7 February 1998 (the "Australia-Pakistan Treaty") in an arbitration between Pakistan and Petitioner, captioned *Tethyan Copper Company Pty Limited v. Islamic Republic of Pakistan* (ICSID Case No. ARB/12/1) (the "Award").  As set forth in detail below, the Award is currently the subject of an annulment proceeding before ICSID and is one of the largest ICSID awards ever to be subject to an annulment proceeding.  Accordingly, at this time, the Award should not be confirmed by this Court.[2]

In the ICSID annulment proceeding, Pakistan seeks to vacate the Award in whole or in part based on numerous errors by the arbitral tribunal in rendering the Award.  A number of the arguments Pakistan advanced in the annulment proceeding could impact those raised before this Court.  A stay of proceedings in this Court during the pendency of the annulment proceeding will

---

[1] Pakistan reserves all rights to object to the jurisdiction of this Court, and by this motion does not consent to jurisdiction or waive any objections based on sovereign immunity or otherwise.

[2] Pakistan's counsel met and conferred with Petitioner's counsel on December 30, 2019. Petitioner's counsel does not consent to the requested stay.

therefore avoid the possibility of inconsistent decisions.  In addition, should this Court confirm the Award, and Petitioner thereafter attempts to enforce it against assets of Pakistan, a whole series of additional litigations could be rendered moot, with the attendant waste of judicial (and the parties') resources, if the Award is later annulled.  Moreover, if enforcement is allowed to go forward prior to the resolution of those challenges, the consequences to Pakistan's economy and political stability would be devastating.  Accordingly, in the interest of judicial economy and in view of the enormous hardship that would be inflicted on Pakistan if this $6 billion Award were to be even partially enforced and subsequently annulled, the Petition should be stayed until the annulment proceeding has been fully and finally resolved.  Petitioner will not be prejudiced by any delay in enforcement because post-judgment interest is accruing on the Award at the rate of several hundred thousand dollars per day.

In the alternative, should the court consider the merits of the motion to dismiss at this time, the Petition should be dismissed because: (a) this Court does not have jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"); and (b) the award is not entitled to full faith and credit.[3]

## BACKGROUND

### I.      The Dispute Between Petitioner and Pakistan

This dispute arises out of the denial of a license for a contemplated mining project involving TCC.  *See* ECF 1-1, Declaration of Matthew S. Rozen in Support of Petition to Enforce Arbitral Award, Exhibit B, Tribunal's Decision on Jurisdiction and Liability ("Rozen Decl.

---

[3] If the Court determines to stay the action at this time rather than rule on Pakistan's motion to dismiss, Pakistan reserves the right to raise and further brief its motion to dismiss arguments in the event the stay is subsequently lifted in this proceeding following a decision in the ICSID annulment proceeding.

Ex. B") at ¶¶ 224-25.  The mining project was envisioned to be developed at Reko Diq in the Chagai Hills, a region in western Balochistan, Pakistan.  To date, no actual mining of copper or other minerals has taken place at Reko Diq.  *See* Declaration of John M. Conlon in Support of Respondent's Renewed Motion to Stay Proceedings, or in the Alternative, to Dismiss the Petition, dated November 30, 2020 ("Conlon Decl.") Ex. A (Pakistan's Application for the Annulment of the Award) at ¶ 11.

On July 29, 1993, the Balochistan Development Authority ("BDA"), a statutory corporation under the Government of Balochistan ("GOB"), and a predecessor in interest to TCC, concluded the Chagai Hills Exploration Joint Venture Agreement (the "CHEJVA"), which established a joint venture to explore mineral deposits and evaluate possibilities for mining near Reko Diq.  Rozen Decl. Ex. B at ¶¶ 217, 263.  Over time, there was an addendum to the CHEJVA and a series of additional agreements executed in furtherance of the project.  *Id*. at ¶ 265.

In May 2002, Exploration License EL-5 ("EL-5") was granted by the Balochistan Licensing Authority to the joint venture to conduct mining-related exploration for a period of three years.  *Id*. at ¶ 284.  This license was twice renewed.  *Id*. at ¶ 285.

On November 28, 2006, a petition was filed in the Balochistan High Court seeking to have the CHEVJA and related agreements declared invalid because, *inter alia*, the GOB had acted illegally in granting mineral titles for Reko Diq.  By order dated June 26, 2007, the Balochistan High Court dismissed the petition.  An appeal of this decision, as well as other challenges to the actions of GOB in entering into the agreements and issuing licenses, was submitted to the Pakistan Supreme Court.

On February 15, 2011, TCC formally submitted a Mining Lease Application for mining in Reko Diq.  Rozen Decl. Ex. B at ¶ 506.  The Licensing Authority issued a Notice of Intent to

Reject the Mining Lease Application on September 21, 2011, followed by a final rejection on November 15, 2011. *Id*. at ¶¶ 513, 521. Among the bases for its decision, the Licensing Authority cited defects in the feasibility studies that TCC had prepared for mining operations, the fact that TCC sought to conduct mining operations in areas where no feasibility studies had been conducted, the fact that TCC failed to establish a smelter, and that the application was procedurally defective because TCC had filed the application rather than the joint venture. *Id*. at ¶ 513.

On July 1, 2013, the Pakistan Supreme Court issued a decision ("Pakistan Supreme Court Decision") which found that the CHEVJA was "executed contrary to the provisions of the Mineral Act, 1948, the Mining Concession Rules, 1970 framed thereunder, the Contract Act, 1872, the Transfer of Property Act, 1883, etc., and is even otherwise not valid, therefore the same is declared to be illegal, void and *non est*." *See* Conlon Decl. Ex. B (July 1, 2013 Order of the Supreme Court of Pakistan) at 16. The Supreme Court further found that the other associated agreements were "illegal and void" and "do not confer any right on [TCC] in respect of the matters covered therein." *Id*. The EL-5 license was also declared to be invalid. TCC participated in these court proceedings without objection.

## II.     Arbitration Proceedings

On November 28, 2011, TCC commenced an ICSID arbitration against Pakistan. In its Request for Arbitration, TCC alleged that its claims against Pakistan were authorized by the Australia-Pakistan Treaty. Following the filing of the Request for Arbitration, Pakistan never consented in writing to the submission of the dispute to an ICSID Tribunal under Article 13(2)(b) of the Australia-Pakistan Treaty. Pakistan also objected that the claimed contract right under the CHEJVA was not an "asset" subject to arbitration under the Australia-Pakistan Treaty. In addition, Pakistan asserted that because the contracts and licenses were tainted by corruption, they were not the proper subject of an arbitration and TCC could not seek to enforce the claimed contract rights

based on unclean hands.  Pakistan further objected that the denial of the mining license was a reasoned decision, properly based on fact and Pakistani law, which did not amount to an expropriation and could not be challenged in arbitration.

On July 12, 2019, the Tribunal issued its final Award in the ICSID arbitration.[4]  In its Award, the Tribunal assessed damages against Pakistan in the shocking amount of approximately $6 billion, comprised of:  (a) $4.087 billion in "compensation"; (b) pre-award interest from November 15, 2011 to July 12, 2018 at a rate of the U.S. Prime Rate plus 1 percent, compounded annually; (c) $2,533,277.08 for the costs of the arbitration; (d) $59,447,596.60 for TCC's legal fees and expenses; and (e) post-award interest at the rate of the U.S. Prime Rate plus 1 percent, compounded annually.

The amount of the Award was grossly disproportionate both to TCC's claims and to Pakistan's resources.  Indeed, the Award amounts to 2% of Pakistan's annual gross domestic product and 40% of its total liquid foreign reserves.[5]

On November 8, 2019, Pakistan filed an Application for the Annulment of the Award ("Annulment Application") with ICSID.  *See* Conlon Decl. Ex. A.  Pakistan argued that the Award should be annulled pursuant to Articles 52(1)(a), (b), (d), and (e) of the ICSID Convention because:

---

[4] The Tribunal had previously issued a Decision on Jurisdiction and Liability and a Decision on Respondent's Application to Dismiss the Claims.

[5] The Award is the same amount as the 2019 loan package to Pakistan from the International Monetary Fund Executive board, obtained on an emergency basis to stabilize Pakistan's economy and government.  *See* Conlon Decl. Ex. C (*IMF board approves $6 billion loan package for Pakistan*, Reuters, available at https://www.reuters.com/article/us-pakistan-imf/imf-board-approves-6-billion-loan-package-for-pakistan-idUSKCN1TY2JW).  Enforcement of the Award at this time would effectively negate the loan, destabilizing Pakistan's economy and government.  It would therefore be at odds with official U.S. policy with respect to Pakistan: "Since 2001, U.S. policy has broadly been to assist the creation of a more stable, democratic, and prosperous Pakistan that actively combats religious militancy." Conlon Decl. Ex. D (*Pakistan-U.S. Relations*, Congressional Research Service, available at https://fas.org/sgp/crs/row/IF11270.pdf).

(a) the Tribunal was not properly constituted; (b) the Tribunal manifestly exceeded its powers; (c) there had been a serious departure from a fundamental rule of procedure; and (d) the Award failed to state the reasons on which it is based.  *Id*.

On November 18, 2019, the Secretary-General of the ICSID sent a letter to the parties' counsel notifying them of the registration of the Annulment Application and stating that, pursuant to Article 52(5) of the ICSID Convention and ICSID Arbitration Rule 54(2), "the enforcement of the Award is provisionally stayed."  Conlon Decl. Ex. E.

On March 25, 2020, ICSID constituted the *ad hoc* annulment committee (the "Committee") to consider the Annulment Application and on September 17, 2020, the Committee issued its decision continuing the stay on a conditional basis (the "Stay Decision").  *See* ECF No. 31-1, Stay Decision.  The Stay Decision conditioned continuance of the stay on Pakistan's provision of a letter of credit and an undertaking, as specified by the Committee.  The Stay Decision stated that if Pakistan did not comply with these requirements within 30 days after notification of the decision—*i.e.*, by October 17, 2020—the stay of enforcement in the amount of 50% of the Award, plus accrued interest as of the date of the Decision on Stay, would be lifted upon TCC's provision of an undertaking as specified by the Committee.  The Committee also noted that even if it lifted its stay, "national courts might even grant a separate stay of enforcement of an ICSID award irrespective of ongoing ICSID proceedings" and specifically acknowledged that this Court has the power to stay this action in the United States.  ECF No. 31-1, Stay Decision at 48 and fn. 235.  The Stay Decision also required, among other things, (1) TCC to place any funds recovered in judgment enforcement, if the stay were to be lifted, into an escrow account under the sole control of an international escrow agent and under the direction of the Committee, and (2) TCC to provide an

undertaking that if the Award were annulled, it would pay any amounts owed to Pakistan that Pakistan could not recover from the escrow account.

Pakistan was not able to satisfy the conditions for a continued stay of enforcement by October 17, 2020, and Petitioner provided the requisite undertaking to the Committee on October 22, 2020. The following week, on October 28, TCC submitted a resolution by its board of directors authorizing the execution of the undertaking on behalf of the board. On October 30, 2020, the Committee issued a further decision partially terminating the stay of enforcement. *See* ECF No. 33-1. The Committee held that "the stay of enforcement of the Award will be lifted in the amount of 50 percent of the Award plus accrued interest," and ordered TCC "to place into an escrow account under the sole control of an international escrow agent and under the direction of the Committee any amounts collected through enforcement of the Award" as TCC had undertaken to do. *Id*. at 5-6.

On July 31, 2020, Pakistan submitted its Memorial on Annulment ("Memorial"), a 193 page memorandum detailing the facts and legal authorities in support of its application. On that same date, Pakistan also filed its supporting exhibits and authorities. In its Memorial, Pakistan makes four principal arguments in favor of annulment. First, Pakistan argues that the Tribunal was not properly constituted and that there was a breach of procedure based on the lack of independence and impartiality of one of the arbitrators. In particular, Pakistan argues that one of the arbitrators engaged in improper conduct with respect to the damages analysis in this matter. Pakistan argues that virtually identical conduct by this arbitrator led to the annulment of another ICSID award,[6] and the same remedy should apply here. Memorial at 31-49. Second, Pakistan

---

[6] Conlon Decl. Ex. F (*Eiser Infrastructure Ltd. and Energia Solar Luxembourg S.A.R.L. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Decision on Annulment, dated June 11, 2020).

contends that the Tribunal failed to address Pakistan's submissions that the CHEJVA and related agreements were void under Pakistani law and not capable of qualifying as "assets" subject to arbitration under the Australia-Pakistan Treaty.  Memorial at 49-105.  Third, Pakistan argues that it never consented to submit this dispute to ICSID arbitration and the Tribunal failed to state the reasons for its finding of consent.  Memorial at 105-115. Fourth, Pakistan asserts that the Tribunal's assessment of damages was not authorized and constituted a serious departure from a fundamental rule of procedure.  Memorial at 115-193.

On October 30, 2020, TCC submitted its 211 page Counter Memorial on Annulment ("Counter Memorial") setting forth its objections to Pakistan's application, as well as its authorities and exhibits.  Pakistan and TCC will each submit an additional memorandum, along with supporting authorities and exhibits, to be followed by hearings scheduled for May 26-28, 2021. *See* Conlon Decl. Ex. G (Procedural Order No. 1, May 11, 2020).

Pursuant to this Court's November 9, 2020 Amended Minute Order, Respondent Pakistan now renews its motion to stay these proceedings, or in the alternative, pursuant to Rules 12(b)(1), 12(b)(2), 12(b)(5) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Petition to Enforce the Arbitral Award.

## ARGUMENT

This Petition, to enforce a $6 billion[7] Award against Pakistan, should be stayed in the interest of judicial economy and to avoid undue hardship to Pakistan, until its Annulment Application has been resolved by the Committee.  ICSID is the appropriate forum to resolve the

---

[7] At present, based on the Committee's Stay Decision, TCC is able to seek enforcement of 50% of the Award, or approximately $3 billion.

merits of this dispute between TCC, an Australian company, and Pakistan, and a decision by the Committee could moot this action in its entirety.

In the alternative, should the Court address the merits of the motion to dismiss this Petition, it should be dismissed because: (a) this Court does not have jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"); and (b) the award is not entitled to full faith and credit.

## I.   This Action Should Be Stayed Pending the Completion of the ICSID Annulment Proceedings

Rather than address the enforcement of an award that may be later annulled, this Court, as every court in this Circuit has done, should stay this action pending the outcome of the annulment proceedings before the Committee.

### A.   This Court Has the Inherent Power to Stay this Proceeding

As the Committee acknowledged (ECF 31-1, Stay Decision at 48), this Court has the "inherent" power to stay this action.  *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.").

Courts in this District uniformly invoke this power to stay enforcement proceedings pending the resolution of annulment proceedings before ICSID, even after the *ad hoc* annulment committees in those proceedings chose not to continue the ICSID stay.  *See, e.g., Nextera Energy Global Holdings B.V. v. Kingdom of Spain*, 2020 WL 5816238, at *2-3 (D.D.C. Sept. 30, 2020) (staying enforcement proceedings for €290 million award pending resolution of ICSID annulment proceedings because "Spain would be burdened by having to litigate the validity of arbitral awards in two forums"); *9REN Holding S.A.R.L. v. Kingdom of Spain*, 2020 WL 5816012, at *3 (D.D.C. Sept. 30, 2020) (staying enforcement proceedings for €41 million award pending resolution of

ICSID annulment proceedings because "[l]itigating the validity of arbitral awards in two forums would burden Spain"); *Unión Fenosa Gas, S.A. v. Republic of Egypt*, 2020 WL 2996085, at *4 (D.D.C. June 4, 2020) (granting a stay of enforcement of $2 billion award because, among other reasons, "there is a possibility that the award will be set aside" in the ICSID annulment proceedings); *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, 397 F. Supp. 3d 34, 40 (D.D.C. 2019) (staying enforcement proceedings for $75 million award during the pendency of ICSID annulment proceedings "in the interest of avoiding cross-border, piecemeal litigation"); *Infrastructure Servs. Luxembourg S.A.R.L. & Energia Termosolar B.V. v. Kingdom of Spain*, No. 1:18-cv-01753-EGS, Minute Order (D.D.C. July 15, 2020) (continuing stay of enforcement of $125 million award because "it is wiser to... stay these proceedings pending the opinion of the ICSID regarding Spain's petition to annul."); *Karkey Karadeniz Elektrik Uretim A.S. v. Islamic Republic of Pakistan*, No. 1:18-cv-01461-RJL, Minute Order (D.D.C. July 24, 2019) (staying $845 million award enforcement proceedings, even though the ICSID stay had already been lifted); *OI European Group B.V. v. Bolivarian Republic of Venezuela*, No. 1:16-cv-01533-ABJ, Min. Order (D.D.C. Dec. 21, 2017) (same for $372 million award).  This case should be no different.

That the Committee made the stay conditional, and Pakistan was not able to satisfy those conditions, is of no consequence.  *See, e.g.*, *Unión Fenosa Gas, S.A.*, 2020 WL 2996085, at *4-5 (finding Egypt's failure to comply with the conditions of the ICSID stay, including the posting of security, irrelevant because "[t]he conditions predicate for a stay in the ICSID [] are not synonymous with those pertinent here"); *Karkey Karadeniz Elektrik Uretim A.S.*, No. 1:18-cv-01461-RJL, Minute Order (D.D.C. July 24, 2019) (staying proceedings even where Pakistan was unable to provide partial security for the award in question); *see also Nextera Energy Global Holdings B.V.*, 2020 WL 5816238, at *1 (staying proceedings despite Spain's failure to furnish the

undertaking required by the ICSID annulment committee, including a recognition of the award as "final and binding" and an agreement "to unconditionally and irrevocably pay" the award within ninety days of a final decision on the annulment).

**B.      The Benefits of a Stay Decisively Outweigh Any Harm**

As other courts have done in deciding to stay enforcement actions pending the conclusion of an ICSID annulment proceeding, this Court should "weigh competing interests and maintain an even balance between the court's interests in judicial economy and any possible hardship to the parties." *Belize Soc. Dev., Ltd. v. Gov't of Belize*, 668 F.3d 724, 732-33 (D.C. Cir. 2012) (internal citation and quotation marks omitted).  In doing so, it should consider "the benefits of a stay, the hardship to the movant of denying a stay, and any injury to the nonmovant from issuing a stay." *Hulley Enters. v. Russian Fed'n*, 211 F. Supp. 3d 269, 280 (D.D.C. 2016).

(1)      Judicial Economy Is Served by a Stay

The benefits of a stay are overwhelming.  First, and decisively, judicial economy is better served, and party resources will be spared, by a stay of this action.  *Infrastructure Servs.*, No. 1:18-cv-01753, ECF No. 36 at 7 (finding a stay to be "the most efficient and fairest course" of action).  The pending annulment proceedings, when resolved, are likely to directly impact this action, and may even render it entirely moot.  Where "it is clear that the outcome of [the annulment] proceedings ... may affect this Court's determinations," a stay is warranted.  *Masdar Solar*, 397 F. Supp. 3d at 40  (citing *Hulley*, 211 F. Supp. 3d at 284); *see also Nextera Energy Global Holdings B.V.*, 2020 WL 5816238, at *2; *Hulley Enters. v. Russian Fed'n*, 2020 WL 6822666, at *6 (D.D.C. Nov. 20, 2020) ("*Hulley II*") (judicial economy favors a stay where foreign parallel proceedings "may be persuasive as to certain issues" such that the court's resolution of issues "may be a fruitless exercise").  Second, a stay not only "avoids the possibility of conflicting results between this Court's determination of enforcement and the ICSID's determination to annul the award[,]"

(*Infrastructure Servs.*, No. 1:18-cv-01753, ECF No. 36 at 7) but it also eliminates the time and expense associated with an appeal and any subsequent litigation.

The Court's decision in *Unión Fenosa Gas, S.A.* to stay proceedings under circumstances identical to those in this action is illustrative.[8]  The Court first observed that because "some of the arguments [Egypt] raised in its annulment petition are identical to those that it will offer to this Court in defending" the petition, "at a minimum the annulment proceedings may affect this Court's determination . . . by virtue of the[ir] persuasive value."   2020 WL 2996085, at *4 (internal quotation marks omitted).   Regardless of the likelihood of success, "[l]itigating essentially the same issues in two separate forums is not in the interest of judicial economy or in the parties' best interests."  *Id.*  The Court further found it irrelevant that the ICSID lifted its own stay following Egypt's failure to post the required security because "courts in this Circuit generally have not required foreign sovereigns to post security in order to secure a stay." *Id.* at *5 (internal quotation marks omitted) (citing *Novenergia II - Energy & Env't (SCA) v. Kingdom of Spain*, 2020 WL 417794, at *6 (D.D.C. Jan. 27, 2020)).  And like Egypt, the fact that Pakistan was unable to comply with the conditions for a continued stay of enforcement is irrelevant to the Court's consideration of a stay in this proceeding.

The same principles apply here.  As noted above, Pakistan's defense in this action raises many of the same issues that are already before the Committee, such that the outcome of this action may be directly impacted by the pending annulment proceedings.  For example, at issue both in

---

[8] Like *Unión Fenosa Gas, S.A.*, the Court in *Nextera Energy Global Holdings B.V.* also found it prudent to stay the enforcement action pending the outcome of the annulment proceedings, notwithstanding the ICSID annulment committee's decision to lift its stay.  2020 WL 5816238, at *2-3. In doing so, the Court found the risk of "inconsistent rulings" to be against the interest in judicial economy.  *Id.*  It also found that a balance of the hardships favors a stay because "Spain would be burdened by having to litigate the validity of arbitral awards in two forums" and there was a "risk of premature enforcement."  *Id.*

this case and in the annulment proceeding are the arguments that: (a) the Tribunal failed to address Pakistan's submissions that the CHEJVA and related agreements were void under Pakistani law and not capable of qualifying as "assets" subject to arbitration under the Australia-Pakistan Treaty (III.A *infra*, Memorial at 49-105 and Counter Memorial at 73-94); (b) the lack of consent by Pakistan to submit this dispute to ICSID arbitration (II.B *infra*, Memorial at 105-115, and Counter Memorial at 54-78); and (c) the Tribunal's assessment of damages was unauthorized, unreasonable, and violative of due process. (III.B *infra,* Memorial at 115-193, and Counter Memorial at 94-172).

### a.   No Security Is Required

With respect to the provision of security, the case law in this Circuit is clear that sovereign states are not required to provide security during a stay of enforcement proceedings. *See, e.g.*, *DRC, Inc. v. Republic of Honduras*, 774 F. Supp. 2d 66, 76 (D.D.C. 2011), vacated on other grounds, 999 F. Supp. 2d 1 (D.D.C. 2012) (holding that it would "not require the Republic of Honduras—a sovereign state that presumably is solvent and will comply with legitimate orders issued by courts in this country or in Honduras—to post any guaranty in this case"); *Getma Int'l v. Republic of Guinea*, 142 F. Supp. 3d 110, 118 n.10 (D.D.C. 2015) (finding that the Republic of Guinea need not post security during a stay because the cases where "[c]ourts [] require posting of security due to the risk posed to the petitioner's interest" "do not involve respondents that [are] solvent sovereigns"); *Novenergia II - Energy & Env't (SCA)*, 2020 WL 417794, at *6 (same); *see also Hulley II*, 2020 WL 6822666, at *13 (finding that the Russian Federation "is a sovereign country with economic tendrils that cross the globe, not an insecure potential debtor that must be required to post security lest there be no assets to seize at a later date").

(2)   Hardship to Pakistan

Denying a stay would present a "clear case of hardship or inequity" to Pakistan.  *Landis*, 299 U.S. at 255.  Even if 50% of the Award were to be enforced at this time, a $3 billion award would still be one of the largest ICSID awards and one of the largest ever to be subject to ICSID annulment proceedings.   Pakistan's economy is currently facing significant challenges and weaknesses, which have been magnified by the COVID-19 pandemic.  Permitting enforcement now would effectively negate half of the $6 billion 2019 IMF loan that was obtained for the sole purpose of stabilizing Pakistan's government and economy, and would result in a windfall for TCC.  *See* Conlon Decl. Ex. H (Expert Report of Jeffrey D. Sachs, Nov. 7, 2019) at ¶ 43; Conlon Decl. Ex. I (Expert Report of Shahid Javed Burki, Nov. 8, 2019) at ¶ 22; Conlon Decl. Ex. J (IMF Country Report No. 19/212, incorporating Press Release No. 16/264); *see also Hulley II*, 2020 WL 6822666, at *11 (internal quotation marks omitted) (noting that "the sheer enormity of the Award that may be enforced against a sovereign's treasury weighs in favor of the stay when 'there is a chance that the award might be set aside").  Given the enormity of the damages, and Pakistan's already weak economy, premature enforcement of the Award would have devastating effects on Pakistan.  The Award cannot be paid by re-allocating certain already budgeted state funds, but only by dramatically reducing, if not eliminating, spending on critical needs.  This would derail the economic stability of Pakistan and cause serious and immediate adverse consequences to the health and welfare of the people of Pakistan.  Indeed, hardship to sovereign states has been found for arbitral awards in the millions of dollars, far less than the billions at issue here.  *See, e.g., 9REN Holding S.A.R.L.*, 2020 WL 5816012, at  *1 (€41 million award); *Nextera Energy Global Holdings B.V.*, 2020 WL 5816238, at *1 (€290 million award); *Masdar Solar*, 397 F. Supp. 3d at 36, 40 ($75 million award).

The basic premise and stated objective of the Australia-Pakistan Treaty is to "promot[e] the flow of capital for economic activity and development."  Conlon Decl. Ex. K (Australia-Pakistan Treaty).  Premature enforcement of the Award would defeat that objective.  Although confirmation of the Award would not immediately lead to the seizure of Pakistan's assets, it is the start of a process that would quickly lead to that result.  Indeed, the only reason that Petitioner objects to the requested stay is that it intends to move forward with the seizure of assets as quickly as possible.  Such a seizure could result in a downgrade of Pakistan's credit rating and increased borrowing costs, which in turn would have further devastating impact on Pakistan's economy and its ability to borrow vital foreign currency for development and to purchase essential supplies.  A stay is absolutely necessary in the present circumstances to protect the population of Pakistan from the consequences of immediate enforcement of the Award, which includes impairing their ability to purchase food and maintain the status quo.

Although the requirement that any funds recovered by TCC must be placed into escrow limits some of the potential harm to Pakistan if the Award is later annulled in part or in full by the Committee, the harm is still substantial.  First, and as noted above, Pakistan would be deprived of the use of those funds during the COVID-19 pandemic and its aftermath.  In addition, Pakistan would be forced to engage in judgment enforcement litigations in every jurisdiction in which TCC were to allege that Pakistan had assets subject to enforcement.  The costs of such litigations will be substantial and the prospect of recovery of these costs from TCC uncertain.  A decision to enforce now could therefore cause Pakistan irreparable harm.  *See Unión Fenosa Gas, S.A.,* 2020 WL 2996085, at *4 (recognizing Egypt's hardship in potentially having to "recover assets seized during this action should the annulment proceeding go its way," particularly in light of the fact that it "faces a massive fiscal crisis exacerbated by the ongoing global COVID-19 pandemic");

*Masdar Solar*, 397 F. Supp. 3d at 40 (finding the balance of hardships favors a stay because Respondent would be burdened by "having to recover assets seized during this action should the annulment proceeding go its way"); *Nextera Energy Global Holdings B.V.*, 2020 WL 5816238, at *3 (same); *see also Hulley II*, 2020 WL 6822666, at *7 ("Absent a stay, history may be forced to repeat itself with yet additional litigation to retrieve seized property . . . . [T]his is a litigation quagmire that a stay would forestall").  Because the prejudice to Pakistan would be severe, the Court should not "act[] improvidently by enforcing the award prior to the completion" of annulment proceedings.  *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 317 (2d Cir. 1998).

(3)    No Harm to TCC

On the other hand, a stay will not result in any prejudice to TCC.  TCC's position is protected (indeed, improved) by the daily accrual of nearly seven hundred thousand dollars in interest under the terms of the Award.  *See Hulley II*, 2020 WL 6822666, at *12 (finding the petitioner's hardship "tempered [] by the fact . . . that post-award interest will compensate for any delay").  There is no reason that TCC cannot wait until the completion of the ICSID annulment proceeding and then, assuming the Award is not annulled, seek to enforce the Award.

Moreover, any further delay resulting from a stay "would still likely be shorter than the possible delay that would occur if this Court were to confirm the award and the [ICSID *ad hoc* committee] were to then set it aside."  *Matter of Arbitration of Certain Controversies Between Getma Int'l & Republic of Guinea*, 142 F. Supp. 3d 110, 114 (D.D.C. 2015) (internal alterations and quotation marks omitted).  As such, Petitioner will not suffer any hardship from the requested stay, whereas Pakistan would be severely and potentially irreversibly prejudiced if this action were to proceed.  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. 1:17-cv-00151-VAC-SRF, Mem. Order at 4, ECF No. 154 (D. Del. Dec. 12, 2019) (staying the enforcement of a

billion-dollar award because Venezuela would be "irreparably injured in the absence of a stay," whereas "a stay [would] not substantially injure the other parties").

(4)    <u>Public Policy Weighs In Favor Of A Stay</u>

Finally, consideration of the "public interest (including the public's interest in furthering the expressed foreign policy of the United States, as determined by the Executive Branch) strongly supports a stay." *Crystallex*, No. 1:17-cv-00151-VAC-SRF, Mem. Order at 4, 6 (enforcement stayed, in part, based on furtherance of U.S. policy for an orderly transition of power in Venezuela). Here, "[s]ince 2001, U.S. policy has broadly been to assist the creation of a more stable, democratic, and prosperous Pakistan that actively combats religious militancy." Conlon Decl. Ex. D (*Pakistan-US Relations*). Specifically, "U.S. officials say vital U.S. interests are at stake in Pakistan related to terrorism, Afghanistan, nuclear proliferation, India, democratization and human rights, and economic development." *Id*. Allowing enforcement of this Award now and depriving the Pakistan economy of $6 billion would destabilize the economy and government of Pakistan and, thereby, undermine U.S. policy and compromise "vital U.S. interests." *Id*. The devastating consequences of immediate enforcement weigh heavily in favor of an immediate stay of this action.

## II.   **This Court Has No Jurisdiction Under the FSIA**

The FSIA is the "sole basis for obtaining jurisdiction over a foreign state in federal court." *Samantar v. Yousuf*, 560 U.S. 305, 314 (2010) (quoting *Argentine Republic v. Amerada Hess Shipping Corp*., 488 U.S. 428, 439 (1989)) (internal marks omitted). This statute provides that a federal court will have personal jurisdiction only where: (1) service of the foreign state was accomplished properly pursuant to 28 U.S.C. § 1608 and (2) there is a statutory exception to sovereign immunity under 28 U.S.C. §§ 1605–1607. *Abur v. Republic of Sudan*, 437 F. Supp. 2d 166, 172 (D.D.C. 2006). In other words, subject matter jurisdiction resulting from an exception to

sovereign immunity plus proper service results in personal jurisdiction.  Here, TCC failed to properly serve Pakistan and there are no applicable statutory exceptions to immunity.  The Petition should therefore be dismissed pursuant to F.R.C.P. 12(b)(1), 12(b)(2), and 12(b)(5).

### A.   There Is No Personal Jurisdiction Because Pakistan Was Not Properly Served

In order to obtain personal jurisdiction over a foreign sovereign, a petitioner must serve process "under section 1608 of [the FSIA]."  28 U.S.C. § 1330(b).  Section 1608(a) "prescribes four methods of service—in descending order of preference—and a plaintiff must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on."  *Angellino v. Royal Family Al-Saud*, 688 F.3d 771, 773 (D.C. Cir. 2012) (internal quotation marks omitted).

The four authorized methods are as follows:

(1)   by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

(2)   if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

(3)   if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, *to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned*, or

(4)   if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services--and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a) (emphasis added).

Section 1608(a)(1) is inapplicable here because there is no special agreement between Petitioner and Pakistan regarding service of process. Section 1608(a)(2) is also inapplicable as Petitioner did not effect service on Pakistan pursuant to the Hague Convention on the Service Abroad of Judicial Extrajudicial Documents in Civil or Commercial Matters, which is the applicable legal convention on service of judicial documents. *See* ECF 15 at 1.

Relevant to this motion is Petitioner's failure to effect service pursuant to Section 1608(a)(3). Section 1608(a)(3) requires that Petitioner coordinate with the Clerk of the Court to ensure that the summons, complaint, and notice of suit are "***addressed*** and ***dispatched*** by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." 28 U.S.C. 1608(a)(3) (emphasis added). "[B]ecause of the sensitive nature of directly serving a foreign state, courts require strict compliance" with the statutory requirements of Section 1608(a). *Adetoro v. King Abdullah Academy*, 2019 WL 3457989, at *2 (D.D.C. July 30, 2019) (citing *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994)). "[N]either substantial compliance" with Section 1608(a), "nor actual notice" of the petition or complaint by the foreign sovereign, will "suffice[]." *Barot v. Embassy of the Republic of Zambia,* 785 F.3d 26, 27 (D.C. Cir. 2015).

"Specifically, the *clerk of the court* must be the one to 'address[] and dispatch[]' the documents 'to the head of the ministry of foreign affairs of the foreign state concerned.'" *Adetoro*, 2019 WL 3457989, at *2 (quoting 1608(a)(3)) (direct mailing was not strictly compliant, as petitioners mailed the documents rather than the clerk of the court); *Abur*, 437 F. Supp. 2d at 173 (finding requirements § 1608(a)(3) satisfied when the clerk dispatched the documents using DHL);

*de Sousa v. Embassy of Rep. of Angola*, 229 F. Supp. 3d 23, 28 (D.D.C. 2017) (requirement satisfied when the clerk of the court sent the documents by FedEx).

Here, Petitioner failed to have the Clerk address and dispatch the documents to the head of Pakistan's ministry of foreign affairs.  On September 24 and 26, 2019, the Clerk of the United States District Court for the District of Columbia filed a Certificate of Mailing certifying that the summons, complaint, and notice of suit in the above-captioned action were mailed to Pakistan's minister of foreign affairs pursuant to § 1608(a)(3). *See* Declaration of Hannah C. Banks in Support of Respondent's Renewed Motion to Stay Proceedings, or in the Alternative, to Dismiss the Petition, dated November 30, 2020 ("Banks Decl.") at ¶ 4; Banks Decl. Ex. A (ECF No. 13) and Ex. B (ECF No. 14).  However, the DHL tracking information attached to the certificates shows that the shipments were actually from "GIBSON DUNN & CRUTCHER LLP" and that Katherine Davis, an associate at Gibson Dunn & Crutcher LLP ("Gibson Dunn"), and not the Clerk of the United States District Court for the District of Columbia, addressed the package.  *See* Banks Decl. Exs. A, B.  DHL has since confirmed that the package was picked up from the Gibson Dunn office at 1050 Connecticut Avenue NW, Washington, D.C.  Banks Decl. at ¶ 6.  There have been no attempts by Petitioner to cure the default in service.

Accordingly, because "the clerk of the court must be the one to 'address[] and dispatch[]' the documents 'to the head of the ministry of foreign affairs of the foreign state concerned,'" and here, based on the DHL tracking information, Petitioner's counsel was the one that addressed and dispatched the documents, Petitioner has failed to properly serve Pakistan.  *See Adetoro*, 2019 WL 3457989, at *2.  This Court therefore lacks personal jurisdiction over Pakistan and the Petition should be dismissed pursuant to F.R.C.P. 12(b)(2) and 12(b)(5).

**B.**     **There Is No Subject Matter Jurisdiction Because None of the FSIA Sovereign Immunity Exceptions Are Present Here**

Pursuant to the FSIA, "a foreign state is presumptively immune from the jurisdiction of the United States courts[,] unless a specified exception applies." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). Because "subject matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity" laid out in the FSIA, as a threshold matter in every action against a foreign state, a district court "must satisfy itself that one of the exceptions applies." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493–94 (1983); *see* 28 U.S.C. § 1605(a).

Petitioner here has argued that Pakistan is not entitled to immunity for two reasons: (1) it has waived that immunity pursuant to Section 1605(a)(1) by agreeing to the ICSID Convention and (2) this is an action to enforce an arbitral award governed by the ICSID Convention pursuant to Section 1605(a)(6). ECF No. 1 at 2-3. Neither exception is applicable here.

The exception to immunity contained in Section 1605(a)(6) permits a court to exercise jurisdiction over an action "to confirm an award made pursuant to . . . an agreement to arbitrate" if the "award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6). This exception, however, only allows jurisdiction where there is a "valid agreement . . . to submit to arbitration." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 102 (D.C. Cir. 2015) (internal quotation omitted). "If there is no arbitration agreement . . . the District Court lacks jurisdiction over the foreign state and the action must be dismissed." *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200, 204 (D.C. Cir. 2015).

Here, the Australia-Pakistan Treaty does not contain a wholesale agreement to arbitrate disputes. Rather, the Australia-Pakistan Treaty requires that the state in a dispute provide written

consent to ICSID to arbitrate that dispute.  Article 13 of the Australia-Pakistan Treaty states in

relevant part as follows:

> 2. If the dispute in question cannot be resolved through consultations and negotiations, either party to the dispute may:
>
> . . .
>
> (b) [] refer the dispute to the International Centre for Settlement of Investment Disputes ("the Centre") for conciliation or arbitration pursuant to Articles 28 or 36 of the Convention;
>
> . . .
>
> 3. Where a dispute is referred to the Centre pursuant to paragraph 2(b) of this Article:
>
> (a) where that action is taken by an investor of one Party, *the other Party shall consent in writing to the submission of the dispute to the Centre within thirty days of receiving such a request from the investor*; . . .

Conlon Decl. Ex. K at Article 13 (emphasis added).

Accordingly, the Australia-Pakistan Treaty does not, like some other bilateral investment

treaties ("BIT"), contain the automatic consent of the state to ICSID arbitration without further

action on the part of that state.  For example, in another ICSID case, *Planet Mining v. Indonesia*,

the tribunal found that the phrase "shall consent," with respect to a substantially identically worded

jurisdiction provision in Article XI(4)(a) of the Australia-Indonesia BIT, "contains no standing

offer to arbitrate before ICSID," but rather an agreement to consent through a further act:

> If the host State 'shall consent in writing within 45 days' after the investor's request, it follows that consent cannot be located in the Treaty itself and that a separate act is needed.

Conlon Decl. Ex. L (*Planet Mining Pty Ltd v. Republic of Indonesia*, ICSID Case No. ARB/12/14

and 12/40, Decision on Jurisdiction, February 24, 2014) at ¶ 161; *see also* ¶¶ 153, 167, 173 and

198.

Indeed, the fact that the drafters of the Australian-Pakistan Treaty intentionally included two separate and related provisions regarding consent necessitates that both of these provisions must be satisfied before Pakistan, as the "other Party" under Article 13(3)(a), can be deemed to have consented to any given ICSID arbitration.  This separate consent is a feature of Australia's BITs: "[a] further feature of Australia's BITs is that they require the host State to consent in writing to the submission of the dispute to ICSID (usually within 30 or 45 days).  Without such consent an ICSID arbitral tribunal will not have jurisdiction".  Conlon Decl. Ex. L (*Planet Mining Pty Ltd v. Republic of Indonesia*) at ¶ 177 (quoting Michael Pryles & Richard Garnett, "Australia," in Michael Pryles (ed.), *Dispute Resolution in Asia* (Kluwer Law, 2006), at 82 a& n. 174).[9]  A promise to consent necessarily requires an action of consent.  Without this action, which Pakistan did not provide, there cannot be any consent.

Additionally, there are further consistencies between the tribunal's interpretation in *Planet Mining* and the language in Article 13(3)(a).  Article 13(3)(a) frames a promise to consent as "consent in writing . . . within thirty days of receiving such a request from the investor."  The *Planet Mining* tribunal found that these words "impl[y] a time sequence," albeit that tribunal was dealing with a forty-five day requirement rather than thirty days.  Conlon Decl. Ex. L (*Planet Mining Pty Ltd v. Republic of Indonesia*) at ¶ 162.  The timing of the consent presupposes the filing

---

[9] The *Planet Mining* Tribunal also cited another commentator on Australia's BITs as follows: "Australia's BITs are very subtle in this regard.  They generally contain a comprehensive, effective pre-consent to *ad hoc* arbitration, *but only if Australia and its treaty partner have not joined the ICSID Convention.* Where they both have done so, the ad hoc pre-consent becomes invalid, leaving the investor with the sole option of seeking ICSID arbitration.  But as to ICSID arbitration, each state party to the Australian treaties promises only that it "shall consent in writing to the submission of the dispute to the Centre within forty-five days of receiving such a request from the investor"– with the words "shall consent" indicating that the consent has not yet been given, but is only promised".  *Id.* at ¶ 178 (*quoting* Jason Webb Yackee, Sacrificing Sovereignty: Bilateral Investment Treaties, International Arbitration, and the Quest for Capital (Chapel Hill, 2007), p. 33).

of a request, to which Pakistan then consents.  Pakistan did not commit such an act so as to provide consent in writing within the specified time period.

Article 25 of the ICSID Convention requires, *inter alia*, that the parties to the dispute consent in writing to submit the dispute to ICSID.[10]  Moreover, there is no jurisdiction by estoppel in the ICSID context, and therefore Pakistan's consent in writing was required.[11]  Because Pakistan did not consent in writing to submit the dispute to ICSID within 30 days of receiving the request from TCC, there was therefore no agreement to arbitrate.  This lack of agreement precludes jurisdiction under Section 1605(a)(6).

The lack of an agreement to arbitrate also precludes jurisdiction under Section 1605(a)(1) of the FSIA.  Section 1605(a)(1) provides that "[a] foreign state shall not be immune from the jurisdiction of United States courts in any case . . . in which the foreign state has waived its immunity either explicitly or by implication."  28 U.S.C. § 1605(a)(1).  Generally, "explicit waivers of sovereign immunity are narrowly construed in favor of the sovereign' and are not

---

[10] It is well-established in ICSID decisions (and in international law generally) that such consent cannot be presumed and must be unequivocal. *See e.g.,* Conlon Decl. Ex. M (*Philip Morris Brands Sàrl, Philip Morris Products S.A. and Abal Hermanos S.A. v. Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7, Decision on Jurisdiction, July 2, 2013) at ¶ 141. Further, as noted in the 2016 "Updated Background Paper on Annulment for the Administrative Council of ICSID":

> The parties cannot agree to derogate from these criteria. In fact, the Tribunal must decline jurisdiction where a mandatory requirement is not met, even if neither party has raised any objection to jurisdiction".

Conlon Decl. Ex. N (ICSID, Updated Background Paper on Annulment for the Administrative Council of ICSID, May 5, 2016) at ¶ 85.

[11] Conlon Decl. Ex. O (*Eureko B.V. v. The Slovak Republic,* PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension (26 October 2010)) at ¶ 219 ("such jurisdiction cannot here be created, continued or extended by arguments based on the possible operation of doctrines of acquiescence, waiver or estoppel in respect of acts or omissions of Respondent (or Claimant)"; Conlon Decl. Ex. P (*Daimler Financial Services AG v. Argentine Republic,* ICSID Case No. ARB/05/1, Award (22 August 2012)) at ¶ 175 ("[w]hat is not permissible is to presume a state's consent by reason of the state's failure to proactively disavow the tribunal's jurisdiction.  Non-consent is the default rule; consent is the exception.").

enlarged 'beyond what the language requires.'" *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002) (quoting *Library of Cong. v. Shaw*, 478 U.S. 310, 318, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986)).  Thus, "[a] foreign sovereign will not be found to have waived its immunity unless it has clearly and unambiguously done so." *Id.; see Aquamar S.A. v. Del Monte Fresh Produce N.A.,* 179 F.3d 1279, 1292 (11th Cir. 1999) (quotation marks omitted) ("An express waiver under [S]ection 1605(a)(1) must give a clear, complete, unambiguous, and unmistakable manifestation of the sovereign's intent to waive its immunity.").  The foreign state must "expressly consent[]—for example, in the text of a treaty or a contract—to forgo its immunities with regard to a certain class of disputes or a particular subject matter." *Ashraf-Hassan v. Embassy of France in the U.S.*, 40 F. Supp. 3d 94, 99 (D.D.C. 2014).

Implied waivers are also "construed narrowly and require[] clear evidence of the foreign sovereign's intention to dispense with its immunity." *Id.* (citing *Creighton Ltd. v. Gov't of the State of Qatar*, 181 F.3d 118, 122 (D.C. Cir. 1999)).  This Circuit has "found an implicit waiver of sovereign immunity in only three situations." *Gutch v. Fed. Republic of Germany*, 255 F. App'x 524, 525 (D.C. Cir. 2007) (citing *World Wide Minerals*, 296 F.3d at 1161-62 n.11).  Specifically, "[t]he legislative history of [the] FSIA gives three examples of circumstances in which courts have found implied waivers: (1) a foreign state has agreed to arbitration in another country; (2) a foreign state has agreed that the law of a particular country governs a contract; or (3) a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity." *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990).  None of these exceptions is applicable here.

Petitioner alleges that Pakistan has waived immunity with respect to this action by "agreeing to the ICSID Convention."  ECF No. 1 at ¶ 2.  The ICSID Convention, however, does

not contain any waiver of Pakistan's immunity. "An express waiver under section 1605(a)(1) must give a clear, complete, unambiguous, and unmistakable manifestation of the sovereign's intent to waive its immunity." *World Wide Minerals*, 296 F.3d at 1162. The ICSID Convention's text contains no such language. Rather, the only reference in the Convention to immunity is to confirm that it is preserved with respect to execution. *See* ECF No. 1-2, ICSID Convention art. 55 ("Nothing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from execution."). No other mention of immunity is made, thus refuting any contention that the ICSID Convention contains an express waiver of sovereign immunity in U.S. court proceedings.

Nor has Pakistan impliedly waived its immunity. As described above, the FSIA's implied waiver provision must be construed narrowly. *See Ashraf-Hassan*, 40 F. Supp. 3d at 99; *see also Foremost-McKesson, Inc.*, 905 F.2d at 444. For actions to enforce arbitral awards, this requires an affirmative indication that the foreign sovereign "intended to waive its sovereign immunity" with respect to the particular dispute that was arbitrated. *Creighton*, 181 F.3d at 122. Contrary to Petitioner's claim, no intent to waive immunity may be found in Pakistan's ratification of the ICSID Convention. Rather, the ICSID Convention expressly preserves sovereign immunity, which is wholly inconsistent with an intention to waive it. Additionally, the Preamble to the ICSID Convention explicitly states: "[N]o Contracting State shall by the mere fact of its ratification, acceptance or approval of this Convention and without its consent be deemed to be under any obligation to submit any particular dispute to conciliation or arbitration." ECF No. 1-2, ICSID Convention pmbl. 7. There can be no doubt that the ICSID Convention by itself does not constitute consent to arbitrate a particular dispute.

An agreement to arbitrate a specific dispute is therefore a requirement for finding jurisdiction pursuant to the waiver exception when the action concerns enforcement of an arbitral award. *Seetransport Wiking Trader v. Navimpex Centrala Navala*, 989 F.2d 572, 577 (2d Cir. 1993) (finding implied waiver where foreign sovereign had both ratified New York Convention and entered into an agreement to arbitrate a specific dispute); *Stati v. Republic of Kazakhstan*, 199 F. Supp. 3d 179, 188 (D.D.C. 2016) (accepting that waiver exception would not apply if foreign sovereign "never agreed to arbitrate"); *Creighton*, 181 F.3d at 123 (Qatar's agreement to arbitrate did not waive sovereign immunity from recognition and enforcement in United States because it was not also a party to New York Convention).

Petitioner cites to two cases in support of its statement that Pakistan has waived immunity. Neither case is applicable because those cases indisputably involved an agreement to arbitrate the dispute at hand, which is not the case here. *See Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72, 85 (2d Cir. 2013) (containing no mention of any dispute related to the existence of an agreement to arbitrate); *Tatneft v. Ukraine*, 771 F. App'x 9, 9 (D.C. Cir. 2019) ("Ukraine next argues that an arbitration agreement cannot constitute an implied waiver of foreign sovereign immunity").

Because there is no agreement to arbitrate the specific dispute here, there is therefore no implied waiver. Simply ratifying the ICSID convention, as Petitioner claims, without any further agreement to arbitrate a particular dispute is not enough. Otherwise, a petitioner that failed to establish FSIA jurisdiction under the Section 1605(a)(6) arbitration exception due to the lack of an arbitration agreement, could nevertheless establish jurisdiction and defeat sovereign immunity by asserting the Section 1605(a)(1) implied waiver exception based only on the fact that the state is party to a "treaty or other international agreement in force for the United States calling for the

recognition and enforcement of arbitral awards."  28 U.S.C. § 1605(a)(6).  Indeed, this is the specific scenario the Section 1605(a)(6) arbitration exception governs, but that exception requires a valid agreement to arbitrate.  *See Belize Soc. Dev.*, 794 F.3d at 102; *Chevron Corp.*, 795 F.3d at 204.  Pakistan is not aware of any case in which a court found jurisdiction under the implied waiver exception after finding that there was no agreement to arbitrate, and therefore no jurisdiction under the arbitration exception.

Because there is no exception to sovereign immunity here under either Section 1605(a)(1) or 1605(a)(6), there is no subject matter jurisdiction, and the Petition must be dismissed pursuant to F.R.C.P. 12(b)(1).

## III.    The Award Is Not Entitled to Full Faith and Credit

Enforcement of ICSID awards in the United States is governed by ICSID's implementing statute, 22 U.S.C. §§ 1650-1650a.  *Mobil Cerro Negro Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 102 (2d Cir. 2017).  "Section 1650a requires federal courts to 'enforce' ICSID awards and accord them 'the same full faith and credit as if [they] were [] final judgment[s] of a court of general jurisdiction of one of the several States.'"  *Id.* at 121-22 (quoting 22 U.S.C. § 1650a) (alterations original).  The treatment of state court judgments in federal court is governed by 28 U.S.C. § 1738, which provides in pertinent part that the:

> Acts, records and judicial proceedings or copies [of any State, Territory, or Possession of the United States] shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

*See Mobil Cerro Negro*, 863 F.3d at 122.

"Although the Court's role in enforcing an ICSID arbitral award is . . . exceptionally limited, the Court is more than a 'rubber stamp.'"  *TECO Guatemala Holdings, LLC v. Rep. of Guatemala*, 2019 WL 4860819, at *5 (D.D.C. Oct. 1, 2019).  "The Court must ensure that it has

subject-matter and personal jurisdiction, must ensure the award is authentic, and must ensure that its enforcement order is consistent with the award." *Id.* at \*5 (citations omitted). "Moreover, as Congress provided, the Court must apply the same standard that applies when federal courts are asked to give 'full faith and credit' to a 'final judgment of a court of general jurisdiction of one of the several States.'" *Id.* (quoting 22 U.S.C. § 1650a).

Here, the Court should refuse to enforce the Award for two reasons, either of which would lead a federal court to refuse recognition and enforcement of a state judgment:[12]

*First*, the arbitral tribunal lacked jurisdiction to hear this arbitration and issue the Award.

*Second*, the Award violates due process based on the excessively large award of damages.

### A.   The Tribunal Lacked Jurisdiction to Hear this Arbitration and Issue an Award

"[B]efore a court is bound by the judgment rendered in another State, it may inquire into the jurisdictional basis of the foreign court's decree. If that court did not have jurisdiction over the subject matter or the relevant parties, full faith and credit need not be given." *Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n*, 455 U.S. 691, 705 (1982). Only final judgments "rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment" qualify for full faith and credit. *V.L. v. E.L.*, 136 S. Ct. 1017, 1020 (2016).

Here, as set forth in Section II.B above, the Award should not be enforced because the Tribunal lacked jurisdiction to conduct this arbitration and issue the Award. Moreover, the

---

[12] For the avoidance of doubt, Pakistan is appearing for the limited purpose of contesting jurisdiction and offers the defense of the claim only in the alternative that the Court finds jurisdiction exists in order to avoid waiving any rights.

Tribunal exceeded its adjudicatory authority because Petitioner had no valid "investment" under Pakistani law.

The Australia-Pakistan Treaty limits the Tribunal's jurisdiction to "a dispute between a Party and an investor of the other Party relating to an *investment*," Conlon Decl. Ex. K at Article 13 (emphasis added). Article 1(1)(a) of that treaty defines "investment" non-exhaustively as meaning "every kind of <u>asset</u>, owned or controlled by investors of one Party and admitted by the other Party <u>subject to its law</u>..." Here, the "asset" upon which Petitioner's claim for arbitration was premised was its purported interest in the CHEJVA agreements (*i.e.*, the CHEJVA and related agreements) and related rights. However, these agreements were all subject to Pakistani law, and it is undisputed that the Supreme Court of Pakistan ruled that the CHEJVA agreements were "illegal, void and *non est.*" Conlon Decl. Ex. B at 16. Indeed, Petitioner accepted that "the judgment [of the Pakistan Supreme Court] invalidated every instrument giving TCC rights to Reko Diq." Conlon Decl. Ex. Q (Tr. Hr'g, Jurisdiction and Liability, Day 8, p. 2301: 1-3).

ICSID tribunals have found that "the Tribunal, whilst retaining its independent powers of assessment and decision, must seek to determine the content of the applicable law in accordance with evidence presented to it as to the content of the law and the manner in which the law would be understood and applied by the municipal courts." Conlon Decl. Ex. R (*Emmis International Holding, B.V. and others v. Republic of Hungary*, ICSID Case No. 02/12, Award, (16 April 2014)) at ¶ 175*; see also* Conlon Decl. Ex. S (*Payment in Gold of Brazilian Federal Loans Contracted in France (France v. Brazil)* Series A No 21 (1929)) at 124 ("Once the Court has arrived at the conclusion that it is to apply the municipal law of a particular country, there seems to be no doubt that it must seek to apply it as it would be applied in that country. It would not be applying the municipal law of a country if it were to apply it in a manner different from that in which that law

would be applied in the country in which it is in force."). Accordingly, Petitioner had no "interests" or "rights" with respect to those agreements, and they could not constitute an "asset" as required by the definition of "investment" in Article 1(1)(a).

Moreover, it is a well-established principle of international law that international arbitral tribunals lack competence to sit as appellate bodies in relation to the interpretation or application of municipal law. As set out in *Helnan v. Egypt*:

> An ICSID Tribunal will not act as an instance to review matters of domestic law in the manner of a court of higher instance. Instead, the Tribunal will accept the findings of local courts as long as no deficiencies in procedure or substance, are shown in regard to the local proceedings which are of a nature of rendering these deficiencies unacceptable from the viewpoint of international law, such as in the case of a denial of justice.

Conlon Decl. Ex. T (*Helnan International Hotels A/S v. Arab Republic of Egypt*, ICSID Case No. 05/19, Award, (July 3, 2008)) at ¶¶ 106, 108. *Cf* Claimant's position summarized at Rozen Decl. Ex. B ¶ 593. Because Petitioner did not claim before the Tribunal that Pakistan Supreme Court Decision amounted to a denial of justice or was not in accordance with the applicable international law standards, the Pakistan Supreme Court Decision was conclusive. Rozen Decl. Ex. B, ¶¶ 861, 1037 and 1107. Indeed, TCC participated in the proceedings that led to that judgment without objection. Accordingly, the Tribunal manifestly exceeded its adjudicatory authority in finding jurisdiction with respect to rights under the CHEJVA and related agreements that were held by Pakistan's Supreme Court to be void, and could not qualify as "assets" for the purposes of Article 1(1)(a). The Award should be denied full faith and credit. *See V.L.*, 136 S. Ct. at 1020.

## B.    The Manifestly Excessive Damages Award Results in a Denial of Due Process

Federal courts have recognized that an award of damages may be "so unreasonable as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial." *United Int'l Holdings Inc. v. Wharf*

*Holdings Ltd.*, 210 F.3d 1207, 1229-30 (10th Cir. 2000) (citing *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1300 (10th Cir. 1998)); *see also Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 703 F.2d 1152, 1168 (10th Cir. 1981) ("[B]ias, prejudice or passion can be inferred from excessiveness").  Put differently, an award of compensatory damages can be set aside where it "is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice."  *Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1414 (4th Cir. 1992) (*quoting Johnson v. Parrish*, 827 F.2d 988, 991 (4th Cir. 1987)).  Indeed, a damages award may be so excessive that "it would result in financial ruin of the defendant or constitute a disproportionately large percentage of a defendant's net worth and thereby violate due process. . . ."  *Luciano v. Olson Corp.*, 110 F.3d 210, 221 (2d Cir. 1997) (internal quotation marks omitted).

The damages award here, amounting to approximately $6 billion (the entire value of Pakistan's 2019 IMF loan and 40% of its liquid foreign exchange reserves), is precisely the type of manifestly excessive award that violates due process.  This is especially so when the Award is compared with Petitioner's investment in the project:  Petitioner allegedly invested less than $260 million in the project, making the Award approximately 23 times greater than Petitioner's investment.  Moreover, the Tribunal made this astronomical award notwithstanding the "inherently speculative" nature of determining lost profits of a mining venture that had not begun operations, located in a remote, poverty-stricken province open to terrorist attacks, for commodities subject to extreme price fluctuations.  *See* Conlon Decl. Ex. U (Commentary to Article 36 of the International Law Commission's Articles on the Responsibility of States for Internationally Wrongful Acts ("ARSIWA")).  In other words, the $6 billion Award is premised upon technical studies—there is

no actual mining or even ability to mine—and relies on a mineral agreement whose terms neither side agreed to and would violate Pakistani law.

Not surprisingly, in order to arrive at this massively disproportionate damages calculation, the Tribunal made a series of decisions against the clear weight of the evidence that resulted in a miscarriage of justice.  In particular, the Tribunal, without authorization or rational explanation (i) rejected norms of international law, and (ii) applied a novel speculative approach to damages.

*First*, the Tribunal disregarded international law, which, if adopted, would have resulted in far less, if any, damages.  The Tribunal claimed to rely on a general international law theory expressed in *Factory at Chorzów (Germany v Poland) (Merits)*, PCIJ Rep. Ser. A. (No. 17) (13 September 1928), that "reparation must, as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed."  Conlon Decl. Ex. V at ¶ 125; *see also* Rozen Decl. Ex. A, Award at ¶ 87. Under this theory, the limitation that international law places on compensation for loss of profits is set out in the Commentary to Article 36 of the ARSIWA.  *See* Conlon Decl. Ex. U.  The Commentary states that lost profits are "inherently speculative" and "vulnerable to commercial and political risks, and increasingly so the further into the future projections are made," and are awarded only where "an anticipated income stream has attained sufficient attributes to be considered a legally protected interest of sufficient certainty to be compensable."  *Id.* at ¶ 27.  This Commentary has led to the well-established test under international law that the projected cash flow must have attributes that render its existence "sufficiently certain."  However, the Tribunal rejected this standard, and formulated a test that the profitability of the project must not be "fundamentally uncertain" in order for purported lost profits to be recovered.  The Tribunal did so

without authorization and without explaining the reasons for this decision, which resulted in a materially lower threshold for the recovery of lost profits.

Second, the Tribunal employed a novel damages calculation model, the "modern" DCF model,[13] rather than the "traditional" DCF model,[14] also without authorization or explanation. While these two approaches, if used properly, should give the same or similar result, here, the modern DCF analyses adopted by the Tribunal resulted in a value billions of dollars higher than the results of a traditional DCF. As part of its analysis, the Tribunal purported to arrive at a cash flow going 56 years into the future for a project which had no track record of operations, much less profitability, and then arriving at a final value for the project by discounting that cash flow based on certain risks to the project it identified. The Tribunal did this even though it is impossible to identify, much less quantify, those risks 56 years into the future. Indeed, the Tribunal disregarded the clear weight of the evidence in reaching its conclusion. For example, based on the range of future anticipated commodity prices (just of one of the risks identified), it was accepted that there was a 50% likelihood that the project as a whole would fail, *i.e.,* that there would be no loss caused by any breach of the Australia-Pakistan Treaty.

---

[13] The "modern" DCF attaches specific risk discounts to the individual components of the projected cash flow, rather than applying an overall discount rate to the entire cash flow. To make judgments about which individual components of the cash flow are affected by which type of risk, and the specific impact of those risks in each individual component, requires a high degree of certainty as to those risks. Indeed, a greater degree of certainty is required in the modern DCF than would be necessary in other valuation methodologies, making its use here inappropriate given the uncertain risks involved in a project of this type and degree of completion.

[14] In a "traditional" DCF valuation, risk is assessed as part of the overall weighted average cost of capital. The risks that attach to a project valued under that traditional approach are built into the capital asset pricing model that allows one to determine the cost of equity. There is no fundamental decision by a valuer as to whether risk does or does not attach to the project (let alone to a specific component of its projected cash flows). There is simply a carefully informed choice as to level of risk that is included – *e.g.,* the levels of market risk and/or country risk that are to be included as premia in the cost of equity.

## CONCLUSION

For the foregoing reasons, Respondent respectfully requests that the Court stay these proceedings pending the resolution of Pakistan's Annulment Application, or in the alternative, dismiss the Petition in its entirety.

Dated: November 30, 2020

Respectfully Submitted,

By: /s/ Reginald R. Goeke

John M. Conlon (*pro hac vice*)
Hannah C. Banks
Christopher J. Mikesh
Jamie N. Leipzig
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
T: (212) 506-2500
jconlon@mayerbrown.com

Reginald R. Goeke (DC Bar No. 435613)
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
T: (202) 263-3000
F: (202) 263-3300
rgoeke@mayerbrown.com

Jawad Ahmad (*pro hac vice*)
MAYER BROWN INTERNATIONAL LLP
201 Bishopsgate, London EC2M 3AF
United Kingdom
T: +44 20 3130 3072
jahmad@mayerbrown.com

*Counsel for Islamic Republic of Pakistan*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was filed electronically on November 30, 2020 with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to all parties and counsel of record by operation of the Court's CM/ECF system.

/s/ Reginald R. Goeke
<u>                    </u>