IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Tethyan Copper Company Pty Limited,

*Petitioner*,

v.

Islamic Republic of Pakistan,

*Respondent*.

**Civil Action No. 1:19-cv-02424**

**PETITIONER'S OPPOSITION TO
RESPONDENT'S RENEWED MOTION TO STAY PROCEEDINGS
<u>OR IN THE ALTERNATIVE, DISMISS THE PETITION</u>**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................... iii

GLOSSARY ...................................................................................................... ix

Introduction.......................................................................................................... 1

Background .......................................................................................................... 4

    I.    TCC's Investment In Pakistan ................................................................. 4

    II.   The Australia-Pakistan Treaty And The ICSID Convention ..................... 4

    III.  The ICSID Award .................................................................................. 6

    IV.  This Recognition and Enforcement Proceeding........................................ 8

Argument ............................................................................................................ 10

    I.    Pakistan's Motion To Dismiss Should Be Denied.................................... 10

           A.   This Court Has Jurisdiction Under The Foreign Sovereign Immunities
               Act's Waiver And Arbitration Exceptions Without Regard To Any
               Challenge To The Tribunal's Determination That Pakistan Consented To
               Arbitration................................................................................... 11

                   1.   This Court Has Jurisdiction Under The FSIA's Waiver Exception
                        Because Pakistan's Signing Of The ICSID Convention Waived Its
                        Immunity To Enforcement Of ICSID Awards In United States
                        Courts ................................................................................. 12

                   2.   Pakistan Cannot Dispute This Court's Jurisdiction Under The
                        FSIA's Arbitration Exception Because The Tribunal's Ruling That
                        Pakistan Consented To Arbitration Is Binding On This Court ................. 18

                   3.   The ICSID Convention And The FSIA Preclude Pakistan's
                        Argument............................................................................ 20

                     4.   The Tribunal's Determination That Pakistan Consented To
                        Arbitration Was Correct ....................................................... 21

            B.   TCC Completed Service Of Process On Pakistan Pursuant To The
                Foreign Sovereign Immunities Act............................................... 26

            C.   Pakistan's Purported Merits Defenses Are Meritless ......................... 30

1.   Pakistan Cannot Relitigate The Tribunal's Jurisdiction............................ 30

2.   Pakistan Cannot Relitigate Damages ........................................................ 32

II.   Pakistan's Stay Motion Should Be Denied ................................................... 35

A.   The ICSID Convention Provides For Enforcement Of The ICSID Award
Absent An ICSID-Imposed Stay Of Enforcement.............................................. 35

B.   Pakistan Fails To Demonstrate Its Entitlement To A Stay ................................ 39

1.   An Indefinite Stay Will Not Materially Advance The Interests Of
The Court Or Conserve The Parties' Resources ........................................ 40

2.   A Stay Would Unduly Prejudice TCC's Right To Recover For
Pakistan's Misconduct............................................................................... 42

3.   Pakistan Offers No Argument That The Recognition Of The ICSID
Award Will Cause It Any True Hardship.................................................... 43

C.   There Is No U.S. Policy Interest That Warrants Ignoring U.S. Treaty
Obligations To Enforce The ICSID Award ........................................................ 44

CONCLUSION.................................................................................................................... 45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*9REN Holding S.A.R.L. v. Kingdom of Spain*,
   2020 WL 5816012 (D.D.C. Sept. 30, 2020) ...........................................................38

*Abur v. Republic of Sudan*,
   437 F. Supp. 2d 166 (D.D.C. 2006) ......................................................................30

*Belize Soc. Dev. Ltd. v. Gov't of Belize*,
   668 F.3d 724 (D.C. Cir. 2012) ..............................................................................38

*Blue Ridge Invs., L.L.C. v. Republic of Argentina*,
   735 F.3d 72 (2d Cir. 2013) ..........................................................................2, 14, 15

*Bruesewitz v. Wyeth LLC*,
   562 U.S. 223 (2011) ..............................................................................................15

*Cabiri v. Gov't of Republic of Ghana*,
   165 F.3d 193 (2d Cir. 1999) ..................................................................................13

*Carr v. District of Columbia*,
   646 F.2d 599 (D.C. Cir. 1980) ..............................................................................19

*Chevron Corp. v. Republic of Ecuador*,
   795 F.3d 200 (D.C. Cir. 2015) .........................................................................19, 20

*Chevron Corp. v. Republic of Ecuador*,
   949 F. Supp. 2d 57 (D.D.C. 2013) ........................................................................20

*Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*,
   532 U.S. 424 (2001) ..................................................................................33, 34, 35

*Cox v. Nielsen*,
   2019 WL 1359806 (D.D.C. Mar. 26, 2019) ...........................................................35

*Creighton Ltd. v. Gov't of State of Qatar*,
   181 F.3d 118 (D.C. Cir. 1999) ........................................................13, 14, 15, 17

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
932 F.3d 126 (3d Cir. 2019) ....................................................................................43

*de Sousa v. Embassy of Republic of Angola*,
   229 F. Supp. 3d 23 (D.D.C. 2017) ........................................................................30

*United States ex rel. Drakeford v. Tuomey*,
   792 F.3d 364 (4th Cir. 2015) ................................................................................33

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
 905 F.2d 438 (D.C. Cir. 1990) ........................................................................17

*Griffin v. Griffin*,
 327 U.S. 220 (1946) ........................................................................................35

*Hulley Enters. Ltd. v. Russian Fed'n*,
 211 F. Supp. 3d 269 (D.D.C. 2016) ................................................................42

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*,
 456 U.S. 694 (1982) ............................................................................19, 31, 32

*Johnson v. Hugo's Skateway*,
 974 F.2d 1408 (4th Cir. 1992) ........................................................................34

*Johnson v. Panetta*,
 953 F. Supp. 2d 244 (D.D.C. 2013) ................................................................35

*Landis v. N. Am. Co.*,
 299 U.S. 248 (1936) ........................................................................................39

*Leonard v. Stemtech Int'l Inc*,
 834 F.3d 376 (3d Cir. 2016) ...........................................................................33

*Livnat v. Palestinian Auth.*,
 851 F.3d 45 (D.C. Cir. 2017) .........................................................................32

*Luciano v. Olsten Corp.*,
 110 F.3d 210 (2d Cir. 1997) ...........................................................................34

*Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
 703 F.2d 1152 (10th Cir. 1981) ......................................................................34

*Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*,
 397 F. Supp. 3d 34 (D.D.C. 2019) ..................................................................41

*Micula v. Gov't of Romania*,
 104 F. Supp. 3d 42 (D.D.C. 2015) ....................................................................8

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*,
 863 F.3d 96 (2d Cir. 2017) ..............................................8, 9, 10, 11, 19, 20, 30

*Nat'l Collegiate Athletic Ass'n v. Tarkanian*,
 488 U.S. 179 (1988) ........................................................................................33

*NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*,
 2020 WL 5816238 (D.D.C. Sept. 30, 2020) ...................................................38

*Owens v. Republic of Sudan*,
 864 F.3d 751 (D.C. Cir. 2017) ................................................................................. 11

*Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*,
 724 F.3d 230 (D.C. Cir. 2013) ................................................................................. 21

*NB ex rel. Peacock v. District of Columbia*,
 794 F.3d 31 (D.C. Cir. 2015) ................................................................................... 33

*Price v. Socialist People's Libyan Arab Jamahiriya*,
 294 F.3d 82 (D.C. Cir. 2002) ................................................................................... 32

*Princz v. Fed. Republic of Germany*,
 26 F.3d 1166 (D.C. Cir. 1994) ................................................................................. 13

*Republic of Argentina v. NML Capital, Ltd.*,
 573 U.S. 134 (2014) ................................................................................................. 15

*Republic of Sudan v. Harrison*,
 139 S. Ct. 1048 (2019) ....................................................................................... 27, 29

*RosInvestCo UK Ltd. v. Russian Fed'n*,
 SCC Case No. V 079/2005, Award on Jurisdiction, (Oct. 2007) ............................. 23

*S & Davis Int'l, Inc. v. Republic of Yemen*,
 218 F.3d 1292 (11th Cir. 2000) ............................................................................... 17

*Sale v. Haitian Ctrs. Council, Inc.*,
 509 U.S. 155 (1993) ................................................................................................. 25

*Saudi Arabia v. Nelson*,
 507 U.S. 349 (1993) ................................................................................................. 11

*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co.,
 Kommanditgesellschaft v. Navimpex Centrala Navala*,
 989 F.2d 572 (2d Cir. 1993) ................................................................................... 14

*Stati v. Republic of Kazakhstan*,
 199 F. Supp. 3d 179 (D.D.C. 2016) ......................................................................... 14

*Tatneft v. Ukraine*,
 771 F. App'x 9 (D.C. Cir. 2019) ............................................................ 2, 13, 14, 16, 17

*TECO Guatemala Holdings, LLC v Republic of Guatemala*,
 414 F. Supp. 3d 94 (D.D.C. 2019) ..................................................................... 18, 36

*Tidewater Inv. SRL v. Bolivarian Republic of Venezuela*,
 2018 WL 6605633 (D.D.C. Dec. 17, 2018) .................................................. 10, 31, 37

*Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar.
   Ass'n,*
   455 U.S. 691 (1982)............................................................................19, 31, 32

*Unión Fenosa Gas, S.A. v. Arab Republic of Egypt,*
   2020 WL 2996085 (D.D.C. June 4, 2020)............................................................38

*United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.,*
   210 F.3d 1207 (10th Cir. 2000) .............................................................................34

*United States v. Thompson,*
   279 F.3d 1043 (D.C. Cir. 2002).............................................................................29

*United States v. Verdugo-Urquidez,*
   494 U.S. 259 (1990).............................................................................................33

*World Wide Minerals, Ltd. v. Republic of Kazakhstan,*
   296 F.3d 1154 (D.C. Cir. 2002).............................................................................13

**Arbitration Decisions**

*Compañía de Aguas del Aconquija S.A. v. Argentine Republic,* ICSID Case No.
   ARB/97/3, Decision of the *Ad Hoc* Committee on the Request for
   Supplementation and Rectification of Its Decision Concerning Annulment of
   the Award (May 28 2003)......................................................................................41

*Millicom Int'l Operations B.V. v. Republic of Senegal,* ICSID Case No.
   ARB/08/20, Decision on Jurisdiction (July 16, 2010).............................................23

*Planet Mining Pty Ltd. v. Republic of Indonesia,* ICSID Case Nos. ARB/12/14
   and 12/40, Decision on Jurisdiction (Feb. 24, 2014)........................................25, 26

**Statutes**

9 U.S.C. § 9.......................................................................................................8

9 U.S.C. § 10.....................................................................................................8

9 U.S.C. § 207...................................................................................................37

22 U.S.C. § 1650a...............................................2, 3, 8, 9, 10, 11, 12, 19, 31, 35, 37, 38, 45

22 U.S.C. § 1650a(a)......................................................1, 8, 10, 19, 20, 37

28 U.S.C. § 1330................................................................................................8

28 U.S.C. § 1391(f)............................................................................................8

28 U.S.C. § 1604...........................................................................................15, 21

28 U.S.C. § 1605(a)(1)................................................................2, 12, 13, 15, 16, 18

28 U.S.C. § 1605(a)(6)....................................................................2, 12, 18, 22, 23

28 U.S.C. § 1605(a)(6)(D)........................................................................................18

28 U.S.C. §§ 1607........................................................................................................15

28 U.S.C. § 1608............................................................................................................8

28 U.S.C. § 1608(a)....................................................................................................27

28 U.S.C. § 1608(a)(1)................................................................................................27

28 U.S.C. § 1608(a)(2)................................................................................................27

28 U.S.C. § 1608(a)(3)....................................................................................28, 29, 30

28 U.S.C. § 1608(c)(2)................................................................................................28

28 U.S.C. § 1609..........................................................................................................15

28 U.S.C. § 1610..........................................................................................................15

28 U.S.C. § 1610(c).............................................................................................40, 44

28 U.S.C. § 1611..........................................................................................................15

**Rules**

Fed. R. Civ. P. 12(h)(1).............................................................................................27

Fed. R. Evid. 801(c)...................................................................................................29

Fed. R. Evid. 801(d)(1)(B).........................................................................................29

**Constitutional Provisions**

U.S. Const. amend. XIV, § 1 ....................................................................................32

**Other Authorities**

*Arbitral Awards: Hearing on H.R. 3106, et al. Before the Subcomm. on Admin. Law & Gov. Relations of the H. Comm. on the Judiciary*, 99th Cong. (1986)........17

Campbell McLachlan et al., *International Investment Arbitration: Substantive Principles* (Oxford Univ. Press, 2d ed. 2017)........................................................24

Christoph H. Schreuer et al., *The ICSID Convention: A Commentary* (Cambridge Univ. Press, 2d ed. 2009) ................................................................24, 36

11 Federal Practice and Procedure Civil § 2807 (3d ed.) ............................................................33

ICSID, *List of Member States* (June 9, 2020) ................................................................5

ICSID Updated Background Paper on Annulment for the Administrative Counsel of ICSID (May 5, 2016) ................................................................41

Lisa Bohmer, *Tribunal In Egyptian Mining Arbitration Finds Advance Consent To ICSID Arbitration In Australia-Egypt BIT,* Investment Arbitration Reporter (Oct. 12, 2020) ................................................................26

## GLOSSARY

**A-P Treaty** ....................................................Agreement Between Australia and the Islamic Republic of Pakistan on the Promotion of Investments

**Award**............................................................Award, *Tethyan Copper Company Pty Limited v. Islamic Republic of Pakistan*, ICSID Case No. ARB/12/1 (July 12, 2019)

**FAA** ..............................................................Federal Arbitration Act (9 U.S.C. §§ 1-16)

**FSIA** .............................................................Foreign Sovereign Immunities Act (28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), 1602-1611)

**ICSID** ...........................................................International Centre for Settlement of Investment Disputes

**ICSID Convention**.........................................Convention on the Settlement of Investment Disputes between States and Nationals of Other States

**J&L**...............................................................ICSID Tribunal's Decision on Jurisdiction and Liability

**TCC** .............................................................Tethyan Copper Company Pty Limited, Petitioner

**TCCP**............................................................Tethyan Copper Company Pakistan

# INTRODUCTION

After nearly eight years of proceedings, a distinguished three-member arbitral tribunal constituted under the auspices of the International Centre for Settlement of Investment Disputes ("ICSID") determined that Petitioner Tethyan Copper Company Pty Limited ("TCC") was entitled to a $4.087 billion arbitral award, plus interest, costs, fees, and expenses, against the Islamic Republic of Pakistan ("Pakistan") stemming from Pakistan's denial of a mining lease that the tribunal found breached a bilateral investment treaty between Australia and Pakistan.  The arbitration was conducted pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "ICSID Convention") under the auspices of the World Bank.  The ICSID Convention is a treaty in force between the United States, Pakistan, and 152 other nations that provides a comprehensive framework for resolving investment disputes between contracting states and the private investors of other contracting nations.

A critical feature of the ICSID Convention and its implementing legislation in the United States is that they provide for streamlined enforcement procedures against contracting nations.  ICSID awards are treated as "binding," "final judgment[s]" that are not "subject to any appeal or to any other remedy except those provided for in th[e] Convention."  ECF No. 1-2 (ICSID Convention), arts. 53, 54.  In the United States, ICSID awards are entitled to the same "full faith and credit" as the judgments of a state court, and are not subject to any of the defenses to confirmation of an arbitration award under the Federal Arbitration Act ("FAA"), which expressly does not apply to ICSID awards.  22 U.S.C. § 1650a(a).  U.S. courts universally have agreed that foreign states have no right to oppose enforcement of an ICSID award entered against them by challenging the arbitration tribunal's jurisdiction or merits determinations.  Instead, Congress has provided that federal courts are required to recognize and enforce an ICSID award expeditiously by converting the award into a federal judgment as soon as the court's jurisdiction is established.

1

With no serious argument to resist enforcement under Section 1650a, Pakistan instead claims that the ICSID tribunal was wrong to conclude that it had jurisdiction over the underlying dispute and that, accordingly, this Court lacks jurisdiction under the Foreign Sovereign Immunities Act ("FSIA").  Pakistan's sole recourse for challenging the ICSID tribunal's jurisdiction (or the award) lies not with this Court, but with ICSID.  As the ICSID Convention permits, Pakistan has filed an application before ICSID seeking annulment of TCC's arbitral award, challenging both the arbitral tribunal's jurisdiction and its merits rulings.  While the tribunal's determinations are correct and do not warrant annulment, this Court need not and respectfully should not reach these issues—nor, for that matter, await a decision on annulment—because this Court's jurisdiction does not depend on whether Pakistan agreed to arbitrate the underlying disputed, but rather on the FSIA.

Two provisions of the FSIA establish jurisdiction.  First, the FSIA provides for jurisdiction whenever a foreign state has waived its immunity from suit.  *See* 28 U.S.C. § 1605(a)(1).  As the Second Circuit has held, a foreign state "waive[s] its sovereign immunity" from enforcement of an ICSID award "by becoming a party to the ICSID Convention."  *Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72, 84 (2d Cir. 2013).  The D.C. Circuit has applied the same principle to other treaties, *Tatneft v. Ukraine*, 771 F. App'x 9 (D.C. Cir. 2019) (per curiam), and its reasoning applies equally to the ICSID Convention.  As a party to the ICSID Convention, Pakistan's waiver of immunity from suits to *enforce* ICSID awards does not depend on the validity of its consent to *arbitrate* any particular dispute.  Pakistan's waiver of immunity in enforcement actions is sufficient to establish this Court's jurisdiction to enter judgment on the award here.

Second, the FSIA also abrogates a foreign state's immunity when the action is "to confirm an award made pursuant to . . . an agreement to arbitrate."  28 U.S.C. § 1605(a)(6).  Even though Pakistan now disputes that it agreed to arbitrate—despite its full participation and attempt to assert counterclaims in the arbitration—this Court is bound by the tribunal's determination that it had

2

jurisdiction, a determination that Pakistan agreed to abide by when it entered into the ICSID Convention.  In any event, the tribunal's determination was correct.

Pakistan's remaining arguments are makeweight.  The record thoroughly dispels its attack on service—founded only on speculative hearsay, and contradicted by sworn testimony.  The court clerk certified, under penalty of perjury, that she properly dispatched process to Pakistan at the proper address, in compliance with the FSIA's requirements for service of process.  And because the ICSID Convention and § 1650a do not permit any substantive defenses to enforcement of ICSID awards, there is no basis to oppose enforcement once this Court recognizes its jurisdiction.

Finally, Pakistan falls back on a request to stay enforcement while it attempts to annul the award.  But the ICSID Convention directs such stay requests to the ICSID committee hearing the annulment application, not this Court.  In a reasoned 69-page decision, that committee rejected Pakistan's request to unconditionally stay enforcement of the award.  Instead, the committee offered a stay if Pakistan complied with two conditions—posting security in the amount of 25% of the award and providing an undertaking to voluntarily pay the award in full if annulment is unsuccessful.  Pakistan chose to do neither.  As a result of Pakistan's refusal to commit to honoring its treaty obligations, the committee terminated the stay of enforcement as to 50% of the award plus accrued interest as of October 30, 2020.  Pakistan's current motion attempts an end run around the committee's balanced decision by seeking a total stay without complying with any of the conditions the committee thought necessary—thereby leaving Pakistan free to move assets out of the United States at its leisure during the entire duration of the annulment process, which could stretch into 2022.  Having failed to fulfill the requirements imposed by the annulment committee and having the benefit of the undertakings that TCC has made as directed by the committee to protect Pakistan in the unlikely event the award is annulled in whole or in part, there is no legitimate basis for Pakistan's request in this Court for a stay similar to the one that the annulment committee

rejected.  TCC should be allowed to enforce and secure its award without further delay.

TCC therefore respectfully requests that this Court deny the motion to dismiss, grant the petition, and enter judgment in TCC's favor without further delay.

## BACKGROUND

### I.     TCC's Investment In Pakistan

TCC is an Australian mining company, a joint venture between Barrick Gold Corporation of Canada and Antofagasta plc of Chile, that invested approximately $240 million in exploration and development of a proposed copper and gold mining project in Pakistan's Balochistan province pursuant to a 2006 agreement with the Government of Balochistan.  ECF No. 1-1, Ex. A ("Award") ¶¶ 5, 156; ECF No. 1-1, Ex. B (Decision on Jurisdiction and Liability ("J&L")) ¶¶ 217-22, 228, 1328.  TCC made this investment in reliance on the legitimate expectation—fostered by Pakistan through its conduct and the contractual and regulatory framework of TCC's investment—that TCC would be entitled to convert its exploration license into a mining lease, subject only to compliance with routine government requirements.  Award ¶¶ 138, 153.

In 2011, after years of exploratory work and investing hundreds of millions of dollars into the project, TCC's wholly-owned subsidiary, Tethyan Copper Company Pakistan ("TCCP"), filed an application for a mining lease for the Reko Diq deposit in northwestern Balochistan.  J&L ¶¶ 506, 814, 1264.  Though TCCP had fulfilled all applicable requirements, Balochistan rejected its application on pretextual grounds with the motive of implementing its own mining project and taking the value of TCC's investment for itself.  *Id.* ¶¶ 1264, 1329.  The denial of TCC's mining lease application deprived TCC of the entire value of its investment.  *Id.* ¶ 1328.

### II.    The Australia-Pakistan Treaty And The ICSID Convention

TCC's investment in Pakistan was protected by two treaties:  the Agreement between Australia and the Islamic Republic of Pakistan on the Promotion and Protection of Investments, ECF

No. 1-3 (the "A-P Treaty"), and the ICSID Convention.  The A-P Treaty is a bilateral investment treaty between Australia and Pakistan designed to "promot[e]" "investment relations" and "strengthe[n]" "economic co-operation" between Australia and Pakistan "in accordance with the internationally accepted principles of mutual respect for sovereignty, equality, mutual benefit, non-discrimination and mutual confidence." A-P Treaty, pmbl., ¶ 2.  Article 3(2) of the Treaty provides that "[e]ach Party shall ensure fair and equitable treatment in its own territory to investments." *Id.*, art. 3(2).  Article 7(1) prohibits either Party from "expropriat[ing] . . . the investments of investors of the other Party" without adequate compensation, or engaging in "measures having effect equivalent to . . . expropriation." *Id.*, art. 7(1).  And Article 3(3) requires each Party to protect and refrain from impairing the investments of each other's investors.  It states that "[e]ach Party shall, subject to its laws, accord within its territory protection and security to investments and shall not impair the management, maintenance, use, enjoyment or disposal of investments." *Id.*, art. 3(3).

The ICSID Convention further protects investors like TCC by facilitating enforcement of arbitral awards arising from violations of the A-P Treaty.  The Convention is a treaty among 155 contracting nations—including Australia, Pakistan, and the United States[1]—that provides a comprehensive framework for arbitrating investment disputes "between Contracting States and nationals of other Contracting States."  ICSID Convention, pmbl.  Arbitral tribunals constituted under the ICSID Convention are responsible for conclusively deciding not only the merits of any dispute submitted to them, *id.*, art. 48, but also all issues pertaining to their jurisdiction, including the scope of the parties' consent to arbitrate, *id.*, arts. 25, 41.  By signing the ICSID Convention, Pakistan agreed to "abide by" and "comply with" all awards issued pursuant to the Convention. *Id.*, art. 53.

The ICSID Convention provides for only a limited review of arbitral awards and assigns

---

[1]   *See* ICSID, *List of Member States-ICSID/3* (June 9, 2020), https://icsid.worldbank.org/en/Pages/icsiddocs/List-of-Member-States.aspx.

that power to an *ad hoc* annulment committee. *Id.*, art. 52. Under Article 52 of the Convention, that committee—not the courts of any Contracting State—decides whether an award should be set aside on the ground that the Tribunal was not properly constituted, exceeded its power, acted corruptly, seriously departed from a fundamental rule of procedure, or failed to state the reasons on which the award was based. *Id.*, art. 52(1). In assigning this role to the annulment committee, the ICSID Convention differs from other regimes like the New York Convention, in which the enforcing court would determine if the award is subject to challenge. Similarly, the Convention assigns to the annulment committee the decision of whether to stay enforcement while an annulment proceedings are pending. *Id.*, art. 52(5). Pakistan and the other parties to the ICSID Convention thus agreed that an ICSID arbitration award would be enforceable in the courts of any Contracting State—including the United States—as "final judgment[s]" without being "subject to any appeal or to any other remedy except those provided for in th[e] Convention." *Id.*, arts. 53, 54.

The A-P Treaty provides for arbitration of disputes arising thereunder pursuant to the ICSID Convention, *see* A-P Treaty, art. 13(2)(b); J&L ¶ 646, ensuring that arbitration will be binding and conclusive, and that all resulting arbitral awards will be broadly and expeditiously enforceable nearly worldwide, without any challenge to the validity of the award or the conclusions of the arbitral tribunal in any domestic court.

## III.   The ICSID Award

On November 28, 2011, TCC filed a request with ICSID for arbitration with Pakistan under the ICSID Convention. Request for Arbitration (Ex. A to Declaration of Katherine Maddox Davis, (Ex. 1 hereto) ("Davis Decl.")); Award ¶ 9. TCC alleged that Pakistan's denial of TCCP's mining lease application constituted a breach of Pakistan's obligations under the A-P Treaty. J&L ¶ 5. TCC alleged that Pakistan had breached its obligations under the A-P Treaty by: (1) failing to accord fair and equitable treatment to TCC's investments within Pakistan's territory, in violation

of Article 3(2) of the Treaty; (2) unlawfully expropriating TCC's investment, in violation of Article 7(1) of the Treaty; and (3) unlawfully impairing TCC's use of its investment, in violation of Article 3(3) of the Treaty.  Award ¶ 2; J&L ¶¶ 1264, 1328-33, 1365.

TCC invoked Pakistan's consent to arbitrate disputes under the A-P Treaty.  J&L ¶¶ 5-10. ICSID constituted an arbitral tribunal (the "Tribunal") on July 12, 2012, after each side appointed a co-arbitrator and the parties jointly appointed the president.  Award ¶ 11.  Pakistan then filed counterclaims, likewise invoking the "consent of the parties" to ICSID arbitration.  J&L ¶ 1380. The Tribunal conducted a Hearing on Jurisdiction and Liability in Paris from October 6 to 17, 2014 and a Hearing on Quantum in London from May 14 to 24, 2018.  Award ¶ 69.

On November 10, 2017, the Tribunal issued its 370-page Decision on Jurisdiction and Liability (J&L) in which it decided, among other things, that Pakistan had consented in writing to ICSID arbitration of disputes under the A-P Treaty, J&L ¶ 646; TCC's claims concerned "investment[s]" protected by that treaty, *id.* ¶ 599; and therefore the Tribunal had jurisdiction to hear those claims, *id.* ¶ 688.  In the same decision, the Tribunal also determined that Pakistan had breached its obligations under the A-P Treaty by:  (1) failing to accord fair and equitable treatment to TCC's investments within Pakistan's territory, in violation of Article 3(2) of the Treaty, *id.* ¶ 1264; (2) effectively expropriating the value of TCC's investment, in violation of Article 7(1) of the Treaty, *id.* ¶¶ 1328-36; and (3) impairing TCC's use of its investment, in violation of Article 3(3) of the Treaty, *id.* ¶ 1372.  The Tribunal rejected Pakistan's counterclaims.  *Id.* ¶ 1449(V)-(VI).  The Tribunal further determined that TCC was entitled to be compensated for all damages and losses resulting from Respondent's breaches of the A-P Treaty.  *Id.* ¶ 1449(IV).  On the same day, the Tribunal issued a 421-page Decision on Respondent's Application to Dismiss the Claims ("ADC"), ECF No. 1-1, Ex. C, rejecting Pakistan's application to dismiss TCC's claims.

Following further proceedings on quantum, on July 12, 2019, the Tribunal rendered its

622-page Award in which it ordered Pakistan to pay TCC $4.087 billion in compensation, plus interest, costs, and expenses.  Award ¶ 1858(II)-(VII).  The Award incorporated both November 10, 2017 decisions by reference.  *Id.* ¶¶ 4, 19, 21.

## IV.    This Recognition and Enforcement Proceeding

Upon its rendering, the Award was fully enforceable and due in full, but despite its agreement to "comply with the terms of the award except to the extent that enforcement shall have been stayed," ICSID Convention, art. 53(1), Pakistan has not paid any portion of the Award.  Accordingly, TCC commenced this action to recognize and enforce the Award.

Recognition and enforcement of ICSID awards in the United States is governed by 22 U.S.C. § 1650a, which implements the treaty obligations of the United States, as a contracting party to the ICSID Convention, to ensure that U.S. courts treat an ICSID award "as if it were a final judgment" of a state court.  ICSID Convention, art. 54(1).  Section 1650a thus provides, in relevant part, that "[t]he pecuniary obligations imposed by [an ICSID] award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." 22 U.S.C. § 1650a(a).  Enforcement proceedings are commenced by "fil[ing] a plenary action under section 1650a" to "convert [the] award into an enforceable judgment" in federal court, *Micula v. Gov't of Romania*, 104 F. Supp. 3d 42, 49-51 (D.D.C. 2015), in compliance with the Federal Rules of Civil Procedure and the FSIA's personal jurisdiction, service, and venue requirements, 28 U.S.C. §§ 1330, 1391(f), 1608; *see Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 100, 117-20 (2d Cir. 2017).  Further, the statute specifies that even the limited grounds for vacating or refusing confirmation of an ordinary arbitration award under the FAA, 9 U.S.C. §§ 9-10, "shall not apply to enforcement of awards rendered pursuant to the [ICSID] convention," 22 U.S.C. § 1650a(a).  "By expressly precluding the FAA's application to enforcement of ICSID Convention awards, Congress intended to

8

make these grounds of attack unavailable to ICSID award-debtors in federal court enforcement proceedings." *Mobil Cerro Negro*, 863 F.3d at 120-21.  Consistent with these procedures, TCC commenced this proceeding in August 2019 by filing its Petition requesting that this Court enforce the Award pursuant to 22 U.S.C. § 1650a in the same manner as a final judgment of a court of one of the several states and enter judgment against Pakistan in the amount specified in the Award.

On November 8, 2019, Pakistan submitted an application to ICSID for annulment of the Award.  ECF No. 17-3.  The Convention ordinarily permits investors like TCC to proceed with enforcement of awards during the pendency of annulment proceedings unless enforcement is stayed under the Convention, ICSID Convention, arts. 53(1), 54.  But Pakistan's annulment application included a request to stay enforcement.  ECF No. 17-3, ¶ 112.  Under the ICSID Convention, that request automatically triggered a provisional stay of enforcement until a committee could be constituted and decide Pakistan's request for a longer stay while annulment proceedings are pending.  ICSID Convention, art. 52(5).  The parties thus stipulated to a stay of this proceeding until the committee decided Pakistan's application to extend the provisional stay.  *See* ECF No. 27.

On March 25, 2020, ICSID constituted a committee to hear Pakistan's annulment application (the "Committee").  On September 17, 2020, the Committee issued a decision setting two conditions for continuing a stay—Pakistan's provision of:  (1) an irrevocable and unconditional bank guarantee or letter of credit for 25% of the Award, to be released to TCC on order of the Committee; and (2) an undertaking that Pakistan will comply with the Award, make full payment with 120 days after annulment is denied, and not use Pakistan's court system to thwart payment.  ECF No. 31-1, ¶ 213(b)-(c).  The Committee specified that if Pakistan did not comply with these requirements within 30 days, the Committee would lift the stay of enforcement in the amount of 50% of the Award, provided that TCC submitted an undertaking to place "any amounts collected through enforcement" in escrow and, "if the Award is annulled," to "pay any amounts that Pakistan

cannot recover from the escrow." *Id.* ¶ 213(d)-(g).  Pakistan failed to comply with any of the conditions set out by the Committee and TCC submitted the required undertaking.  ECF No. 33-1, ¶¶ 9, 11.  The Committee, after affording Pakistan an opportunity to comment, issued a decision partially terminating the stay and permitting enforcement of 50% of the Award plus accrued interest as of October 30, 2020.  *Id.* ¶ 14(a).

## ARGUMENT

### I.   Pakistan's Motion To Dismiss Should Be Denied

Pakistan's illegitimate attempt to collaterally attack the Award through its motion to dismiss this enforcement proceeding should be rejected.  Under the ICSID Convention's plain terms, the United States is obligated by treaty to enforce such awards without permitting "any appeal or . . . *any other remedy* except those provided for in th[e] Convention."  ICSID Convention, art. 53(1) (emphasis added).  Section 1650a, which implements the Convention, provides that "[t]he pecuniary obligations imposed by . . . an [ICSID] award shall be enforced" and "be given the same full faith and credit" as a state court judgment.  22 U.S.C. § 1650a(a).

Section 1650a thus envisions a "perfunctory role . . . for federal district courts," *Tidewater Inv. SRL v. Bolivarian Republic of Venezuela*, 2018 WL 6605633, at \*6 (D.D.C. Dec. 17, 2018), in which an award debtor "[is] not . . . permitted to make substantive challenges to the award," *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 100, 118 (2d Cir. 2017).  District courts "are . . . not permitted to examine an ICSID award's merits, its compliance with international law, or the ICSID tribunal's jurisdiction to render the award."  *Id.* at 102.  Instead, courts "may do no more than examine the judgment's authenticity and enforce the obligations imposed by the award."  *Id.*

Pakistan attempts to circumvent these limitations by recasting its challenge to the Tribunal's jurisdiction as an argument that this Court lacks subject-matter jurisdiction under the FSIA.

Pakistan mainly contests the Tribunal's determination that the A-P Treaty reflects Pakistan's consent to arbitrate disputes arising under that treaty, which Pakistan claims is a necessary prerequisite for jurisdiction under the FSIA.  Mot. 21-22.  Pakistan's arguments about the meaning of the A-P Treaty are irrelevant, however, because, consistent with the ICSID Convention, the FSIA creates subject-matter jurisdiction over the petition to enforce the Award without regard to the correctness of the Tribunal's determination that Pakistan consented to binding arbitration.

Pakistan fares no better in challenging TCC's service of process or purporting to raise substantive defenses to enforcement.  Pakistan does not dispute that it was served all necessary process required at the address required by the FSIA.  Pakistan's unsubstantiated attempt to raise doubts about whether that process was properly dispatched by the proper sender—the clerk of court—runs counter to the relevant documentary evidence and sworn certifications by both the clerk and TCC's attorney.  TCC's substantive defenses, meanwhile, are not before this Court because they do not provide any basis to deny full faith and credit to an ICSID award.  The Court should therefore deny Pakistan's motion to dismiss and proceed to enter judgment for TCC without delay.

### A.   This Court Has Jurisdiction Under The Foreign Sovereign Immunities Act's Waiver And Arbitration Exceptions Without Regard To Any Challenge To The Tribunal's Determination That Pakistan Consented To Arbitration

The FSIA is the exclusive basis for a federal court's exercise of jurisdiction over a foreign state.  *See Owens v. Republic of Sudan*, 864 F.3d 751, 763 (D.C. Cir. 2017).  While the FSIA recognizes that foreign states are "presumptively immune" from suit under most circumstances, it provides a number of enumerated exceptions to that immunity.  *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  As noted *supra* at 10, in actions to enforce ICSID awards, federal courts exercise jurisdiction under the FSIA strictly in compliance with the ICSID Convention as implemented by 28 U.S.C. § 1650a, and are "not permitted to examine . . . the ICSID tribunal's jurisdiction to render the award."  *Mobil Cerro Negro*, 863 F.3d at 102.  Two exceptions to jurisdictional immunity

under the FSIA apply here, each without regard to any challenge to Pakistan's consent to arbitrate this dispute.

*First*, under the FSIA's waiver exception, a foreign state is subject to jurisdiction in any case in which it "has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1). Because the ICSID Convention expressly contemplates enforcement of ICSID awards against contracting states in the courts of other contracting states, including the United States, Pakistan's ratification of the Convention necessarily waived its immunity from such enforcement in U.S. court. That waiver, which is a sufficient basis for jurisdiction in this Court, is based on Pakistan's consent to *enforcement* in the ICSID Convention. This Court's jurisdiction in no way depends on whether Pakistan consented to *arbitration* in the A-P Treaty, or on any other ground on which Pakistan attempts to attack the jurisdiction of the ICSID Tribunal.

*Second*, under the FSIA's arbitration exception, a foreign state is also subject to jurisdiction in an action "to confirm an award made pursuant to . . . an agreement to arbitrate" that is "made by the foreign state with or for the benefit of a private party." 28 U.S.C. § 1605(a)(6). The petition to enforce the Award falls squarely within that exception. While Pakistan argues that the A-P Treaty does not express Pakistan's agreement to arbitrate treaty disputes, the Tribunal concluded otherwise, and § 1650a obligates this Court to accord full faith and credit to that determination.

These exceptions thus confirm this Court's subject-matter jurisdiction without regard to any challenge to the Tribunal's determination that Pakistan consented to arbitrate before ICSID. Out of an abundance of caution, TCC has briefed the issue—and shown that the Tribunal was correct—but the Court need not decide it. Either way, this Court has jurisdiction under the FSIA.

1.   **This Court Has Jurisdiction Under The FSIA's Waiver Exception Because Pakistan's Signing Of The ICSID Convention Waived Its Immunity To Enforcement Of ICSID Awards In United States Courts**

While Pakistan's motion to dismiss focuses on challenging this Court's jurisdiction under

the FSIA's arbitration exception, this Court need not even reach that challenge because its jurisdiction under another exception is beyond dispute:  Under settled precedent, a foreign state waives its immunity in a proceeding to enforce an arbitral award, where (as here) it signs an international treaty such as the ICSID Convention that provides for enforcement of such awards in U.S. court.

**1.**  The FSIA provides that a foreign state is not immune from suit in U.S. court "in any case . . . in which the foreign state has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1).  Pakistan's repeated invocation of the standard for an "'express waiver,'" Mot. 24-25 (quoting, *e.g.*, *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002)), is irrelevant here, as this case involves a waiver "by implication," 28 U.S.C. § 1605(a)(1).  To waive immunity by implication, a foreign state need only "indicat[e] its amenability to suit" in U.S. court.  *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994).  Waiver may be implied where the state: (a) demonstrates "a subjective intent to waive immunity"; (b) "take[s] an act that objectively can be interpreted as exhibiting an intent to waive immunity"; or (c) "take[s] acts that forfeit its right to immunity, irrespective of whether it has intended to do so."  *Cabiri v. Gov't of Republic of Ghana*, 165 F.3d 193, 202 (2d Cir. 1999).

Applying these principles, courts have repeatedly found foreign states to have impliedly waived sovereign immunity from proceedings to enforce arbitral awards when the state has signed an international treaty providing for the enforcement of arbitral awards in U.S. courts.  Just last year, the D.C. Circuit reaffirmed that by signing the New York Convention—a treaty in which "signatories agree to enforce arbitral awards made in other signatory countries"—Ukraine waived its immunity to enforcement of arbitration awards under that Convention.  *Tatneft v. Ukraine*, 771 F. App'x 9, 9 (D.C. Cir. 2019) (per curiam).  Ukraine was therefore subject to jurisdiction under the FSIA's "waiver exception."   28 U.S.C. § 1605(a)(1).  The Court relied on its holding in *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 123 (D.C. Cir. 1999), that a party that

joins the New York Convention necessarily "contemplate[s] arbitration-enforcement actions in other signatory countries, including the United States," and thus "waives its immunity from arbitration-enforcement actions" under the FSIA. *Tatneft*, 771 F. App'x at 10. The Second Circuit has endorsed the same rule in a decision cited favorably in *Creighton*, 181 F.3d at 123. *See Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 578-79 (2d Cir. 1993) (signatory to New York Convention "implicitly waive[s] any sovereign immunity defense" when it "becomes a signatory to th[at] Convention"); *see also Stati v. Republic of Kazakhstan*, 199 F. Supp. 3d 179, 190 (D.D.C. 2016) (Kazakhstan impliedly waived immunity to enforcement actions by signing the New York Convention). Because the New York Convention requires its signatories to "'recognize arbitral awards [under the Convention] as binding and enforce them,'" each signatory "must have contemplated enforcement actions in other signatory States." *Seetransport*, 989 F.2d at 578. These decisions directly undercut Pakistan's outdated assertion that "[t]his Circuit has 'found an implicit waiver of sovereign immunity in only three situations'" not applicable here. Mot. 25.

The same rule applies, with even greater force, to the ICSID Convention. Contracting states agree to "enforce the pecuniary obligations imposed by [an] award within its territories as if it were a final judgment of a court in that State." ICSID Convention, art. 54(1). They also agree to "abide by and comply with" all awards against them, *id.*, art. 53(1), subject to such enforcement. Contracting states thus necessarily "contemplat[e] enforcement actions in other Contracting States," including the United States. *Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72, 84 (2d Cir. 2013) (alteration omitted). As a result, a foreign state "waive[s] its sovereign immunity" from enforcement of an ICSID award "by becoming a party to the ICSID Convention." *Id.* (finding subject-matter jurisdiction to enforce an ICSID award on this basis). Because Pakistan is a party to the ICSID Convention, *see supra* at 5 n.1, it has waived immunity to enforcement of

ICSID awards, and this Court has jurisdiction under 28 U.S.C. § 1605(a)(1).[2]

2. Pakistan's waiver of immunity in no way depends, as Pakistan argues, on whether it "agree[d] to arbitrate" the underlying dispute. Mot. 27. The waiver occurs "'when [the] country becomes a signatory to the Convention,'" *Creighton*, 181 F.3d at 123—"by becoming a party," *Blue Ridge*, 735 F.3d at 84—not later, by signing an agreement providing for arbitration. Contracting parties agree that an ICSID tribunal will determine whether the parties to an investment dispute have consented to arbitration, ICSID Convention, arts. 25, 41, and that determination will be "final" and "binding" in enforcement proceedings without "any appeal or . . . other remedy," *id.*, arts. 53(1), 54(1). The ICSID Convention makes clear that the Committee has the exclusive authority to hear challenges to the Tribunal's jurisdiction. *Id.*, arts. 52-54. This Court's jurisdiction thus depends solely on whether the Tribunal rendered an award, not whether the Tribunal was correct in finding jurisdiction to do so.

Pakistan gets this Court's responsibility exactly backwards in claiming otherwise. It asserts that it cannot find any case "in which a court found jurisdiction under the implied waiver exception *after* finding that there was no agreement to arbitrate." Mot. 28 (emphasis added). But that is because the question of waiver of immunity comes *first* and obviates any inquiry into consent to arbitrate. When a state waives immunity by signing the ICSID Convention or the New

---

[2] Pakistan claims Article 55 of the ICSID Convention "expressly preserves sovereign immunity." Mot. 26. But the only immunity that article preserves is "immunity . . . from execution," ICSID Convention, art. 55, not immunity from jurisdiction. These "two kinds of immunity" are distinct. *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 142 (2014). Jurisdictional immunity protects states from suit, 28 U.S.C. §§ 1604-1607, while execution immunity protects state assets from seizure, *id.* §§ 1609-1611. While execution immunity as to non-commercial assets may have been preserved, Pakistan's motion invokes only jurisdictional immunity, Mot. 21, and the Convention does *not* preserve that type of immunity. Indeed, by expressly preserving execution immunity without mentioning immunity from suit, the Convention makes clear that the latter is *not* preserved. If the drafters "intended to . . . preserv[e]" both, "it would be strange to mention specifically only [one], and leave the [other] to implication." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 232 (2011).

York Convention, the question of an arbitration agreement never arises because the waiver establishes subject-matter jurisdiction under the FSIA, *see* 28 U.S.C. § 1605(a)(1), without any need for the court to first decide whether an arbitration agreement exists.  Thus in *Tatneft*, the D.C. Circuit rejected precisely the type of argument that Pakistan makes here—that Ukraine "did not agree to arbitrate th[e] dispute" and that "[n]o agreement to arbitrate" the claims of two of the companies involved was ever "formed," Br. for Appellant at 43, 46, *Tatneft v. Ukraine*, No. 18-7057, Doc. ID 1748825 (D.C. Cir. Sept. 4, 2018) (emphasis omitted).  The *Tatneft* court found jurisdiction under the waiver exception without even addressing these arguments or the existence of an arbitration agreement.  Pakistan's attempt to create an issue out of its supposed failure to consent to the arbitration in which it vigorously participated is thus irrelevant.

Further, Pakistan cannot avoid its waiver of immunity by denying that it agreed to arbitrate A-P Treaty disputes, because it *confirmed* precisely the opposite before the ICSID Tribunal.  Pakistan affirmatively *invoked* that jurisdiction as far back as 2013 by asking the Tribunal to adjudicate its own counterclaim against TCC.  Pakistan Counter-Mem. (Davis Decl. Ex. B) ¶¶ 626-30.  In support of the Tribunal's jurisdiction, Pakistan expressly represented to the Tribunal that it had "consented in writing . . . to the jurisdiction of th[e] ICSID Tribunal . . . in the form of Article 13 of the" A-P Treaty.  *Id.* ¶ 644; *see also id.* ¶ 632.  Pakistan then arbitrated this dispute to completion before ICSID over a period of nearly eight years without ever denying that Article 13 of the A-P Treaty expressed its written consent to arbitration.  If, somehow, Pakistan's adoption of the ICSID Convention was not enough, Pakistan's own words and conduct in the arbitration unmistakably waived any argument that it is immune because of a supposed failure to provide consent to arbitrate this dispute as Pakistan was obligated to do under the A-P Treaty.  A-P Treaty art. 13(3)(a).

**3.**  Pakistan finally asserts that invoking the waiver exception here would circumvent the FSIA's separate "arbitration exception."  Mot. 27-28.  But the D.C. Circuit already rejected this

argument in *Tatneft*, explaining that applying the waiver exception in arbitration cases would not "swallow up the . . . arbitration exception" because "each [exception] contains its own unique elements" and "the overlap is incomplete." *Tatneft*, 771 F. App'x at 9-10.  The arbitration exception remains, for example, the exclusive jurisdictional basis for enforcing arbitration awards against foreign states that have not waived immunity from suit by signing a treaty that provides for enforcement of arbitration awards in the courts of the United States.  *E.g.*, *Creighton*, 181 F.3d at 121, 123-24 (separately considering waiver exception and arbitration exception); *S & Davis Int'l, Inc. v. Republic of Yemen*, 218 F.3d 1292, 1301-02 (11th Cir. 2000) (finding award enforceable against foreign state by treaty even though foreign state had not agreed to arbitrate).

While the waiver and arbitration exceptions may both apply when a foreign state *both* agrees to arbitrate *and* agrees by treaty to enforcement of arbitral awards in the United States, such overlap is demonstrably what Congress intended.  The FSIA's legislative history indicates that even before the arbitration exception was enacted, "Congress expected arbitration awards to be executed against the commercial assets of foreign states under [the waiver exception]." *Arbitral Awards: Hearing on H.R. 3106, et al. Before the Subcomm. on Admin. Law & Gov. Relations of the H. Comm. on the Judiciary*, 99th Cong. 92 (1986) (statement of Mark B. Feldman).  When courts reached conflicting views about the circumstances in which the waiver exception applied, Congress enacted the arbitration exception to resolve the "uncertainty." *Id.* at 92-94.  But far from "replac[ing]" the waiver exception with the arbitration exception, the legislative history reflects Congress's intent that courts "may still hold that a particular agreement to arbitrate constitutes a waiver of immunity and consent to the jurisdiction of the court." *Id.* at 96.  Pakistan's own cases recognize, for example, that the waiver exception may apply when "'a foreign state has agreed to arbitration in another country.'" Mot. 25 (quoting *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990)).  Indeed, the arbitration exception *expressly* provides

17

that it applies in some cases in which the waiver exception "is otherwise applicable."  28 U.S.C.

§ 1605(a)(6)(D) (referencing *id.* § 1605(a)(1)).

This Court thus has jurisdiction under the FSIA's waiver exception, and Pakistan's collateral challenge to jurisdiction under the arbitration exception is entirely irrelevant.

### 2.     Pakistan Cannot Dispute This Court's Jurisdiction Under The FSIA's Arbitration Exception Because The Tribunal's Ruling That Pakistan Consented To Arbitration Is Binding On This Court

This Court also has jurisdiction under the FSIA's arbitration exception, which permits a proceeding against a foreign state to "confirm an award" made pursuant to an agreement "by the foreign state," "with or for the benefit of a private party," to "submit to arbitration," if the "award is . . . governed by a treaty," such as the ICSID Convention, that is "in force for the United States" and that "call[s] for the recognition and enforcement of arbitral awards."  28 U.S.C. § 1605(a)(6).

Pakistan does not dispute that this is a proceeding to "confirm an award" under the A-P Treaty, or that the award is "governed by" the ICSID Convention.  Instead, it claims it never "agree[d] to arbitrate" A-P Treaty disputes, but merely agreed to "provide written consent" to such arbitration in the future.  Mot. 21-22.  That is incorrect.  As Pakistan confirmed before the ICSID Tribunal and the Tribunal determined, Pakistan *did* agree to arbitrate A-P Treaty disputes before ICSID.  Pakistan told the Tribunal that it had "consented in writing . . . to the jurisdiction of th[e] ICSID Tribunal . . . in the form of Article 13 of the" A-P Treaty, Pakistan Counter-Mem. ¶ 644, and the Tribunal stated without qualification that "Pakistan has given its consent to submit disputes relating to an investment"—including "the present dispute"—"to the jurisdiction of the Centre," J&L ¶ 646.  Pakistan's challenge to that ruling will be heard by the ICSID Committee hearing its annulment application, and is not properly before this Court.  *See TECO Guatemala Holdings, LLC v Republic of Guatemala*, 414 F. Supp. 3d 94, 100 (D.D.C. 2019) (explaining that principles of full faith and credit made applicable by § 1650a bar award debtors from collaterally attacking

such determinations in U.S. courts); *Mobil Cerro Negro*, 863 F.3d at 100, 102, 118.

Section 1650a requires this Court to give the Award "the same full faith and credit" as a state court judgment in "enforc[ing]" the "pecuniary obligations [it] impose[s]."  22 U.S.C. § 1650a(a).  As Pakistan's cases confirm, such judgments are "'entitled to full faith and credit—*even as to questions of jurisdiction*—when . . . those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment.'"  *Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n*, 455 U.S. 691, 706 (1982) (emphasis added).  "When the question of the [initial] tribunal's . . . jurisdiction is raised in the original action," therefore, its "determination of th[at] issue" is "conclusive under the usual rules of issue preclusion."  *Carr v. District of Columbia*, 646 F.2d 599, 607-08 (D.C. Cir. 1980).  Indeed, even if jurisdiction is *not* raised before the initial tribunal, "[a] party that has had an opportunity to litigate the question of subject-matter jurisdiction may not . . . reopen that question in a collateral attack upon an adverse judgment."  *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 n.9 (1982).  Because the question of the Tribunal's jurisdiction to arbitrate the dispute was presented to and decided by the Tribunal, that determination is therefore entitled to full faith and credit in enforcing the Award.

Even in the commercial arbitration context, where, unlike here, full faith and credit is not the rule, courts applying the FSIA's arbitration exception still must defer to an arbitral tribunal's determination that a foreign state consented to arbitration.  *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200 (D.C. Cir. 2015)—which applied the New York Convention, *id.* at 203—lays out the standard that would apply in the absence of § 1650a's full faith and credit requirement.   A plaintiff meets its "initial burden" of establishing that a foreign state has "agreed to arbitrate" simply by "producing the [agreement], [the] notice of arbitration . . . , and the tribunal's arbitration decision," *id.* at 204-05—as TCC unquestionably has done here.  *See generally* A-P Treaty (ECF No. 1-3);

Request for Arbitration (Davis Decl. Ex. A); Award (ECF No. 1-1, Ex. A).  The "burden" then "shift[s]" to the foreign state to show that there is not "a valid arbitration agreement between the parties." *Chevron*, 795 F.3d at 205.  In *Chevron*, the district court made this determination applying the New York Convention's "deferential standard of review" because the relevant arbitration rules—like the ICSID Convention, arts. 25, 41—provided for the arbitral tribunal to resolve all objections to its jurisdiction.  *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 64, 67 (D.D.C. 2013).[3]  The D.C. Circuit found this deferential analysis adequate to establish jurisdiction under the arbitration exception.  *See* 795 F.3d at 205 n.3 (citing 949 F. Supp. 2d at 63 and quoting *id.* at 67).  In light of the even greater deference owed to ICSID awards—which are not even reviewable under the New York Convention's already deferential standard, 22 U.S.C. § 1650a(a); *Mobil Cerro Negro*, 863 F.3d at 120-21—the Tribunal's determination that Pakistan consented to arbitrate A-P Treaty disputes is entitled to full faith and credit.

### 3.    The ICSID Convention And The FSIA Preclude Pakistan's Argument

Should this Court have any doubt that the FSIA requires enforcement of the Award without permitting Pakistan's collateral attack on the Tribunal's findings, the ICSID Convention and the FSIA would resolve it in favor of finding jurisdiction.  Nothing in the ICSID Convention's text permits the United States to condition enforcement of an ICSID award on a court's independent assessment of the validity of Pakistan's consent to arbitration.  To the contrary, the Convention requires the United States to enforce ICSID awards without permitting "any appeal or . . . *any other remedy* except those provided for in th[e] Convention."  ICSID Convention, art. 53(1) (emphasis added).  Declining enforcement on jurisdictional grounds would thus violate the United

---

[3]  The court stated that it was applying this "deferential standard" in holding that "Ecuador did consent to arbitration." *Chevron*, 949 F. Supp. 2d at 64.  It later applied this deferential standard in holding that the dispute involved an "investment" covered by the arbitration agreement, *id.* at 67-69, and expressly relied on that holding in finding "a valid agreement to arbitrate," *id.* at 67.

States' obligations under the ICSID Convention.

There is no conflict between the United States' treaty obligations under the ICSID Convention and the FSIA.  The FSIA is expressly drafted to avoid any such conflict.  It grants foreign states jurisdictional immunity only "[s]ubject to existing international agreements to which the United States [was] a party" when the FSIA was enacted in 1976.  28 U.S.C. § 1604.  The Convention—ratified by the United States in 1966—is such a pre-existing "international agreemen[t]," *id.*, so the Convention's mandate must control to the extent of any conflict with the FSIA.  Further, under settled principles of statutory interpretation, courts in this Circuit must interpret federal statutes "to avoid . . . conflicts" with preexisting treaties.  *Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*, 724 F.3d 230, 233-34 (D.C. Cir. 2013).  This Court should therefore reject Pakistan's invitation to subvert the ICSID Convention's unequivocal directive by pitting it against the FSIA.  Both the FSIA and settled rules of interpretation demand an interpretation of the FSIA that avoids any conflict with the United States' obligations under the ICSID Convention.

### 4.   The Tribunal's Determination That Pakistan Consented To Arbitration Was Correct

For the reasons just stated, this Court need not and should not reach the merits of Pakistan's improper collateral attack on the Tribunal's determination that Pakistan consented to arbitrate TCC's claims.  Although Pakistan has now raised identical challenges to its consent to arbitration before this Court and the ICSID Committee, *see* Annulment App., ECF No. 17-3, ¶¶ 66-72, the Court need not resolve that issue or await its resolution by the Committee to conclude that it has jurisdiction under a proper interpretation of the FSIA.

**1.**   While the Court need not reach the issue, Pakistan clearly consented to arbitration of this dispute.  As Pakistan confirmed before the ICSID Tribunal, *see supra* at 16; Pakistan Counter-Mem. ¶ 644, the A-P Treaty contains both state parties' written offers to arbitrate disputes with

investors from the other state.  Specifically, Article 13(2)(b) of that treaty provides that "either party to the dispute may . . . refer the dispute to [ICSID]."  A-P Treaty, art. 13(2)(b).  This easily satisfies both the FSIA arbitration exception's requirement of an "agreement . . . to submit to arbitration," 28 U.S.C. § 1605(a)(6), and the ICSID Convention's requirement for written consent to initiate ICSID arbitration proceedings, *see* ICSID Convention, art. 25.

Pakistan itself adopted this interpretation of the A-P Treaty throughout the arbitration, in which it not only fully participated, but affirmatively asserted—successfully—that the Tribunal had jurisdiction to hear Pakistan's counterclaims.  *See* J&L ¶¶ 1432–1433, 1449(V); Pakistan's Counter-Mem. (Davis Decl. Ex. B) ¶ 634 (TCC "commenc[ed] these proceedings pursuant to the arbitration agreement" in "Article 13 of the BIT"); Pakistan's Rejoinder on J&L (Davis Decl. Ex. C) ¶ 532 (TCC "accepted the terms of [Pakistan]'s consent to arbitrate in Article 13"), id. ¶ 552 ("By initiating . . . arbitration [TCC] accepted [Paki-stan]'s offer of ICSID arbitration, contained in Article 13 of the BIT").  The Tribunal agreed with Pakistan, finding that "[i]n Article 13(2)(b) of the Treaty, Pakistan has given its consent to submit disputes relating to an investment to the jurisdiction of the Centre."  J&L ¶ 646.

While Pakistan raised other challenges to the Tribunal's jurisdiction, at no time did it suggest that consent to arbitrate had to be provided separately from this provision of the A-P Treaty. Pakistan's purported failure to comply with its own obligation to confirm its consent to arbitration in no way negates its agreement to arbitrate or deprived the ICSID Tribunal of jurisdiction.

**2.**  As Pakistan's repeated acknowledgements to the Tribunal make clear, with Article 13 of the A-P Treaty, Australia and Pakistan issued a standing offer to arbitrate disputes with each other's investors.  Parties to an investment dispute must first try to resolve it via consultations and negotiations.  If these do not succeed, "either party to the dispute may" either (1) "initiate proceedings before [domestic] judicial or administrative bodies" under Article 13(2)(a); or (2) "refer the

dispute" to arbitration through two possible forums.  A-P Treaty, art. 13(2).  Article 13(2)(b) pro-vides that if Australia and Pakistan remain parties to the ICSID Convention at the time a dispute arises, either party "may . . . refer the dispute to [ICSID]."  *Id.*, art. 13(2)(b).  Otherwise, Article 13(2)(c) provides that either party "may . . . refer the dispute to an Arbitral Tribunal constituted in accordance with Annex B" of the A-P Treaty.  *Id.*, art. 13(2)(c).

By allowing their respective investors to "refer the dispute" to arbitration, A-P Treaty, art. 13(2)(c), Australia and Pakistan provided a binding standing offer to arbitrate investment disputes under the A-P Treaty.  This language closely tracks—and thus satisfies—the FSIA arbitration ex-ception's requirement of an agreement "to submit [disputes] to arbitration," 28 U.S.C. § 1605(a)(6), as well as the ICSID Convention's requirement that the parties agree "to submit" a dispute to ICSID arbitration, *see* ICSID Convention, art. 25(1).  It is standard treaty language sim-ilar to other provisions that other investment tribunals have likewise interpreted as establishing consent to arbitrate.  *See RosInvestCo UK Ltd. v. Russian Fed'n*, SCC Case No. V 079/2005, Award on Jurisdiction, ¶¶ 71, 74 (Oct. 2007) (finding that where "the investor [was] entitled to submit the case" to arbitration, there existed "a binding consent to arbitration"); *Millicom Int'l Operations B.V. v. Republic of Senegal*, ICSID Case No. ARB/08/20, Decision on Jurisdiction, ¶ 95 (July 16, 2010) (finding that an investment contract which provided that the parties may have "recourse to" ICSID arbitration constituted a standing offer to arbitrate).

A party's decision to "refer the dispute" to ICSID triggers additional procedural obligations under the A-P Treaty.  Article 13(3)(a) requires that the respondent state (be it Pakistan or Aus-tralia) "shall" provide a written undertaking of its consent to ICSID arbitration.  But that require-ment does not negate the state's consent to ICSID arbitration already given in Article 13(2)(b).  Rather, the circumstances in which the A-P Treaty was drafted and concluded confirm that the treaty's drafters introduced Article 13(3)(a) to offer written confirmation of the consent already

provided in Article 13(2)(b).

The A-P Treaty, including Article 13, closely mirrors the Model Investment Promotion and Protection Agreement that Australia created shortly after it ratified the ICSID Convention in 1991. *See* Australian Department of Foreign Affairs and Trade, *National Interest Analysis of the Treaty*.[4] At the time, scant jurisprudence on the ICSID Convention was available, so there was uncertainty as to how the Convention would be applied.[5]  In particular, at the time, it "remained controversial" whether a bilateral investment treaty could provide for standing consent to arbitration without the need for additional, written consent.  Campbell McLachlan et al., *International Investment Arbitration: Substantive Principles* 52-53 (Oxford Univ. Press, 2d ed. 2017).  The issue is now "no longer controversial," *id*.—providing standing consent through investment treaties now is "accepted practice," Christoph H. Schreuer et al., *The ICSID Convention: A Commentary* 205 (Cambridge Univ. Press, 2d ed. 2009).  The uncertainty at the time Australia's model agreement was drafted explains the belt-and-suspenders approach by which the parties both consented in the treaty to the submission of disputes to ICSID, A-P Treaty, art. 13(2)(b), and also agreed out of an abundance of caution to provide further written confirmation of that consent upon submission of a dispute to ICSID, *id.*, art. 13(3)(a).  Pakistan's own submissions recognize that one form of consent under the A-P Treaty is sufficient—telling the Tribunal that Pakistan had "provided its written consent in the form of Article 13 of the BIT."  Pakistan's Counter-Mem. ¶ 634.

Further, the Australian government recognized when the treaty was concluded that an investor could "refer [an investment] dispute" to ICSID and thereby "require[e]" Australia to participate and "bear all or part of the cost of arbitration."  *National Interest Analysis*, *supra*.  Australia

---

[4]  https://www.austlii.edu.au/au/other/dfat/nia/1998/12.html.

[5]  Only a few ICSID cases had been registered before 1990; the number only took off in the early 2000s.  The ICSID Caseload – Statistics, Issue 2019-2, charts 1-2.  tiny.cc/iiw6tz.

made no mention of being able to escape arbitration by failing to comply with 13(3)(a).

**3.**  Pakistan nonetheless now claims that the A-P Treaty "'contains no standing offer to arbitrate before ICSID'" unless Pakistan complies with Article 13(3)(a) by "consent[ing] in writing . . . within 30 days of receiving [an arbitration] request."  Mot. 22, 24.

Pakistan's interpretation of the A-P Treaty cannot be squared with that treaty's plain language or the applicable ICSID framework.  To start, it ignores Article 13(2)(b) entirely.  *Supra* at 23-24.  It also ignores the identical language in Article 13(2)(c), which provides that the parties "may . . . refer the dispute" to a non-ICSID tribunal if Australia or Pakistan have ceased to be parties to the ICSID Convention.  A-P Treaty.  It would make no sense for Australia and Pakistan to provide for unconditional arbitration only in the event that one or both parties withdraws from the ICSID Convention, while otherwise conditioning their consent on a further writing only when both nations remain parties to the ICSID Convention.  The A-P Treaty should not be read to produce such absurd results.  *See Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 179-80 (1993) (rejecting treaty interpretation that would result in "absurd anomaly").

Pakistan's interpretation likewise clashes with the ICSID Convention.  The Convention requires that a party requesting arbitration before ICSID obtain written consent to arbitrate *before* submitting the dispute to ICSID.  Yet under Pakistan's interpretation of the A-P Treaty, TCC was required to submit the dispute to ICSID *before* obtaining Pakistan's consent to arbitrate, because Pakistan's obligation to consent arose only *after* "receiving the request" to arbitrate.  Mot. 24.  Pakistan thus reads the A-P Treaty to mandate commencement of arbitration in contravention of the ICSID Convention, and without consent of both disputing parties.  This Court should reject that unreasonable reading of the A-P Treaty.  *See Sale*, 509 U.S. at 179-80.

**4.**  Pakistan bases its contrary interpretation on a single ICSID case, *Planet Mining Pty Ltd. v. Republic of Indonesia*, ICSID Case Nos. ARB/12/14 and 12/40, Decision on Jurisdiction (Feb.

24, 2014), ECF No. 34-14.  In that case, which is not binding on this Court (or on any other arbitral tribunal or annulment committee constituted by ICSID), the tribunal concluded that "a separate act [was] needed" to establish consent in the Australia-Indonesia BIT.  ECF No. 34-14, ¶ 161.  The *Planet Mining* tribunal arrived at this conclusion despite acknowledging that such an interpretation "poses a difficulty in the ICSID framework," where "consent must exist on the day of the filing of the request for arbitration."  *Id.* ¶ 166.  That tribunal also acknowledged that it lacked access to documents, such as the Australian government's National Interest Analysis of the treaty, to provide insight into the state parties' contemporaneous views on the treaty's provisions.  *Id.* ¶ 197.  And while purporting to give "primacy [to] the text," *id.* ¶ 151, that tribunal concluded that a "further act" of consent by the state, *id.* ¶ 198, could be satisfied by actions taken *before* the commencement of the arbitration, *id.* ¶ 202, even though the treaty plainly obligated the state to provide its undertaking "'*within forty-five days*'" of "'*receiving*'" the investor's request for arbitration, *id.* ¶ 153 (emphases added).  In light of the acknowledged limitations of the information available to that tribunal and the above-identified errors, this Court should not accord its views any weight.[6]

Even under an approach that requires several "separate act[s]" of consent by Pakistan, those acts are present here.  Pakistan *confirmed* to the Tribunal—in writing—that it had "consented in writing . . . to the jurisdiction of th[e] ICSID Tribunal," Pakistan Counter-Mem. ¶ 644.  Pakistan then filed counterclaims, submitting that they were "within the scope of the consent of the parties." J&L ¶ 1380.  The Tribunal agreed with Pakistan, finding that the "language used in Article[s] 13(1) and (2) of the [A-P] Treaty makes clear that both sides, *i.e.*, the investor and the host State, may

---

[6] Reports indicate that, based on information that was not available to the *Planet Mining* tribunal, an ICSID tribunal recently held that the use of "shall consent" in an Australian bilateral investment treaty conveyed the state's advance consent to arbitration.  Lisa Bohmer, *Tribunal In Egyptian Mining Arbitration Finds Advance Consent To ICSID Arbitration In Australia-Egypt BIT,* Investment Arbitration Reporter (Oct. 12, 2020) (Davis Decl. Ex. Q).

initiate ICSID proceedings with regard to disputes relating to an investment." *Id.* ¶ 1418.  There-

fore, any additional written consent required by the A-P Treaty clearly has been provided.  Paki-

stan's consent to arbitrate thus satisfies the requirements of the FSIA's arbitration exception.

**B.**  **TCC Completed Service Of Process On Pakistan Pursuant To The Foreign Sovereign Immunities Act**

This Court should also reject Pakistan's frivolous attempt to delay enforcement by object-

ing to service of process.  After initially rejecting TCC's request that Pakistan acknowledge service

in exchange for TCC's agreement to extend the time to file a responsive pleading, ECF No. 18-1,

Ex. A, at 1, Pakistan's sole objection to service amounts to no more than outlandish speculation

that the clerk of this Court committed perjury when she attested to dispatching process to Pakistan

pursuant to § 1608(a)(3) of the FSIA.  The record dispels Pakistan's baseless theory, and Pakistan

has now waived any other possible objection to service.  *See* Fed. R. Civ. P. 12(h)(1).

**A.**  The FSIA's "hierarchical" framework for serving process "on 'a foreign state'" lays

out "four methods" that must be attempted sequentially until one succeeds.  *Republic of Sudan v.*

*Harrison*, 139 S. Ct. 1048, 1054 (2019) (quoting 28 U.S.C. § 1608(a)).  Pakistan concedes that the

first method—service by "any special arrangement for service between the plaintiff and the for-

eign state," 28 U.S.C. § 1608(a)(1)—is "inapplicable here because there is no special agreement

between Petitioner and Pakistan regarding service."  Mot. 19.  Likewise, Pakistan does not dispute

that TCC exhausted any obligation to attempt service under the second method—through "an ap-

plicable international convention on service of judicial documents," 28 U.S.C. § 1608(a)(2).[7]

---

[7]  As previously noted, ECF No. 15, at 1 n.1, TCC satisfied its obligations under § 1608(a)(2) by sending the required documents through two separate commercial carriers to the Central Authority designated by Pakistan for receiving and forwarding service under the applicable convention—the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.  Davis Decl. ¶¶ 7-14 & Exs. D-L.  Pakistan's Central Authority refused delivery of both shipments.  *Id.* ¶¶ 10, 13 & Exs. H, L.

Because TCC determined that service "c[ould] not be made under paragraphs (1) or (2)," it was authorized to serve Pakistan through the third method—"sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." 28 U.S.C. § 1608(a)(3). The docket reflects: (1) TCC's request to the clerk of this Court to dispatch service to the head of Pakistan's ministry of foreign affairs under § 1608(a)(3), ECF Nos. 10, 11; (2) the clerk's affidavit, under penalty of perjury, that she dispatched the required materials through DHL, ECF Nos. 12, 13, 14; and (3) the return of service reflecting the ministry's receipt of the dispatched materials on September 30, 2019, ECF Nos. 15, 15-1, 15-2. Under § 1608(c)(2), therefore, service was effective "as of the date of receipt." 28 U.S.C. § 1608(c)(2).

**B.** Pakistan largely concedes compliance with most of these requirements. It recognizes that § 1608(a)(3) is the "[r]elevant" method of service, Mot. 19, and it does not deny that the correct service materials were addressed, dispatched, and successfully delivered to the correct address.

Instead, Pakistan argues that the service materials were not "'addressed and dispatched by the clerk'" because, according to a third-hand report from Pakistan's attorney, "the package was picked up from the Gibson Dunn office" rather than the Clerk's office. Mot. 19-20 (emphases omitted). That argument is contradicted by the record. The Clerk of Court's September 26, 2019 Certificate of Mailing certifies "under penalty of perjury" that on that date, "I"—the Clerk— "mailed . . . [o]ne copy of the summons, complaint and notice of suit, together with a translation of each into the official language of the foreign state, by DHL, to the head of the ministry of foreign affairs, pursuant to the provisions of 28 U.S.C. § 1608(a)(3)." ECF No. 14. In addition, Gibson Dunn attorney Katherine Maddox Davis has sworn a declaration that she delivered the package to the Clerk's office on September 18, 2019, and coordinated with both DHL and the Clerk's office

to ensure that *the Clerk* would timely dispatch the package.  Davis Decl. ¶¶ 17-28.  Ms. Davis's declaration is supported by contemporaneous email correspondence regarding her dealings with DHL, *see id.* & Exs. M, N, which are admissible to dispel any question by Pakistan as to the sincerity of Ms. Davis's declaration, *see* Fed. R. Evid. 801(d)(1)(B).

Against this overwhelming evidence, Pakistan offers only the declaration of its own attorney, Hannah C. Banks, concerning two phone calls she allegedly had with representatives of DHL—one unnamed—through their main customer service line.  ECF No. 34-25 ("Banks Decl.") ¶¶ 6-10.  The testimony is hearsay because it concerns "an out-of-court statement offered for the truth of the matter asserted."  *United States v. Thompson*, 279 F.3d 1043, 1047 (D.C. Cir. 2002) (citing Fed. R. Evid. 801(c)).  No DHL representative has offered any direct testimony to corroborate Ms. Banks's declaration, and TCC has had no opportunity to cross-examine said representative.  Most likely, the DHL representative with whom Ms. Banks allegedly spoke provided the shipper information, not the location of pickup, because Gibson Dunn was listed as the shipper on the waybill in accordance with the Clerk's office's instructions, and so that the shipment could be invoiced to and paid for through Gibson Dunn's DHL account, which is standard practice.  ECF No. 13-2, at 1-2; Davis Decl. ¶ 19.  In any event, all admissible evidence in the record shows that the package was dispatched by the Clerk from the Clerk's office.

To the extent Pakistan is also arguing that service is deficient because Ms. Davis "addressed the package," Mot. 20, that argument is frivolous.  Regardless of who physically wrote out the address on the waybill, the Clerk "addressed" the package by affixing the correctly addressed waybill to the package.  *See* Davis Decl. ¶¶ 17-19 (stating that Ms. Davis provided the waybill to the Clerk but did not affix it to the package).  In any event, as long as the package is both "addressed . . . to" and "dispatched by the clerk . . . to" the correct address, 28 U.S.C. § 1608(a)(3)— as the FSIA requires, *see Republic of Sudan*, 139 S. Ct. at 1053—it would be the height of empty

formalism to conclude that the Clerk must physically write the address on the package. As Pakistan acknowledges, therefore, this Court has repeatedly recognized that the Clerk's responsibilities under § 1608(a)(3) are "satisfied when the clerk dispatched the documents using DHL" or "FedEx." Mot. 19-20 (citing *Abur v. Republic of Sudan*, 437 F. Supp. 2d 166, 173 (D.D.C. 2006); *de Sousa v. Embassy of Republic of Angola*, 229 F. Supp. 3d 23, 28 (D.D.C. 2017)).[8] The Clerk plainly satisfied that requirement here.

### C.      Pakistan's Purported Merits Defenses Are Meritless

Pakistan also purports to raise non-jurisdictional defenses for denying full faith and credit to the Award and refusing to enforce it. Mot. 28-34. The ICSID Convention leaves no room for such defenses. Pakistan arbitrated and lost, and the United States committed itself by treaty to enforcing the resulting award without providing "any appeal or . . . any other remedy except those provided for in [the ICSID] Convention." ICSID Convention, art. 53(1). The sole remedy provided by the ICSID Convention here is review by an annulment committee. *Id.*, art. 52. Once this Court finds jurisdiction, it "may do no more than examine the judgment's authenticity and enforce the obligations imposed by the award," without allowing any "substantive challenges to the award." *Mobil Cerro Negro*, 863 F.3d at 102, 118; *see supra* at 10. In any event, none of Pakistan's defenses provides a basis for denying full faith and credit to the Award.

### 1.      Pakistan Cannot Relitigate The Tribunal's Jurisdiction

Pakistan claims the Award "should be denied full faith and credit" because "the Tribunal lacked jurisdiction to conduct this arbitration." Mot. 29-31. But as explained *supra* at 10, this

---

[8]  In each case, the waybill was completed in the handwriting of the requesting attorney who signed the waybill. *See Abur*, No. 1:02-cv-1188, ECF No. 20, at 2-5 (D.D.C. Apr. 23, 2004) (waybills signed and completed by Eaves Law Firm attorney Joel Hopman in same handwriting). *Compare de Sousa*, No. 1:16-cv-367, ECF No. 15 (D.D.C. May 31, 2016) (affidavit requesting mailing), *with id.* ECF No. 16-1 (May 31, 2016) (waybill completed in same handwriting).

Court "has no authority to relitigate" "ICSID's jurisdiction" where that issue was "'fully and fairly litigated and finally decided'" in arbitration. *Tidewater*, 2018 WL 6605633, at *6 n.4. The Award is entitled to the same "full faith and credit" as a state judgment, 28 U.S.C. § 1650a, and those judgements are entitled to full faith and credit "'even as to questions of jurisdiction'" that were "'fully and fairly litigated and finally decided'" in the original proceeding. *Underwriters*, 455 U.S. at 706. Indeed, Pakistan is precluded from challenging jurisdiction as long as it "had an opportunity to litigate the question of subject-matter jurisdiction," even if it failed to avail itself of that opportunity. *Ins. Corp. of Ireland*, 456 U.S. at 702 n.9.

Here, Pakistan not only had an opportunity to contest the Tribunal's jurisdiction on the grounds it raises in Part III.A of its brief; it *did* contest jurisdiction on those grounds, and it lost. As it argues here, Mot. 30, Pakistan told the Tribunal that the A-P Treaty applies only to disputes about an "investment," including "an asset owned or controlled by an Australian investor," J&L ¶ 599 (citing A-P Treaty, art. 1(1)(a)). Pakistan argued that TCC's mining agreements were not "asset[s]"—and thus not "investment[s]"—because Pakistan's Supreme Court had declared them "void *ab initio*" as allegedly exceeding the Balochistan Development Authority's powers. *Id.* ¶¶ 554, 611. Pakistan further argued that this holding was binding on the Tribunal because "international arbitral tribunals lack competence to act as appellate bodies" as to issues of "domestic law." *Id.* ¶ 613. Pakistan makes the same argument to this Court virtually verbatim. Mot. 30-31.

The Tribunal rejected these arguments. Interpreting the A-P Treaty under principles of international law, it held the status of TCC's mining agreements as "asset[s]" depended on whether they were "accepted by the relevant authorities or officials" "*at the time* [*they were*] *made*." J&L ¶ 637 (emphasis added). The Tribunal emphasized that "[i]f such an acceptance could later be revoked retroactively" by the Pakistan Supreme Court's declaring TCC's interest void, Pakistan "could unilaterally deprive an initially 'admitted' investment of its protection under the [A-P]

Treaty," undermining that treaty's purpose. *Id.* (emphasis omitted). Because TCC's "activities in Pakistan were not only accepted, but highly welcomed and encouraged" by Pakistan officials at the time of the relevant agreements, *id.* ¶ 640, the agreements qualified as investments under the A-P Treaty *irrespective of their status* as a matter of Pakistani domestic law, *id.* ¶ 642.

Pakistan cannot and does not even attempt to dispute the Tribunal's sound reasoning in dispensing with these arguments. Regardless, the merits of these holdings are not before this Court. Because Pakistan had the "opportunity to litigate the question of [the Tribunal's] subject-matter jurisdiction," *Ins. Corp. of Ireland*, 456 U.S. at 702 n.9, and indeed "'fully and fairly litigated'" that issue to a "'fina[l] deci[sion] in the [Tribunal] which rendered the [Award],'" *Underwriters*, 455 U.S. at 706, Pakistan cannot collaterally attack that decision here.

### 2.    Pakistan Cannot Relitigate Damages

Pakistan's challenge to the Tribunal's damages award as "[e]xcessive," Mot. 31, fares no better. Pakistan does not even attempt to cite authority holding that excessive damages is a basis for denying full faith and credit to a state court judgment or (under the same standard) an ICSID award. Instead, it merely contends that the Award is so "manifestly excessive" that it "violates due process." Mot. 32. That argument falters at every step.

**1.** To begin, no limit due process could impose on the power of state and federal courts to award compensatory damages later deemed excessive, would bind the ICSID Tribunal. The Due Process Clause of the Fifth and Fourteenth Amendments limits the power of the United States and its States to deprive "*any person* of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1 (emphasis added). Pakistan, as a foreign state, is not a "person" protected by the Due Process Clauses. *See Livnat v. Palestinian Auth.*, 851 F.3d 45, 49 (D.C. Cir. 2017); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002). Accordingly, even if Pakistan were challenging enforcement of a judgment entered by a state or federal

court, rather than an award of an ICSID tribunal, Pakistan could not raise a due process objection.

Moreover, the Due Process Clause applies only to "state action." *E.g., Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 182 (1988). It "offers no shield against purely private conduct," *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 42 (D.C. Cir. 2015), nor against actions by non-U.S. governments, *United States v. Verdugo-Urquidez*, 494 U.S. 259, 273-75 (1990). ICSID tribunals are not U.S. courts but are private international arbitration tribunals bound by the ICSID Convention (as approved by both the United States and Pakistan) to apply the "rules of law . . . agreed [on] by the parties"—not the U.S. Constitution. ICSID Convention, art. 42(1). Applying U.S.-law limitations on damages to ICSID proceedings would violate the Tribunal's mandate under the ICSID Convention, and enforcing those limits against ICSID tribunals would violate the commitment of the United States in signing the ICSID Convention, *see supra* at 10. Likewise, the procedural authority of federal courts to alter or amend a jury award or order a new trial in *their own cases*, *see infra* at 34—based on the Federal Rules of Civil Procedure, *see* 11 Federal Practice and Procedure Civil § 2807 (3d ed.)—plainly does not constrain ICSID, or in any way authorize federal courts to deny full faith and credit to the decisions of ICSID tribunals. This is sufficient ground to reject Pakistan's collateral attack on the damages award.

**2.** In any event, Pakistan's claim of excessive damages has nothing to do with due process. The Due Process Clause's prohibition on "'grossly excessive'" punishments "imposes substantive limits" on "*punitive* damages," *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 433-34 (2001) (emphasis added), but "does not apply to *compensatory* damage awards," *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 387 (4th Cir. 2015) (emphasis added). The "conclusion that [a] damages award did not include a punitive component is fatal to [a] constitutional excessiveness claim," *Leonard v. Stemtech Int'l Inc*, 834 F.3d 376, 394 n.15 (3d Cir. 2016), because "the extent of a plaintiff's injury is essentially a factual determination," not a question of

"punishmen[t]" regulated by the Due Process Clause, *Cooper Indus.*, 532 U.S. at 432.

Rather than identify any due process limit on compensatory damages, Pakistan cobbles together scattered quotes from out-of-circuit decisions discussing the power of federal courts to alter or amend a jury award or order a new trial if the amount of the award lacks record support or contradicts the weight of the evidence. S*ee* Mot. 31-32.  None of those authorities remotely suggests that due process imposes any independent constraint on compensatory damages.  Most do not even mention due process, except in separate sections not relied on by Pakistan, which address punitive damages.  *See United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1229-30 (10th Cir. 2000); *Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 703 F.2d 1152, 1168 (10th Cir. 1981); *Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1414 (4th Cir. 1992).  The only discussion of due process that Pakistan cites—*Luciano v. Olsten Corp.*, 110 F.3d 210, 221 (2d Cir. 1997)—likewise relates to punitive, not compensatory, damages.

The damages awarded here, however, are compensatory, not punitive.  Because Pakistan's denial of TCCP's mining lease application deprived TCC's investment of its value, the Tribunal awarded damages based on the "market value" of that investment on the day the application was denied.  Award ¶¶ 272-73.  The Tribunal determined that "if [Pakistan] had not denied [the] Mining Lease Application . . . , the Reko Diq [mining] project would have gone forward and become operational and profitable."  *Id.* ¶ 331.  The Tribunal thus awarded damages based on the present value of the "future profits" that TCC would have earned from the mine.  *Id.* ¶ 335.

None of Pakistan's criticisms of the Award, which are not properly before this Court, *see supra* at 18, 32, remotely casts doubt on the compensatory nature of the Tribunal's methodology.  While Pakistan complains that the Award—including interest—is "23 times greater than [TCC's] investment," Mot. 32, both parties agreed in the arbitration that the relevant measure of compensation is not how much TCC invested, but how much its investment was *worth* when it was

expropriated, Award ¶ 274.  Pakistan's objections to the *method* the Tribunal used to calculate "lost profits," Mot. 33-34, meanwhile, involve precisely the type of "factual determination" that the Due Process Clause leaves to the trier of fact, *Cooper Indus.*, 532 U.S. at 432, and which are precluded from consideration in this action to enforce the ICSID Award, *see supra* at 10.

**3.**  Moreover, even if Pakistan could somehow connect its claims of excessive damages to due process, they still would not provide a basis for denying full faith and credit to the Award. While the Supreme Court has stated that a "judgment obtained in violation of *procedural* due process is not entitled to full faith and credit," *Griffin v. Griffin*, 327 U.S. 220, 228 (1946) (emphasis added), the limited constraints that the Due Process Clause imposes on damages (*i.e.*, limiting punitive damages) are "*substantive*," not procedural, *Cooper Indus.*, 532 U.S. at 433 (emphasis added).  Pakistan thus fails to cite a single case holding that excessive damages are a ground for denying full faith and credit to state court judgments.  Because the Award is entitled to the same "full faith and credit" as a state court judgment, 28 U.S.C. § 1650a, TCC is entitled to enforce it regardless of any claim that the damages awarded are excessive.  That claim, as with Pakistan's other challenges to the Tribunal's findings, will be resolved before the annulment committee.[9]

## II.    Pakistan's Stay Motion Should Be Denied

### A.    The ICSID Convention Provides For Enforcement Of The ICSID Award Absent An ICSID-Imposed Stay Of Enforcement

Pakistan's alternative request for a stay should also be denied.  In light of the Committee's decision allowing recognition proceedings and execution of up to 50% of the Award, extending a judicial stay would undermine the streamlined enforcement procedures that are critical to the

---

[9]  In any event, Pakistan's "perfunctory and undeveloped" arguments  that the damages here are punitive—based solely on uncited assertions—are insufficient to preserve its defense, which should be deemed forfeited. *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013); *see also Cox v. Nielsen*, 2019 WL 1359806, at *14 (D.D.C. Mar. 26, 2019).

ICSID Convention's comprehensive scheme.  *See* ICSID Convention, art. 53(1).  ICSID awards are final by design.  *Supra* at 10; ICSID Convention, arts. 53(1), 54(1).  While either party to an award may apply to ICSID to "request annulment of the award" on limited grounds, ICSID Convention, art. 52(1), the submission of an annulment application does not stay enforcement of the award pending a final decision unless the committee constituted to decide the annulment application determines that "the circumstances so require," *id.*, art. 52(5).  Unless enforcement is "stayed *pursuant to . . . th*[e] *Convention*," the parties must "abide by and comply with the terms of the award," *id.*, art. 53(1) (emphasis added), and the Contracting States to the ICSID Convention (including the United States) must "enforce the pecuniary obligations imposed by that award" without allowing "any other remedy except those provided for in th[e] Convention," *id.*, arts. 53(1), 54(1).

The ICSID Convention thus contemplates that ICSID awards will be immediately enforceable in the absence of a stay, and that the annulment committee—not a court—will be responsible for determining whether a stay of enforcement is appropriate.[10]  "[A]nnulment proceedings that are not accompanied by a stay of enforcement . . . are neither a justification for non-compliance with the award nor a basis for domestic courts to withhold recognition or refuse enforcement." C. Schreuer, *supra*, ¶ 581.  "The fact alone that annulment proceedings are pending has no suspensive effect."  *Id.*  Instead, "if the [annulment] committee . . . declines to continue or to grant a stay, the award is fully binding and enforceable."  *Id.*; *see also TECO*, 10414 F. Supp. 3d at 108 (explaining that if respondent "believed that a stay was warranted pending a decision by the [ICSID] tribunal, it should have applied to that tribunal for a stay, as the ICSID rules contemplate.

---

[10]  Parallel enforcement proceedings are pending in Australia and the British Virgin Islands.  In the BVI, along with other relief, a Receiver was appointed over certain assets held by Pakistan-controlled entities, including the indirect owners of the Roosevelt Hotel in New York and the Hotel Scribe in Paris.  Although the ultimate value of these frozen assets will be determined at auction, it is estimated that they are worth no more than 25% of the award.

Absent such a stay, Guatemala must abide by and comply with the terms of the award." (quotation marks omitted)).

Congress incorporated these principles when it implemented the United States' treaty obligations under the ICSID Convention by statute in 22 U.S.C. § 1650a.  Beyond directing courts to treat ICSID awards as "final judgment[s]" entitled to "the same full faith and credit as" the judgments of a state court, § 1650a specifies that the FAA's grounds for vacating or refusing confirmation of other arbitration awards do not apply to the enforcement of ICSID awards.

The "perfunctory role" that § 1650 thus envisions "for federal district courts," *Tidewater*, 2018 WL 6605633, at *6, is inconsistent with imposing a stay on enforcement where the ICSID annulment committee has refused to do so.  Indeed, Section 1650a omits the equivalent provisions of the FAA that allow courts to stay enforcement of a foreign commercial arbitration award issued pursuant to the New York Convention.  Unlike the New York Convention—which allows courts to decide whether to stay enforcement pending proceedings to "se[t] aside" an award, N.Y. Convention, art. VI—the ICSID Convention unequivocally assigns that task to the committee overseeing the annulment proceedings.  *See* ICSID Convention, art. 52.  And unlike the FAA provision implementing the New York Convention—which allows a district court to "defe[r] . . . recognition or enforcement of [an] award" under the grounds specified in that convention, 9 U.S.C. § 207, federal law implementing the ICSID Convention does not provide for a judicial stay, *see* 22 U.S.C. § 1650a.  Both the ICSID Convention and Section 1650a(a) thus require this Court to expeditiously enforce an ICSID award in the absence of an ICSID-imposed stay.

Pakistan's retort misses the point.  That courts have "'inherent'" power to control their dockets, Mot. 9, is not a reason to *exercise* that power without regard to the mandate that two branches of our government endorsed by joining and implementing the ICSID Convention.  Decisions that likewise miss this nuance—and give no weight to treaty principles in granting a stay,

*e.g.*, *Unión Fenosa Gas, S.A. v. Arab Republic of Egypt*, 2020 WL 2996085, at *4 (D.D.C. June 4, 2020); *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain,* 2020 WL 5816238, at *3 (D.D.C. Sept. 30, 2020); *9REN Holding S.A.R.L. v. Kingdom of Spain*, 2020 WL 5816012, at *2 (D.D.C. Sept. 30, 2020)—thus have little persuasive value.  Indeed, many of the stay orders Pakistan cites are unreasoned minute orders that fail to even engage with these principles.  Mot. 10.

Whatever power a court may generally have to stay its proceedings to await the outcome of other litigation, that power is not properly exercised where a treaty provides for unobstructed enforcement of foreign arbitral awards.  Even in the more permissive context of the New York Convention, where the courts have a role in reviewing awards on the limited grounds set out in that Convention, the D.C. Circuit has made clear that a "carefully structured scheme for the enforcement of foreign arbitral awards" leaves no room for an open-ended stay request.  *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 733 (D.C. Cir. 2012).  In *Belize*, the D.C. Circuit issued a writ of mandamus to compel a district court to proceed with enforcement of a New York Convention award, holding that the district court exceeded its authority by staying enforcement outside of the narrow circumstances provided by the Convention and its implementing legislation.  *Id.* at 731-33.  Emphasizing the federal courts' "'virtually unflagging obligation'" to "'exercise the jurisdiction given them,'" the court explained that the FAA alone "defined the district court's task: . . . to confirm the Final Award absent a finding that an enumerated exception to enforcement specified in the New York Convention applied."  *Id*.  The mandatory language of Section 1650a—providing without *any* exception that an ICSID award "shall be enforced," 22 U.S.C. § 1650a—makes this Court's duty to proceed with enforcement of TCC's ICSID Award even clearer than the obligation that the D.C. Circuit enforced by writ of mandamus in *Belize*.

The case against a stay is even clearer under the ICSID Convention than under the New York Convention, because unlike the New York Convention, the ICSID Convention assigns the

question of a stay of enforcement to the annulment committee, not to the courts.  *See* ICSID Convention, art. 52(5).  While Pakistan suggests that proceeding in this Court would interfere with the annulment committee's role, in fact the opposite is true:  Staying proceedings in this Court would interfere with the annulment committee's authority to decide if enforcement should be stayed pending annulment proceedings.  *See id.*  There is no reason for this Court to stay enforcement proceedings if the annulment committee itself fails to see a reason to stay enforcement pending its own determination on the merits.  TCC asks nothing more than the right to proceed to enforcement now that the annulment committee has determined that such enforcement is proper.

### B.    Pakistan Fails To Demonstrate Its Entitlement To A Stay

Even if the ICSID Convention left room for a judicial stay of enforcement, Pakistan has not met its heavy "burden"—as movant—"of showing that the stay is needed and warranted." Mem. Op. & Order at 6, *Infrastructure Servs. Luxembourg S.A.R.L. v. Kingdom of Spain*, No. 1:18-cv-1753, ECF No. 36 (D.D.C. Aug. 28, 2019) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936)).  The Committee already considered Pakistan's arguments for a stay and, in a comprehensively reasoned 69-page decision, determined that Pakistan could obtain a stay if it provided (i) security through a guaranty or letter of credit in the amount of 25% of the Award and (ii) an undertaking that it would pay the Award within 30 days if its Annulment application were rejected. Pakistan failed to provide the minimal security required by the Committee or a commitment to honor its treaty obligations.  Accordingly, the Committee has permitted TCC to enforce 50% of the Award as long as TCC places any amounts recovered into an escrow account during the annulment proceedings.  Pakistan effectively asks this Court to ignore the Committee's decision and to grant it an unconditional stay.  There is no reason to do so.

No harm will befall Pakistan if this Court proceeds to expeditiously resolve Pakistan's objections to the entry of judgment.  This action seeks only the conversion of the Award into an

enforceable judgment.  Execution of that judgment against Pakistan can only begin after this Court determines, upon a separate motion pursuant to 28 U.S.C. § 1610(c), that a reasonable time has elapsed but Pakistan has not voluntarily satisfied the Court's judgment.  Moreover, as directed by the Committee, TCC has provided a written undertaking (to the Committee's satisfaction) to ensure that any actions it may take in aid of execution are readily reversible, by placing any execution proceeds into escrow (under the Committee's control) until the Committee decides Pakistan's annulment application.  This carefully crafted directive from the Committee distinguishes this case from past cases granting stays, none of which involved the imposition of protective conditions even approaching those at issue here.  These protections are meant to safeguard TCC from any attempts by Pakistan to use delay to arrange its affairs to further frustrate TCC from collecting on a nearly decade old debt, while also protecting Pakistan by preserving any execution proceeds until the annulment petition is denied.  Pakistan has offered no basis for this Court to disregard the Committee's decision and Pakistan's choice not to comply with the Committee's stay conditions.  To nonetheless provide to Pakistan the benefit of a stay of U.S. enforcement proceedings would contravene the Committee's decision and further reduce TCC's likelihood of recovery.

1.      **An Indefinite Stay Will Not Materially Advance The Interests Of The Court Or Conserve The Parties' Resources**

Contrary to Pakistan's assertion, a stay of enforcement will not advance the Court's interest in judicial economy.  Mot. 11-13.  ICSID annulment applications are rarely granted, in no small part because the grounds for annulment are narrow.  The ICSID annulment proceeding is not an appeal.  Pakistan's argument that there is a likelihood of conflicting results asks this Court to ignore ICSID's very purpose and structure.  Article 53(1) of the ICSID Convention enshrines the finality of an ICSID award.  The Convention provides narrow, limited remedies once an award is issued— full or partial annulment (either of which allows for the recommencement of proceedings)—but

expressly forbids any appeal of the merits of the parties' dispute.  *See* ICSID Convention, arts. 52, 53(1).  As one ICSID annulment committee noted, an annulment proceeding "in no way consists of a means of appealing or otherwise revising the merits of the decision subject to supplementation or rectification.  Those sorts of proceedings are *simply not provided for in the ICSID system*."  *Compañía de Aguas del Aconquija S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision of the *Ad Hoc* Committee on the Request for Supplementation and Rectification of Its Decision Concerning Annulment of the Award, ¶ 11 (May 28 2003) (emphasis added, footnote omitted).  As ICSID itself reports, of the 228 ICSID awards rendered between 1966 and 2016, 90 annulments were sought, only 15 annulments were granted, and only 5 of those were granted in full.[11]  Thus, Pakistan's assertion that "[t]he pending annulment proceedings . . . may even render [this action] entirely moot" even after the ICSID stay is lifted is the height of optimism.  Mot. 11. Pakistan's odds are long.  In all likelihood, its annulment proceedings only postpone the inevitable.

Pakistan also vastly overstates the resources involved in proceeding to judgment before this Court.  While Pakistan endeavors to complicate this action by "rais[ing] many of the same issues that are already before the Committee," Mot. 12, the ICSID Convention and its implementing legislation make clear that these issues are *not* properly before this Court, and under the correct interpretation of those statutes and the FSIA, this Court need not and should not decide any issue raised by Pakistan's annulment application.  *See supra*, at 10-21.  Decisions that stay ICSID enforcement because of the risk that foreign states will "hav[e] to attack the validity of [an] arbitral award in two forums," *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, 397 F. Supp. 3d 34, 40 (D.D.C. 2019), thus misunderstand the ICSID Convention, and merit no weight.  Besides,

---

[11]  ICSID Updated Background Paper on Annulment for the Administrative Counsel of ICSID (May 5, 2016), ¶ 31, https://tinyurl.com/y258m34c.  "The rate of annulment for 2011–present is 3 percent, while the rate of annulment for 1971–2000 was 13 percent and for 2001–2010 was 8 percent."  *Id.* ¶ 32.

the supposed burden of briefing these purportedly overlapping issues is a sunk cost.  The issues will be fully briefed once Pakistan files its reply brief before this Court.

Pakistan's argument that the delay from its proposed extended stay through annulment "'would . . . be shorter than the possible delay that would occur if this Court were to confirm that award'" and it was subsequently annulled, Mot. 16, is similarly misguided.  Annulment is rare in all circumstances, but in all 15 instances of annulment from 1966 and 2016, the committees themselves stayed enforcement through annulment.  To TCC's knowledge, only one ICSID award has ever been annulled after a stay was lifted.  *See* Mot. 7 n.6.  In short, judicial economy favors following the Committee's lead.  For this Court to stay proceedings for a period longer than the Committee determined was appropriate does not advance judicial economy.[12]

### 2.     A Stay Would Unduly Prejudice TCC's Right To Recover For Pakistan's Misconduct

Pakistan downplays the near-decade that TCC has been waiting for compensation for Pakistan's bad acts in arguing that there would be no "'injury to the nonmovant from issuing a stay'" here.  Mot. 11 (quoting *Hulley Enters. Ltd. v. Russian Fed'n*, 211 F. Supp. 3d 269, 280 (D.D.C. 2016)).  Contrary to Pakistan's protests, a stay in these proceedings would mean hardship and genuine prejudice to TCC.  Pakistan has made no payment on the Award, has made no indication that it intends to honor the Award voluntarily, and has offered no guarantee that its assets in the United States will be preserved while the annulment proceedings continue.  Thus, the mere accrual of prejudgment interest is not sufficient to protect TCC unless that interest is readily recoverable.  Pakistan itself claims that its "economy is currently facing significant challenges and weaknesses" such that the Award cannot be readily paid.  Mot. 14.  Indeed, the Committee expressly authorized

---

[12]   Even if Pakistan's annulment application succeeded, it would be fully protected by the Committee's decision limiting collection to 50% of the Award and TCC's undertaking.

enforcement proceedings after Pakistan claimed it could not furnish a letter of credit for even 25% of the Award.  ECF No. 33-1, ¶ 9.  Any delay beyond that imposed by the ICSID system prejudices TCC's hard-fought right to recover damages for Pakistan's misconduct.

Notably, while arguing that delay will cause no prejudice to TCC, Pakistan offers no assurance of payment.  On the contrary, Pakistan has repeatedly demonstrated its reluctance to pay the Award.  Pakistan made its choice not to comply with the Committee's conditions for continuing a stay of enforcement.  It not only failed to provide a letter of credit ensuring partial payment of the Award; it also refused even to commit in writing to paying the Award if its annulment application is unsuccessful.  ECF No. 33-1, ¶ 9.  Pakistan neither provided the Committee an explanation for its failure to meet any of the conditions, nor requested additional time.  This case thus bears no resemblance to decisions excusing security because a "'sovereign state . . . is solvent and will comply with legitimate orders issued by courts in this country.'"  Mot. 13.

The absence of security likewise distinguishes this case from Pakistan's authority for claiming that TCC "will not suffer any hardship."  Pakistan invokes, for example, the District of Delaware's recent stay of further proceedings in *Crystallex Int'l Corp*, No. 1:17-cv-151, ECF No. 154.  *See* Mot. 16.  But in *Crystallex*, the underlying arbitration award (which is not an ICSID award) had already been confirmed as a judgment and a stay of *execution* on specific assets was ordered only after a court ruling levying on the assets.  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 132 (3d Cir. 2019).  Pakistan offers no such security here; indeed, it has chosen not to provide any security or an undertaking that it intends to pay the Award.  *Supra* at 10.  *Crystallex* provides no support of Pakistan's requested stay.

### 3.    Pakistan Offers No Argument That The Recognition Of The ICSID Award Will Cause It Any True Hardship

Pakistan's purported hardships in the absence of a stay are questionable at best.  Pakistan's

prospective fears all concern not what would occur upon confirmation of the Award, but rather the alleged impact of post-judgment proceedings. Mot. 14-16. But TCC cannot simply go out and execute upon sovereign assets. Rather, even once a judgment is entered, the FSIA only permits execution against sovereign assets upon Court approval upon a showing that a reasonable time has passed without Pakistan attempting to make good on the Court's judgment. *See* 28 U.S.C. § 1610(c). It is execution, not entry of judgment, that implicates Pakistan's assets. Pakistan will have every opportunity to argue after judgment is entered that execution should not proceed. Further, as directed by the Committee, TCC submitted an undertaking to put into escrow "any amounts collected through its enforcement of the ICSID Award" and to pay Pakistan "any amounts that Pakistan cannot recover from the escrow account" if the Award is annulled. ECF No. 33-1, ¶ 5. As Pakistan appears to acknowledge, *see* Mot. 14, this obviates any risk of non-recoupment by Pakistan should the Award be ultimately annulled.

Pakistan contends that permitting enforcement "now" would "effectively negate" the $6 billion loan it received from International Monetary Fund in 2019. Mot. 14. But proceeding to consider TCC's petition and recognizing the Award is not the same as permitting execution "now." It is merely the first of many steps towards collection. Nor can Pakistan's financial concerns negate either Pakistan's or the United States' commitment to the ICSID Convention. There is nothing improper in entering judgment against a debtor that fails to timely honor its debts.

### C.  There Is No U.S. Policy Interest That Warrants Ignoring U.S. Treaty Obligations To Enforce The ICSID Award

Drawing from an out-of-circuit decision that did not involve an ICSID award, Pakistan invokes the public interest as though it were a relevant factor here. Mot. 17 (quoting Mem. Order, at 4, 6, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. 1:17-cv-151, ECF No. 154 (D. Del. Dec. 12, 2019)). Even if consideration of public interest concerns were appropriate in the

context of a proceeding to enter judgment on an ICSID award—and they are not, *see* 22 U.S.C.
§ 1650a—such concerns actually favor the denial of a stay in this Court.

Here, the relevant public interest was established by the President and Senate in ratifying
the ICSID Convention and by Congress in enacting § 1650a.  The treaty and statute establish the
policy of the United States that ICSID awards should be enforced in accordance with the Conven-
tion.  Pakistan relies on a general statement in a Congressional Research Service report about U.S.
interests in Pakistan, but such a statement—even if it were authoritative—cannot amend a treaty
to which the United States and Pakistan agreed or a federal statute as enacted by Congress.

In any event, Pakistan's claim that allowing enforcement of the Award "would . . . under-
mine U.S. policy," Mot. 17, mischaracterizes the very source it cites.  Plucking from a 2019 Con-
gressional Research Service document on Pakistan-U.S. relations, Pakistan quotes a sentence on
"'vital U.S. interests'" in Pakistan, *id.*, without providing the context of the next sentence:  "In
January 2019, the U.S. Director of National Intelligence told a Senate panel of 'Pakistan's recal-
citrance in dealing with militant groups,' and predicted *Pakistan will continue to threaten U.S.
interests* 'by deploying new nuclear weapons capabilities, maintaining its ties to militants, restrict-
ing counterterrorism cooperation, and drawing closer to China.'"  ECF No. 34-6, at 2 (emphasis
added).  The next paragraph reminds readers that Osama bin Laden himself "enjoyed years-long
refuge in Pakistan."  *Id.*  Pakistan cannot prove any American policy of special treatment toward
Pakistan—and surely no treatment that would contravene American treaty obligations.

## CONCLUSION

This Court should deny Pakistan's motion to dismiss and should enter judgment on the
Award in TCC's favor in the amount and currency specified in the Award.

Dated: December 21, 2020

Robert Weigel, N.Y. Bar #1809284
rweigel@gibsondunn.com
Jason Myatt, N.Y. Bar #4450599
jmyatt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone:  212.351.4000
Facsimile:  212.351.4035

Respectfully submitted,

*/s/ Matthew D. McGill*

Matthew D. McGill, D.C. Bar #481430
mmcgill@gibsondunn.com
Matthew S. Rozen, D.C. Bar #1023209
mrozen@gibsondunn.com
Katherine Maddox Davis,
   D.C. Bar #888283826
kdavis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Tethyan Copper Company PTY Limited*

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 21, 2020, I caused the foregoing Petitioner's Opposition to Respondent's Motion to Dismiss to be filed with the Clerk for the U.S. District Court for the District of Columbia through the ECF system.  Participants in the case who are registered ECF users will be served through the ECF system, as identified by the Notice of Electronic Filing.

/s/ Matthew D. McGill
Matthew D. McGill
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
mmcgill@gibsondunn.com