**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **TETHYAN COPPER COMPANY PTY LIMITED,**<br><br>Plaintiff,<br><br>v.<br><br>**ISLAMIC REPUBLIC OF PAKISTAN**,<br><br>Defendant. |

Case No. 1:19-cv-02424 (TNM)

**<u>MEMORANDUM OPINION</u>**

Since 1966, Congress has required federal courts to grant full faith and credit to arbitral awards from the International Centre for Settlement of Investment Disputes (ICSID). *See* 22 U.S.C. § 1650a(a). This case involves the intersection of that mandate with the standards for waiver of sovereign immunity by foreign states.

In 2019, ICSID issued a $6 billion award against the Government of Pakistan. The award arose out of a long dispute between Pakistan and Tethyan Copper Company, an Australian mining company. Tethyan had submitted the dispute to ICSID arbitration according to the terms of a bilateral investment treaty signed in 1998 between Pakistan and Australia. Pakistan argued that ICSID did not have jurisdiction over the dispute. A tribunal disagreed and issued its award against Pakistan. Tethyan then petitioned this Court to recognize and enforce the award.

Pakistan essentially appealed the award at ICSID, seeking a wholesale annulment of the award or a modification of it. Those actions triggered automatic provisional stays of enforcement, all of which the Court applied to these proceedings. But those stays have all expired. Now, two years after Tethyan filed its petition—and over a decade after Tethyan commenced arbitration—Pakistan asks the Court to stay proceedings or, in the alternative, to

dismiss the petition entirely.  Because Pakistan has not shown its entitlement to a stay and D.C.
Circuit precedent demands deference to arbitrability determinations by ICSID, the Court will
deny both requests.

**I.**

This well-tenured dispute began in 2006, when Tethyan entered a joint venture with a
Pakistani province, Balochistan.  *See* Petition ¶ 7, ECF No. 1 (Pet.).  Under that agreement,
Tethyan could "explore potential copper and gold mining" in the province.  *Id.*  In 2011, Tethyan
applied to Balochistan for a lease to mine the Reko Diq deposit, located in the province's
northwest.  *See id.*  Despite the joint venture, Balochistan denied the application.  *See id.*  That
decision triggered events that ultimately landed the dispute here.

Nine months after the application denial, Tethyan referred the dispute to ICSID.  *See id.*
¶ 11.  That body was formed by the ICSID Convention, a multilateral agreement signed by 164
nations—including Australia, Pakistan, and the United States—that provides a framework for
arbitrating investment disputes between contracting states and nationals of other contracting
states and for recognition of any resulting awards.  *See* ICSID Convention, pmbl., Pet. Ex. 2,
ECF No. 1-2.  Tethyan made the referral under a bilateral investment treaty between Australia
and Pakistan (Treaty).[1]  The Treaty provides that when a signatory nation and an investor of the
other nation cannot resolve a dispute among themselves, "either party to the dispute
may . . . refer the dispute to [ICSID]."  Treaty, art. 13(2)(b).  ICSID convened a Tribunal in 2012
to arbitrate.  *See* Pet. ¶ 12.

The Tribunal took its time.  Over four years, it conducted 32 days of hearings.  *See id.*
¶ 13.  Finally, in November 2017, the Tribunal issued a Decision on Jurisdiction and Liability.

---

[1]  The full text of this treaty is attached to the Petition.  *See* Pet. Ex. 3, ECF No. 1-3.

*See* Rozen Decl., Ex. B at 635–1020, ECF No. 1-1 (J&L).[2]  The Tribunal first decided, over Pakistan's objections, that it had jurisdiction to hear Tethyan's claims.  *See id.* ¶ 688.  Next, it held that Tethyan had a legitimate expectation that Balochistan would approve the mining application and that Tethyan had relied on that expectation.  *See id.* ¶ 958.  Balochistan rejected the application on pretextual grounds so that Balochistan could start its own mining project using Tethyan's hard work.  *See id.* ¶ 1264.  Pakistan thus, through one of its provincial governments, had expropriated the value of Tethyan's investment, thereby violating multiple provisions of the Treaty.  *See id.* ¶ 1449.  Tethyan was entitled to "all damages and losses resulting from" Pakistan's breaches.  *Id.*

In July 2019, the Tribunal issued its damages determination.  *See* Rozen Decl., Ex. A at 5–633, ECF No. 1-1 (Award).  The Tribunal directed Pakistan to pay $4.087 billion in compensation, pre-award interest dating from the start of arbitration proceedings, $2.53 million in arbitration costs, $59.4 million in Tethyan's legal costs, and post-award interest compounded annually.  *See id.* ¶ 1858.  All told, the Award totals about $6 billion.  *See* Mot. to Stay at 10, ECF No. 34 (Mot.).

One month later, Tethyan petitioned this Court to enter an order confirming the Award and to enter judgment in the specified amounts.  *See* Pet.  From there, this case devolved into several contemporaneous stays.  In November 2019, Pakistan applied to ICSID to annul the award.  *See* Conlon Decl., Ex. A, ECF No. 34-3.  As required by ICSID rules, that application triggered a provisional stay of enforcement.  *See* Conlon Decl., Ex. E at 3, ECF No. 34-7.  The Court likewise stayed its own proceedings.  *See* Hr'g Tr. at 6, ECF No. 30.

---

[2]  All page citations refer to the pagination generated by the Court's CM/ECF system.  For the ICSID's decisional documents, the Court gives the page numbers now for the entire document but throughout this Opinion will cite to paragraph numbers used in those documents.

Seven months later, the Annulment Committee concluded that it would maintain a stay under certain conditions.  The Committee required Pakistan to (1) provide a letter of credit for 25% of the Award and (2) submit a letter from the nation's Minister of Finance promising that, if the Committee did not annul the Award, Pakistan would recognize it, pay it within 120 days, and not interfere in Pakistani courts with any amount recovered by Tethyan.  *See* Joint Status Report at 2, ECF No. 31.  If Pakistan did not comply with these requirements, the Committee would lift the provisional stay of enforcement against half of the Award.  *See id.* at 2–3.  For Tethyan to execute on that half, however, the Committee required Tethyan to promise that it would place any collected amounts into an escrow account controlled by an international escrow agent.  *See id.* at 3.

Pakistan did not comply with the Committee's conditions, so in October 2020 the Committee lifted the stay for half of the Award.  *See* Joint Status Report at 2, ECF No. 33.  The Court likewise lifted its own stay.  *See* Min. Order, Nov. 9, 2020.

Pakistan then moved to stay proceedings here until the Annulment Committee finishes its work.  In the alternative, Pakistan moved to dismiss Tethyan's Petition.  *See* Mot.  That motion became ripe in early 2021.  Before the Court could rule, however, Pakistan filed another application with ICSID, this time to revise the Award.[3]  *See* Joint Status Report at 1, ECF No.

---

[3]  One might think that ICSID annulment and revision proceedings are the same.  Indeed, Pakistan's revision and annulment applications seek the same outcome—a declaration that Tethyan is not entitled to damages.  *See* Amdt. to Renewed Motion to Stay at 7, ECF No. 46-1 (Renewed Mot.).  But the proceedings differ in bases and bodies.  A party may request revision based only on previously unknown facts that are "of such a nature as decisively to affect the award."  ICSID Convention art. 51(1).  In contrast, a party can move to annul an award on several grounds.  *See id.* art. 52(1).  And ICSID appoints a new panel of arbitrators to handle an annulment application.  *See id.* art. 52(3).  Revision applications go instead to the original tribunal that rendered the award.  *See id.* art. 51(3).  These details do not affect the Court's analysis, but they help situate the multiple proceedings at issue.

41.  As before, that application triggered a provisional stay on enforcement of the Award.  *See id.*
At the parties' request, the Court again stayed its proceedings "while the [ICSID] stay of
enforcement remains in place."  Minute Order, Mar. 25, 2021.

The Centre lifted that provisional stay six months later.  *See* Joint Status Report at 2, ECF
No. 42.  Since then, Pakistan has moved for a stay pending revision proceedings.[4]  *See* Renewed
Mot.  That later motion is ripe for disposition, as is Pakistan's earlier motion to stay or to
dismiss.  The Court addresses both motions.

## II.

After ratifying the ICSID Convention, Congress passed legislation to implement the
Convention's provisions.  Specifically, 22 U.S.C. § 1650a(a) provides that ICSID awards "create
a right arising under a treaty of the United States."  District courts "shall [ ] enforce[ ]" those
awards and give an award "full faith and credit as if the award were a final judgment of a court
of general jurisdiction of one of the several States."  22 U.S.C. § 1650a(a).  Congress also
prohibited courts from using the more robust form of judicial review available under the Federal
Arbitration Act to analyze ICSID awards.  *See id.*

These provisions mandate an "exceptionally limited" role for the Court in enforcing an
ICSID award.  *TECO Guatemala Holdings, LLC v. Repub. of Guatemala*, 414 F. Supp. 3d 94,
101 (D.D.C. 2019).  That said, courts do more than rubber stamp.  The Court must ensure that it
has subject-matter and personal jurisdiction; that the award is authentic; and that its enforcement
order tracks the award.  *See id.*; *see also Mobil Cerro Negro, Ltd. v. Bolivarian Repub. of
Venezuela*, 863 F.3d 96, 112 (2d Cir. 2017) (holding that 22 U.S.C. § 1650a does not provide an

---

[4]  To be clear, Pakistan has two ongoing ICSID proceedings—annulment and revision.  Pakistan
asks the Court for a stay until both proceedings end.

independent grant of subject matter jurisdiction over actions to enforce ICSID awards).  And to give "full faith and credit" to an ICSID award as if it were a final judgment in a state, the Court consults the "established procedures for enforcing state court judgments in federal court." *TECO*, 414 F. Supp. 3d at 101 (cleaned up).  The Court's role thus entails "more than summary enforcement" of an award.  *Id.* at 102.

The Foreign Sovereign Immunities Act (FSIA) guides the Court's jurisdictional analysis. FSIA is the "sole basis for obtaining jurisdiction over a foreign state" in U.S. courts.  *Argentine Repub. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).  Generally, FSIA immunizes foreign sovereigns from suit in federal courts, but "that grant of immunity is subject to a number of exceptions."  *Mohammadi v. Islamic Repub. of Iran*, 782 F.3d 9, 13–14 (D.C. Cir. 2015).  The parties dispute the applicability of two exceptions.

### III.

The Court first considers Pakistan's request for a stay.  Admittedly, courts usually must establish jurisdiction before moving onto any merits issue.  *See Foster v. Chatman*, 578 U.S. 488, 496 (2016).  Yet when a court contemplates on non-jurisdictional "threshold grounds" a delayed hearing of a case's merits, it may consider those grounds first.  *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (cleaned up).  As many judges in this district have held, "[t]he stay of a petition to enforce an arbitration award is one such threshold issue."  *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, 397 F. Supp. 3d 34, 38 (D.D.C. 2019); *see also RREEF Infra. (G.P.) Ltd v. Kingdom of Spain*, No. 19-cv-3783 (CJN), 2021 WL 1226714, at *2 (D.D.C. Mar. 31, 2021).

Generally, courts have an inherent power to stay proceedings before them.  *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  Tethyan argues, however, that only ICSID can impose a

stay on enforcement of its own awards.  Under this argument, Congress's direction in 22 U.S.C.

§ 1650a that courts "shall" enforce ICSID awards withdraws courts' discretionary authority to

delay enforcement of a valid award.  *See* Opp'n to Mot. at 45–49, ECF No. 35 (Opp'n).  This

argument contradicts most decisions in this district.  *See* Mot. at 15–16 (collecting cases).

Indeed, Tethyan identifies no court that has held that it lacks the power to stay enforcement of an

ICSID award.  In any event, the Court need not linger on this point.  The Court assumes that it

can stay ICSID proceedings.  This assumption does not hurt Tethyan because, as discussed

below, the Court will deny the motion for a stay.

When confronted with a request for a stay, the Court "weigh[s] competing interests and

maintain[s] an even balance between the court's interest in judicial economy and any possible

hardship to the parties."  *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 732–33 (D.C.

Cir. 2012) (cleaned up).  Put simply, the Court considers "the benefits of a stay, the hardship to

[Pakistan] of denying a stay, and any injury to [Tethyan] from issuing a stay."  *Hulley Enters.

Ltd. v. Russian Fed.*, 211 F. Supp. 3d 269, 280 (D.D.C. 2016).[5]

Start with the benefits of a stay to judicial economy.  Pakistan argues that the

Committee's eventual decision could impact proceedings here.  That is so because, as both

parties admit, Pakistan's arguments to the Committee are the same arguments it raised here.  *See*

Mot. at 18; Opp'n at 31.  Denying a stay would force Pakistan to litigate those issues in two

---

[5]  Pakistan argues that the Court should also consider the public interest of a stay, specifically its allegedly beneficial effect here on U.S. foreign policy towards Pakistan.  But Pakistan cites no binding authority requiring the Court to consider foreign policy and even admits that "public policy is not an express factor in the balancing test at issue."  Pakistan Reply in Support of Mot. at 17, ECF No. 37 (Reply).  And Pakistan offers no persuasive reason why timely enforcement of ICSID awards does not also serve foreign policy.  *See* Opp'n at 55.  The Court accordingly will not consider those issues in its stay analysis.  In any event, the Court disagrees.  *See Chevron Corp. v. Ecuador*, 795 F.3d 200, 209 (D.C. Cir. 2015) ("[E]nforcement of the arbitral award is fully consistent with the public policy of the United States . . . .").

places.  And, Pakistan says, a stay now ensures that the Court does not issue a ruling inconsistent with ICSID's final annulment decision.

The Court acknowledges that litigating the same issues in two forums often does not advance judicial economy.  *Accord RREEF*, 2021 WL 1226714, at *3.  But Pakistan protests too much.  Briefing before this Court on those issues is now complete—Pakistan thus has already litigated them in at least one place.  The Court need not wait to decide fully briefed issues.  Indeed, judicial economy also favors swift adjudication.

More, the likelihood of annulment by the Committee is low.  Based on historical data, Pakistan predicts its own chances of annulment at less than 30%.  *See* Reply at 12.  That minor chance of annulment—and therefore of inconsistent rulings between this Court and ICSID—does not warrant further delay on fully briefed and ripe merits issues.  Annulment is possible but unlikely.

So too for Pakistan's revision proceedings.  Pakistan points to no time when ICSID has granted a revision application.  *See* Reply in Support of Renewed Mot. at 4, ECF No. 49 (Renewed Reply).  And although Pakistan cites one judge in this district who stayed proceedings pending revision at ICSID, the judge did so summarily by minute order.  *See* July 24, 2019 Minute Order, *Karkey Karadeniz Uretim A.S. v. Islamic Repub. of Pakistan*, No. 18-cv-1461 (D.D.C., voluntarily dismissed Dec. 30, 2019).  That decision is therefore of limited persuasive value.

In sum, a stay would not benefit judicial economy.  The parties have fully briefed the relevant issues, and ICSID likely will not modify the Award.  At most, the low chance of modification means judicial economy is in equipoise between proceeding now or granting a stay.

Next, hardship to Pakistan of denying a stay.  Pakistan suggests a litany of bad consequences from proceeding to the merits and enforcing the Award.[6]  Enforcement and collection of assets would, Pakistan says, essentially negate its 2019 $6 billion loan from the International Monetary Fund, derail its economic stability, diminish its ability to fight COVID-19, and force it to engage in costly enforcement litigation around the world.  *See* Mot. at 20–21.  Pakistan acknowledges that the escrow requirement provides some protection.  *See* Reply at 15.  But, according to Pakistan, $3 billion in escrow means that money is unavailable to respond to COVID-19.  Escrow also does not preclude enforcement actions against Pakistan's non-cash assets, nor does it change that Pakistan will engage in global litigation against enforcement.  *See id.*

These arguments misconstrue the posture of this case.  If the Court were to proceed to the merits and enter judgment, that is but a preliminary step.  Tethyan can execute that judgment only once the Court determines that "a reasonable period of time has elapsed" after entry of judgment.  28 U.S.C. § 1610(c).  Tethyan will not immediately begin attachment of Pakistan's assets into escrow.  True, Tethyan could proceed with an execution action "as quickly as possible."  Reply at 14.  But what qualifies as a reasonable amount of time before execution "will of course vary according to the nuances of each case."  *Ned Chartering and Trading, Inc. v. Repub. of Pakistan*, 130 F. Supp. 2d 64, 67 (D.D.C. 2001).  Pakistan offers no reason why it could not argue those nuances—including the considerations it suggests now—during attachment and execution proceedings.

---

[6]  Pakistan assumes in these arguments that the Court, if it moves to the merits, will deny Pakistan's motion to dismiss and will enter judgment to enforce the Award.  The Court makes the same assumption in assessing Pakistan's arguments.

Pakistan's concerns about global litigation also do not sway the Court.  Pakistan assumes that if this Court proceeds now, other jurisdictions will do the same.  They might not.  They might disagree with this Court and grant stays of their own.  Or they might otherwise delay enforcement and attachment.  That Pakistan needs to litigate elsewhere is thus not so imposing a specter that the Court need delay its adjudication of fully briefed and ripe issues.

Finally, consider the hardship to Tethyan from a stay.  The obvious harm arises from Tethyan's wait of over a decade for compensation.  That delay hurts the economic interests of not only the company but also of its shareholders and employees, who poured money and effort into Tethyan's exploration of Balochistan.  A stay only prolongs justice denied.

Pakistan's past conduct also increases the likelihood of Tethyan's harm from a stay. Pakistan flouted ICSID's conditions for a prolonged stay when it failed either to provide a letter of credit for 25% of the Award or to recognize the Award.  The Court thus credits Tethyan's worry that Pakistan might use a stay to avoid "preserv[ing]" its U.S. assets "while the annulment proceedings continue."  Opp'n at 52.  Pakistan has provided no guarantee that, if the Court stays the case and the Committee does not find in Pakistan's favor, it will abide by that decision.[7]  A stay is cold comfort to Tethyan.

Pakistan retorts that it has "never been non-compliant with an ICSID award."  Reply at 17.  Pakistan's boast proves hollow.  Its own examples of alleged compliance differ markedly from this case.  Those arbitrations either settled, were discontinued by the claimant, or ended in a finding of no liability.  *See id.* at 17, n.6.  In none of those instances did Pakistan ultimately pay

---

[7] Pakistan notes that though courts often require movants to post security during a stay, courts in this circuit do not require security from sovereign states.  *See* Mot. at 19.  Fair enough, but that fact is largely irrelevant.  Pakistan can give other assurances of eventual compliance with and payment of the Award.  It has failed to do so.

an Award in full.  The Court thus cannot predict Pakistan's compliance with this Award based on that history.

Pakistan also responds that at least one judge in this district has granted a stay during ICSID annulment proceedings even when the defendant failed to abide by the Centre's conditions for a prolonged stay.  *See Union Fenosa Gas, S.A. v. Arab Repub. of Egypt*, No. 18-cv-2395 (JEB), 2020 WL 2996085, at *5 (D.D.C. Jun. 4, 2020).  But that underlying arbitral award "garnered a dissent, a relatively rare outcome" in ICSID decisions.  *Id.* at *4.  The court credited that dissent as rendering the likelihood of annulment more than "wishful thinking."  *Id.*  Here, in contrast, Pakistan involves only wishful thinking that the Committee will annul the Award, and no member of the original tribunal dissented.  More, *Union Fenosa* is expressly limited to its facts.  The court there based its decision on "several unique circumstances," including the dissent, *id.*, and refused to "suggest that a stay is always or even often warranted whenever a losing party petitions to annul" an award, *id.* at *5.  Given those statements, this Court also bases its decision on the unique facts of this case.

In sum, those facts are:  The parties have fully briefed all issues, making a stay somewhat detrimental to judicial economy; the preliminary nature of these proceedings means that denying a stay would not irreparably harm Pakistan; and granting a stay would prejudice Tethyan, particularly given Pakistan's refusal to commit to paying the Award.  The Court thus will deny Pakistan's motion to stay proceedings.

*     *     *

During briefing, the D.C. Circuit decided *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871 (D.C. Cir. 2021).  The parties informed the Court of this decision and debate its applicability here.

The Circuit affirmed denial of a motion to stay enforcement of an arbitral award pending an application to vacate the award.  *See id.* at 880.  The award there arose under a different arbitral framework—the New York Convention.  So the court reviewed several New York Convention-specific factors from a leading case, *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 317–18 (2d Cir. 1998).  The D.C. Circuit determined that district courts must, when considering a stay under the New York Convention, consider "(1) the general objectives of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation"; and "(2) the status of the foreign proceedings and the estimated time for those proceedings" to resolve.  *Stileks*, 985 F.3d at 879–80.

Those two factors—though from a different and accordingly nonbinding context— militate against a stay here.  Tethyan filed for arbitration in 2011, over ten years ago.  Pakistan registered its annulment application over two years ago, *see* Mot. at 11, and its revision application over one year ago, *see* Joint Status Report at 1, ECF No. 41.  Adding a stay to such a well-tenured dispute "hardly" promotes its "expeditious resolution."  *Stileks*, 985 F.3d at 880 (cleaned up).  And Pakistan submits no evidence, projection, or prediction about when the Committee or the Tribunal will finish their annulment and revision work.  The Court thus has no "estimated time for those proceedings"—denying a stay might force Tethyan to "sit on its award" for much longer, another fact supporting a merits determination now.  *Id.*

**IV.**

The Court next turns to Pakistan's motion to dismiss Tethyan's Petition.  Pakistan first argues that it has not waived its sovereign immunity under FSIA and that the Court therefore has no subject matter jurisdiction.  Tethyan responds that multiple FSIA exceptions apply to waive that immunity.  Pakistan argues in the alternative that the Court should not give the Award full faith and credit.  The Court confronts these arguments in turn.

**A.**

Recall that a foreign sovereign is immune from suit unless a FSIA exception applies.  *See Mohammadi*, 782 F.3d at 13–14.  The arbitration exception is at issue here.  That exception waives sovereign immunity in cases brought "to confirm an award made pursuant to [ ] an agreement to arbitrate" if the award "is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards."  28 U.S.C. § 1605(a)(6).

In arguing that neither exception applies, Pakistan makes the same argument.  According to Pakistan, it never agreed, under the Treaty's terms, to arbitrate this case at ICSID.  Article 13(2)(b) of the Treaty allows "either party" to refer a dispute to the ICSID for arbitration.  But when an investor of either nation makes that referral, Article 13(3)(a) says that the other nation "shall consent in writing to the submission of the dispute to the [ICSID] within thirty days" of receiving the investor's request to refer.  Treaty, art. 13(3)(a).  Pakistan asserts that it never provided such written consent.  *See* Mot. at 29.  Thus, it never agreed to arbitrate at ICSID.

The Court need only analyze this argument under the arbitration exception, which requires "an agreement to arbitrate."  28 U.S.C. § 1605(a)(6).  Under that exception, "the existence of an arbitration agreement, an arbitration award[,] and a treaty governing the award

are all jurisdictional facts that must be established." *Stileks*, 985 F.3d at 877.  The only question in dispute now is the existence of an arbitration agreement.

In disputes over the existence of an arbitration agreement, the D.C. Circuit applies a burden-shifting framework.  *See Chevron*, 795 F.3d at 204.  The plaintiff has a prima facie burden of production to show an arbitration agreement.  *See id.* at 204.  A plaintiff carries that burden by producing "copies of the [underlying treaty], the notice[ ] of arbitration, and the tribunal's decision."  *Stileks*, 985 F.3d at 877 (citing *Chevron*, 795 F.3d at 204).  That production creates "a presumption" that the treaty and notice of arbitration "constituted an agreement to arbitrate."  *Chevron*, 795 F.3d at 205.  The foreign sovereign then has a "burden of persuasion" to rebut that presumption "by a preponderance of the evidence."  *Id.* at 204.

Tethyan makes a prima facie case by presenting the Award, the Treaty, and its notice of arbitration.  *See* Treaty; Award; Davis Decl., Ex. A, ECF No 36-1 (Request for Arbitration). That production entitles Tethyan to a presumption of a valid arbitration agreement.  *Chevron*, 795 F.3d at 205.  To rebut that presumption, Pakistan must show "by a preponderance of the evidence" that those combined documents do not constitute a valid arbitration agreement.  *Id.* at 205.  But has Pakistan done so?

Recall that the Tribunal determined that it had jurisdiction over the dispute, *see* J&L ¶ 648.  That determination included a conclusion that Pakistan had given written consent to the Tribunal's arbitration.  *See id.* ¶ 646.  In essence, the Tribunal made an arbitrability conclusion that the parties had agreed to arbitrate.  *See Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (defining as a gateway question of arbitrability "whether the parties have agreed to arbitrate" (cleaned up)).  Tethyan argues that this Court must accept the Tribunal's arbitrability decision as binding for purposes of this action.  *See* Opp'n at 28–30.

Pakistan disagrees, saying the Court should make its own independent determination on the existence of an agreement. *See* Reply at 18–20.

The Court takes its cue from *Chevron*, which held that FSIA did not require a de novo review of arbitrability. 795 F.3d at 204–05. There, the D.C. Circuit found that the petitioner had made a prima facie case of an agreement. *See id.* at 205. The Circuit then affirmed the district court's conclusion—though not made in a FSIA jurisdictional analysis—that the prima facie documents constituted an agreement between the parties. *See id.* The Circuit thus found jurisdiction under the FSIA. *See id.* at 206.

The district court's reasoning in *Chevron*—affirmed by the Circuit—confirms this Court's jurisdiction under the FSIA. Ecuador argued that "it never consented to arbitrate the underlying dispute." *Chevron Corp. v. Repub. of Ecuador*, 949 F. Supp. 2d 57, 63 (D.D.C. 2013). Like Pakistan here, Ecuador sought an "independent, de novo determination" by the district court on arbitrability. *Id.* Judge Boasberg rejected that argument as "counter to the clear teaching in this circuit on the purpose and role of the FSIA" as a jurisdictional statute speaking only "to the power of the court rather than to the rights and obligations of the parties." *Id.* (cleaned up). Inquiring into the arbitrability of the underlying dispute would examine the contractual rights of the parties to arbitration "and would thus be beyond the reach of the FSIA's cabined jurisdictional inquiry." *Id.*

The Circuit's affirmance of that conclusion, *see Chevron*, 795 F.3d at 205, n.3, means that under *FSIA*—rather than under the New York Convention—arbitrability does not affect the Court's jurisdiction. Indeed, the Circuit has recently said so. *See Stileks*, 985 F.3d at 878 ("[T]he arbitrability of a dispute is not a jurisdictional question under the FSIA.").

Pakistan responds that the D.C. Circuit misread Judge Boasberg's opinion and that this Court still should analyze de novo the Treaty's language. *See* Reply at 20. That request runs headlong into *Stileks*. There, Moldova argued that the underlying treaty "did not give the arbitral tribunal jurisdiction of the dispute" and thus Moldova had not waived its immunity. *See Stileks*, 985 F.3d at 877. Like Pakistan, Moldova based its argument on the language of the treaty. *See id.* at 878. The Circuit found that Moldova's arbitrability argument was cognizable under the New York Convention, not under FSIA. *See id.* ("If Moldova is correct, it might have a defense under the New York Convention[.]"). That Convention allows for rejecting an award when the award concerns issues "not contemplated by or not falling within the scope of submission to arbitration" or that are "beyond the scope of the submission to arbitration." New York Convention art. V(1)(c).

The Circuit construed Moldova's arbitrability argument as arising under the Convention, even though Moldova used that argument to "bolster its claim of sovereign immunity" under FSIA. *Id.* The Circuit rejected that tactic. "[T]he arbitrability of a dispute is not a jurisdictional question under the FSIA[ ]" and an attempt to argue arbitrability under FSIA "conflates the jurisdictional standard of the FSIA with the standard for review under" an international arbitral framework. *Id.* (quoting *Chevron*, 795 F.3d at 205–06).

Pakistan's argument arises under the ICSID Convention, which has no provision like the New York one allowing non-recognition for awards outside the scope of a submission to arbitration. Pakistan thus attempts to argue arbitrability only at FSIA's jurisdictional stage, not some later merits stage. *Stileks* forecloses that argument and confirms that Pakistan's arbitrability argument cannot defeat the presumption that Pakistan agreed to arbitrate with Tethyan.

And even if the Court misreads that portion of *Stileks*, the next portion mandates deference to the Tribunal's arbitrability decision.  The Circuit reviewed de novo whether Moldova, through its signature on the treaty, had assigned arbitrability determinations to the tribunal.  *See id.* at 878–79.  The Circuit determined that by signing the treaty, Moldova had agreed to arbitrate before a tribunal with "the power to rule on its own jurisdiction."  *Id.* at 878 (quoting New York Convention rules).  The Circuit looked to *Henry Schein*, which held that when an agreement assigns arbitrability decisions to an arbitrator, "a court possesses no power to decide the arbitrability issue."  139 S. Ct. at 529.  Thus, because Moldova had signed a treaty granting arbitrability authority to the tribunal, "it [was] up to the tribunal to determine what the treaty means."  *Stileks*, 985 F.3d at 879.  The Circuit thus needed to "accept the arbitral tribunal's determination" that the treaty encompassed the claims against Moldova.  *Id.*  The Circuit had "no authority to delve into the merits of Moldova's argument" to the contrary.  *Id.*

So too here.  To be sure, precedents under the New York Convention do not bind the interpretation of an award under a different convention.  But the two Conventions are comparable enough on this point.  As in the New York Convention, the ICSID Convention grants a tribunal the authority to be "the judge of its own competence."  ICSID Convention, art. 41(1).  Stated simply, the ICSID Tribunal determines its jurisdiction over a dispute.  Thus, ICSID's jurisdictional power—as agreed to by Pakistan's signature on the Treaty—renders binding on this Court the Tribunal's arbitrability determination.  *See Stileks*, 985 F.3d at 879.  The Court therefore has "no authority to delve into" the merits of Pakistan's argument.  *Id.*  The Tribunal determined that it had jurisdiction over the dispute.  *See* J&L ¶ 648.  The Court cannot disturb that conclusion.

In other words, whether or not Pakistan agreed to arbitrate this dispute, it certainly agreed to be bound by the ICSID Convention, including the provisions granting tribunals the authority to decide whether a signatory agreed to arbitrate.  And the Tribunal found Pakistan agreed to arbitrate this dispute.

In sum, Pakistan's arbitrability argument is not cognizable under FSIA.  And even if it were, D.C. Circuit precedent requires the Court to defer to the Tribunal's arbitrability determination.  According to the Tribunal, Pakistan agreed to arbitrate.  Beyond that, Pakistan does not dispute that the ICSID Convention is an international agreement "in force for the United States calling for the recognition and enforcement or arbitral awards."  28 U.S.C. § 1605(a)(6).  Based on the Court's determination on the agreement to arbitrate, this action is "to confirm an award" governed by the ICSID Convention and "made pursuant to [ ] an agreement to arbitrate."  *Id.*  Thus, the FSIA waives Pakistan's sovereign immunity.  The Court therefore has jurisdiction[8] over this action.[9]

---

[8] Pakistan concedes that the Court has personal jurisdiction over it based on Tethyan's compliance with FSIA's service provisions.  *See* Reply at 28, n.7; *see also In re Sealed Case*, 932 F.3d 915, 922 (D.C. Cir. 2019) ("Unlike subject-matter jurisdiction, however, personal jurisdiction can be waived, meaning a party may consent to a court's personal jurisdiction." (cleaned up)).

[9] Because the Court determines that the arbitration exception applies, it need not consider whether the waiver exception also applies.  *See Bell Helicopter Textron, Inc. v. Islamic Repub. of Iran*, 734 F.3d 1175, 1182–83 (D.C. Cir. 2013) (noting a foreign state is immune under the FSIA "unless one of the enumerated exceptions applies").  The Court therefore also need not determine the preclusive effect of a decision by the High Court in the British Virgin Islands.  That court held that Pakistan's signature on the ICSID Convention did not impliedly waive the nation's sovereign immunity under U.K. law.  *See* Conlon Decl., Ex. B ¶ 51, ECF No. 46-4.  By Pakistan's own admission, that conclusion—assuming this Court gives it preclusive effect— would waive Pakistan's immunity only under the waiver exception.  *See* Renewed Mot. at 13.  It does not affect the Court's consideration of the arbitration exception.

**B.**

Now assured of jurisdiction, the Court decides whether the Award merits full faith and credit. Recall that the ICSID implementing statute requires courts to give awards "the same full faith and credit as if the award were a final judgment of" a state court. 22 U.S.C. § 1650a(a). The Court thus treats the Award "in the same manner as a state court judgment" and consults "established procedures for enforcing state court judgments in federal court." *TECO*, 414 F. Supp. 3d at 101–02 (cleaned up).

Pakistan first argues that the Tribunal lacked jurisdiction, thus precluding full faith and credit to the Award. *See* Mot. at 35–37. Unlike its earlier jurisdictional arguments, Pakistan argues here that the Treaty's definition of "investment" does not cover Tethyan's interest in the original joint venture. *See id.* at 36. The Tribunal held otherwise. *See* J&L ¶¶ 631–642. Under Pakistan's theory now, the Tribunal was mistaken and thus never had jurisdiction of the dispute. *See* Mot. at 36–37.

Longstanding precedent bars this attempt to recycle a losing jurisdictional argument. "[A] judgment is entitled to full faith and credit—even as to questions of jurisdiction—when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in" the original court. *Durfee v. Duke*, 375 U.S. 106, 111 (1963). In its filings before the Tribunal, Pakistan made the same argument it does now: The definition of "asset" divested the Tribunal of jurisdiction. *See* Davis Decl., Ex. B at 132–154, ECF No. 36-2 (Pakistan Counter-Memorandum); Ex. C at 84–110, ECF No. 36-3 (Pakistan Rejoinder). The Tribunal rejected it. *See* J&L ¶ 642. Thus, Pakistan's argument was "fully and fairly litigated and finally decided" before the Tribunal. *Durfee*, 375 U.S. at 111. Pakistan cannot use the same previously litigated jurisdictional argument—even one about subject matter jurisdiction—to

deny full faith and credit to the Award.  *See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706 n.9 (1982) ("A party that has had an opportunity to litigate the question of subject-matter jurisdiction may not, however, reopen that question in a collateral attack upon and adverse judgment.").

Pakistan next argues that the Court should deny full faith and credit because the Tribunal's $6 billion award violates due process.  *See* Mot. at 37–40.

The Court disagrees.  Due process constrains awards of only punitive damages, not compensatory ones.  *See State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). Pakistan suggests that the Award is "so large as to be akin to a punitive damages award."  Reply at 30.  Not so.  The Tribunal fashioned a figure to quantify "the market value" of Tethyan's investment had Pakistan not expropriated that investment.  Award ¶ 273.  That figure included the "future profits" of the investment absent expropriation.  *Id.* ¶ 335.  Repayment of market value and future profits "redress[ed] the concrete loss [Tethyan] has suffered" from Pakistan's conduct, a hallmark of compensatory damages.  *Campbell*, 538 U.S. at 416 (cleaned up). Nowhere did the Tribunal say that the $6 billion was "aimed at deterrence or retribution," the "broader function" of punitive damages.  *Id.*  And Pakistan offers no authority imposing due process constraints on compensatory damages.  Thus, due process does not limit the type of damages awarded here.

The Court will give the Award full faith and credit as required by 22 U.S.C. § 1650a(a).

## V.

For these reasons, the Court will deny Pakistan's motion to stay or dismiss Tethyan's Petition.  The Award is final and Pakistan is "obliged to abide by and comply with" it.  ICSID

Convention art. 53(1).  The Court likewise must "enforce the pecuniary obligations imposed by" the Award.  *Id.* art. 54(1); *see also* 22 U.S.C. § 1650a(a).  A separate Order will issue today.


Dated: March 10, 2022

_____
TREVOR N. McFADDEN, U.S.D.J.